KING, HOLMES, PATERNO & SORIANO, LLP
HOWARD E. KING, ESQ., STATE BAR NO. 077012
HKING@KHPSLAW.COM
MATTHEW J. CAVE, ESQ., STATE BAR NO. 280704
MCAVE@KHPSLAW.COM
1900 AVENUE OF THE STARS, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90067-4506
TELEPHONE: (310) 282-8989
FACSIMILE:  (310) 282-8903

Attorneys for Defendants and Counterclaimants
XX GLOBAL, INC. and JACQUES WEBSTER

[*Additional Counsel on Signature Page*]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| PJAM LLC,<br><br>          Plaintiff,<br><br>     vs.<br><br>XX GLOBAL, INC., JAQUES WEBSTER, and DOES 1-20, inclusive,<br><br>          Defendants.<br>_____<br><br>XX GLOBAL, INC. and JACQUES WEBSTER,<br><br>          Counterclaimants,<br><br>     vs.<br><br>PJAM LLC, JEFFERSON AGAR, ALEX MARTINI, PATRICK JOHNSTONE, and ROES 1 through 10, inclusive,<br><br>          Counterclaim Defendants. | CASE NO.: 2:18-cv-03192 JFW (MRWx)<br><br>Hon. John F. Walter<br><br>**JOINT MOTION IN LIMINE NO. 1: MOTION OF DEFENDANTS AND COUNTERCLAIMANTS XX GLOBAL, INC. AND JACQUES WEBSTER TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT ALEX MARTINI**<br><br>Hearing Date:    April 5, 2019<br>Hearing Time:    10 a.m.<br><br>Pre-Trial Conf.: March 29, 2019<br>Trial Date:        April 9, 2019<br><br>Action Commenced:  March 20, 2018 |

1   Defendants and Counterclaimants XX Global, Inc. and Jacques Webster
2   (together, "Defendants"), by and through their counsel of record, and Plaintiff and
3   Counterclaim Defendant PJAM LLC ("Plaintiff"), by and through its counsel of
4   record, hereby file this Joint Motion in Limine No. 1 regarding the admissibility of
5   Plaintiff's expert witness at trial.

6   This Motion is based upon the accompanying memoranda of points and
7   authorities and declaration of Matthew Cave, the files and records in this case, and
8   such further evidence and argument as the Court may permit.

9

10  DATED:  March 14, 2019            KING, HOLMES, PATERNO &
11                                    SORIANO, LLP

12

13                                    By:  _/s/ Howard E. King_____
14                                          HOWARD E. KING
15                                          MATTHEW J. CAVE
                                      Attorneys for Defendants and
16                                    Counterclaimants XX GLOBAL, INC. and
17                                    JACQUES WEBSTER

18  DATED:  March 14, 2019            HILL, FARRER & BURRIL LLP
19

20

21                                    By:  _/s/ Stephen J. Tomasulo_____
22                                          STEPHEN J. TOMASULO
                                      Attorneys for Plaintiff and Counterclaim
23                                    Defendant PJAM LLC, and Counterclaim
24                                    Defendants JEFFERSON AGAR, ALEX
                                      MARTINI and PATRICK JOHNSTON
25

26

27

28

KING, HOLMES,
PATERNO &
SORIANO, LLP

3975.065/1413594.1

JOINT MOTION IN LIMINE #1 TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT

# **TABLE OF CONTENTS**

**Page**

I.    Identification of the Matters in Dispute ............................................. 1

II.    Defendants' Memorandum of Points and Authorities ....................................... 1

    A.    Background ........................................................ 1

    B.    Legal Standard ..................................................... 2

    C.    Argument.......................................................... 3

           1.    Mr. Martini Is Not Qualified as an Expert ................................ 3

           2.    Mr. Martini's Opinions Lack Reliability..................................... 5

    D.    Speculative Testimony Regarding Revenues Should Also Be Excluded Under Rules 403 and 701......................................... 7

    E.    Conclusion......................................................... 8

III.    PJAM's Memorandum of Points and Authorities............................................. 9

# TABLE OF AUTHORITIES

**Page**

## CASES

*Broadcort Capital Corp. v. Summa Med. Corp.*
  972 F.2d 1183 (10th Cir. 1992).............................................................4

*Calhoun v. Yamaha Motor Corp.*
  350 F.3d 316 (3d Cir. 2003)..................................................................3

*Cashman v. Allied Products Corp.*
  761 F.2d 1250 (8th Cir. 1985)..............................................................9

*Claar v. Burlington Northern R.R. Co.*
  29 F.3d 499 (9th Cir. 1994).........................................................5, 6, 7

*Corp. Fin., Inc. v. Principal Life Ins. Co.*
  No. 05-20595-CIV, 2006 WL 3365602 (S.D. Fla. Nov. 20, 2006) ................8

*Daubert v. Merrell Dow Pharm., Inc.*
  509 U.S. 579 (1993) ...............................................................passim

*Hornblower & Weeks-Hemphill Noyes v. Lazere*
  222 N.W.2d 799 (1974)........................................................................9

*LifeWise Master Funding v. Telebank*
  374 F.3d 917 (10th Cir. 2004)..............................................................3

*Ollier v. Sweetwater Union High School Dist.*
  768 F.3d 843 (9th Cir. 2014)................................................................8

*Polaris Industries v. Plastics, Inc.*
  299 N.W.2d 414 ...................................................................................9

*Tire Co. v. Carmichael*
  526 U.S. 137 (1999) .............................................................................3

*United States v. Frazier*
  387 F.3d 1244 (11th Cir. 2004)............................................................7

## FEDERAL STATUTES

Fed. R. Evid. 701 ...................................................................................8

Fed. R. Evid. 702 ..............................................................................2, 14

Fed. R. Evid. 703 .................................................................................14

## JOINT MOTION IN LIMINE NO. 1: DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT

### I.  Identification of the Matters in Dispute

Defendants and Counterclaimants XX Global, Inc. and Jacques Webster (together, "Defendants") seek to exclude the expert testimony of Alex Martini ("Mr. Martini") at trial on the grounds that Mr. Martini is not qualified to testify as an expert and that his proffered testimony is not reliable.

Plaintiff and Counterclaim Defendant PJAM LLC, and Counterclaim Defendants Jefferson Agar, Alex Martini, and Patrick Johnston (collectively, "PJAM") maintain that Mr. Martini is qualified to testify as an expert and that his proffered testimony is reliable.

### II.  Defendants' Memorandum of Points and Authorities

#### A.  Background

PJAM plans to call one of its members, Alex Martini, to testify at trial as an expert witness "regarding the revenue PJAM would have received on February 3, 2018 if defendant Jacques Webster/Travis Scott had shown up and performed at the Myth Live venue in Minnesota as contemplated in the January 24, 2018 contract at issue in this lawsuit."  Declaration of Matthew Cave ("Cave Decl.") ¶ 2 & Ex. 1 at p. 1.[1]  PJAM produced the Expert Report of Alex Martini (the "Initial Report") on February 5, 2019.  *Id.*  The Initial Report is four pages long and does not include any attachments—for example, Mr. Martini's resume or any documents upon which he relied or consulted in forming his opinions.  *Id.*  After Defendants' counsel met and conferred with PJAM's counsel regarding the insufficiency of the Initial Report, PJAM agreed that Mr. Martini would promptly produce an amended expert report. *Id.* ¶ 3.

---

[1] Mr. Martini also "intends to testify as a percipient witness at the trial of this matter."  Cave Decl. Ex. 1 at p. 1.

PJAM produced the amended Expert Report of Alex Martini (the "Amended Report") on February 19, 2019.  *Id.* ¶ 4 & Ex. 2.  The Amended Report is identical to the Initial Report but also includes two attachments.  The first attachment is a list of events that Mr. Martini was involved with in some capacity.  *Id.*  The second is a list of music festivals, venues and events that Mr. Martini was involved with in some capacity, as well as personal references for Mr. Martini.  *Id.*

Defendants' counsel took Mr. Martini's deposition on March 5, 2019.  *Id.* ¶ 5 & Ex. 3.[2]  During the deposition, Mr. Martini admitted that the bases for his proffered opinions regarding how much money PJAM would have made if Mr. Webster had shown up and performed include his "instincts" and "common sense," and his "hope" that almost all available tickets would be sold on the day of the event at the door.  As discussed below, Mr. Martini did absolutely no analysis to support any of his opinions.  Accordingly, Mr. Martini should not be allowed to offer "expert testimony" regarding potential revenues from the event.

## B.  Legal Standard

Expert testimony "can be both powerful and quite misleading because of the difficulty in evaluating it."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993) (citation omitted).  The legal standard governing the admissibility of expert opinions is well established.  To be eligible to testify as an expert, the party offering expert evidence has the burden to show that the witness is "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  The proponent of the testimony must also show that such testimony will assist the trier of fact to understand evidence or determine a fact in issue; that "the testimony is based on sufficient facts or data;" that it "is the product of reliable principles and methods;" and that the witness "has reliably applied the principles and methods to

---

[2] At this time, only a rough copy of the deposition transcript is available. Defendants will provide the Court with an official transcript of Mr. Martini's deposition as soon as it becomes available.

1  the facts of the case." Fed. R. Evid. 702(a)-(d); *see also Daubert*, 509 U.S. at 588.

2  These requirements, sometimes referred to as the "trilogy of restrictions on expert

3  testimony: qualification, reliability and fit," are not limited to the context of

4  "scientific" expert testimony. *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321

5  (3d Cir. 2003) (citation omitted); *see also Kumho Tire Co. v. Carmichael*, 526 U.S.

6  137, 147 (1999). Thus, the court's "gatekeeping obligation" to ensure that expert

7  testimony on any relevant matter has "a reliable basis in the knowledge and

8  experience of [the relevant] discipline" applies to all types of expert testimony.

9  *Kumho Tire*, 526 U.S. at 148.

10      **C.    Argument**

11      This is precisely the kind of case where the Court should exclude proffered

12  "expert testimony." Mr. Martini is not qualified as an expert and his unsupported

13  and speculative opinions are not reliable.

14                  **1.    Mr. Martini Is Not Qualified as an Expert**

15      Mr. Martini is not qualified as an expert on the topic of how much revenue

16  PJAM *might* have made if Mr. Webster (p/k/a Travis Scott) had shown up and

17  performed at the event. To qualify as an expert, a witness must possess "such skill,

18  experience or knowledge in that particular field as to make it appear that his opinion

19  would rest on substantial foundation and would tend to aid the trier of fact in [its]

20  search for truth." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th

21  Cir. 2004). Mr. Martini does not possess the requisite experience or knowledge

22  related to the topic of his proffered testimony.

23      Mr. Martini is not an accountant. Cave Decl. Ex. 3 (hereinafter, "Martini

24  Dep. Tr.") at 70:12-15. During his deposition, Mr. Martini admitted that he relied

25  on "two accounting firms in Minneapolis" to keep track of "exact financial

26  number[s]" related to the event. *Id.* at 14:19-15:4. Mr. Martini has degrees in

27  economics and economic history; however, as discussed below, he did no economic

28  analysis to support his opinions. *Id.* at 70:18. Mr. Martini has never testified as an

1  expert witness on damages (or any other topic).  *Id.* at 70:19-20.  He did not even

2  take the lead in drafting his own expert report in this matter.  *Id.* at 75:22 ("Q: Who

3  wrote the report you or your attorney?  A: Mostly drafted by my attorney.").  The

4  only apparent basis for his "expertise," then, is "years and years of experience in the

5  night life industry."  *Id.* at 81:15-17.

6  　　General experience "promoting events" in some unspecified capacity at

7  venues outside of Minnesota (mostly in New York)[3]—and none with an artist "as

8  high profile as Travis Scott"—does not make Mr. Martini qualified to testify as an

9  expert regarding how much money PJAM might have made if Mr. Webster had

10  shown up and performed at a pre-Super Bowl event in a Minneapolis suburb.  *See*

11  Cave Decl. Ex. 2 (Amended Report) at 4 & Ex. 1.  Nor does Mr. Martini's general

12  claim that he has been associated with "noteworthy music festivals, events and large

13  scale venues," and "high profile promoters/owners," qualify him as an expert on this

14  topic.  *See id.* at 4 & Ex. 2.  As shown in detail below, there is no foundation—much

15  less a "substantial foundation"—for Mr. Martini's opinions; they are based merely

16  on what he "believed" and "hoped" would happen with sales on the day of the event.

17  Accordingly, Mr. Martini is not an expert and his testimony should be excluded.

18  *See LifeWise Master Funding*, 374 F.3d at 929 (excluding testimony of proposed

19  expert who had "no training in damage analysis, had never testified as a damages

20  expert or prepared an expert damages report, had never taught a course or lectured

21  on damages, and has never been published in the field"); *Broadcort Capital Corp. v.*

22  *Summa Med. Corp.*, 972 F.2d 1183, 1195 (10th Cir. 1992) (holding that witness

23  with some general experience and education in the relevant field lacked sufficient

24  qualifications to qualify as "expert" in that field).

25

26

27  [3] Mr. Martini admits that New York "is a different market than Minnesota."  Cave

28  Decl. Ex. 2 (Amended Report) at p. 3.

## 2. Mr. Martini's Opinions Lack Reliability

Mr. Martini's proffered opinions regarding how much revenue PJAM might have made if Mr. Webster had shown up and performed at the event also lack reliability. To determine whether an expert's testimony is reliable, a court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. In ascertaining the reliability of a particular expert's opinion, the court must consider "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002) (citing *Daubert*, 509 U.S. at 593-94). The court need not apply these factors mechanically, but nonetheless must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire*, 526 U.S. at 152. Significantly, testimony based on a witness's "subjective beliefs and unsupported speculation" is inherently unreliable and, therefore, inadmissible. *Claar v. Burlington Northern R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994).

Mr. Martini's Amended Report and deposition transcript make clear that he did no analysis whatsoever—much less a reliable analysis—in forming his opinions. Mr. Martini opines in the Amended Report that "PJAM would have sold at least 2,000 general admission tickets at an average price of at least $300." Cave Decl. Ex. 2 (Amended Report) at p. 1. But, he admitted during his deposition that:

    (1)    he had no idea how many tickets were actually sold before the event;

    (2)    he was "hoping" that the event would sell out at the door because "common sense" suggests that "people make the decision to attend the

1  Super Bowl within a day or two of the game," and Mr. Webster

2  "normally sells out his shows"; and

3  (3)  for the few tickets that were sold in advance,[4] $300 was "the intended

4  price," although in reality tickets were sold at various prices (as low as

5  $150) and Mr. Martini "hadn't done the math" to determine the actual

6  average price.[5]

7  Martini Dep. Tr. at 24:18-21, 33:13-16, 34:2-6, 38:14-39:1, 85:4-5, 89:3-6, 89:15-

8  17, 90:16-21.  Testimony about how many tickets one "believed" or "hoped" would

9  sell cannot possibly pass muster under *Daubert*.  *See Claar*, 29 F.3d at 502.

10  Mr. Martini also opines in the Amended Report that "PJAM would have sold

11  at least an average of $50 worth of drinks to each of the 2,000 general admission

12  entrants," and that "PJAM would have sold at least 30 tables at an average price of

13  $5,000 per table."  Cave Decl. Ex. 2 (Amended Report) at p. 1.  These opinions are

14  just as unsupported and unreliable as those related to potential ticket sales.  During

15  his deposition, Mr. Martini admitted that only "a few" (less than five) tables had

16  been sold before the event—he could not say the exact number—and that hours

17  before the event PJAM still had not decided whether there would be a cash or open

18  bar.  Martini Dep. Tr. at 24:22-25:1, 26:22-25, 87:22-88:19.  With respect to drink

19  sales specifically, other than opining (based on internet articles that were

20  "immediately available to him") that most people who attend a show or nightclub

21  drink "2.5 drinks while there," Mr. Martini offered no explanation of how he came

22  up with "$50 worth of drinks" sold to each guest.  For example, he does not say

23  _____

24  [4] Later Mr. Martini conceded that ticket sales were at "about 200" (for a 2,000 capacity venue) two days before the event.  Martini Dep. Tr. at 118:7-13.

25  [5] Mr. Martini also testified that at least a couple hundred tickets would be "comped"

26  on Saturday night, meaning they would generate no revenue.  Martini Dep. Tr. at 94:22-95:6.  Yet, his opinion that PJAM would have $600,000 in ticket sales is

27  based on selling 2,000 tickets at $300 each, which obviously does not account for

28  any comped tickets.

1  what types of drinks would be sold or at what price.[6]  *See id.* at 81:19-82:13.

2      Mr. Martini's own deposition testimony aptly summarizes the complete lack

3  of methodology in forming his opinions:  ***"The analysis is what me and my team***

4  ***believed."*** *Id.* at 38:25-39:1 (emphasis added).  Mr. Martini's testimony based on

5  his "subjective beliefs and unsupported speculation" regarding potential sales and

6  revenues is clearly inadmissible. *See Claar*, 29 F.3d at 502.

7      **D.    Speculative Testimony Regarding Revenues Should Also Be**

8          **Excluded Under Rules 403 and 701**

9      Under Federal Rule of Evidence 403, the Court may exclude evidence "if its

10 probative value is substantially outweighed by a danger of one or more of the

11 following: unfair prejudice, confusing the issues, misleading the jury, undue delay,

12 wasting time, or needlessly presenting cumulative evidence."  Here, there is a

13 significant risk that Mr. Martini's testimony regarding potential revenues, which is

14 based solely on speculation, will mislead the jury. *See Daubert*, 509 U.S. at 595

15 (noting that expert testimony "can be quite misleading because of the difficulty in

16 evaluating it"); *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004)

17 ("Because of the powerful and potentially misleading effect of expert evidence, . . .

18 sometimes expert opinions that otherwise meet the admissibility requirements may

19 still be excluded by applying Rule 403." (citation omitted)).

20     Nor should Mr. Martini—or any other witness[7]—be allowed to offer

21 speculation regarding potential revenues from the event to the jury as a percipient

22 _____

23 [6] About $100,000 worth of alcohol that PJAM purchased for the event has not been
   used.  Apparently PJAM is fighting with the owner of the nightclub over who owns
24 that alcohol.  Martini Dep. Tr. at 133:12:134:1.

25 [7] In Plaintiff's pre-trial witness disclosures, Mr. Martini is the only witness
26 designated to testify on the topic of PJAM's "expectations with regard to the Event."
   But, if any other percipient witness attempts to offer speculative opinions on
27 PJAM's potential revenues at trial, such testimony should likewise be excluded for
28 the same reasons as if Mr. Martini were offering it.

1  witness, to the extent that he or any other witness attempts to do so.  *See* Fed. R.

2  Evid. 701 (limiting percipient witness testimony to opinions "(a) rationally based on

3  the witness's perception; (b) helpful to clearly understanding the witness's

4  testimony or to determining a fact in issue; and (c) not based on scientific, technical,

5  or other specialized knowledge within the scope of Rule 701."); *Ollier v.*

6  *Sweetwater Union High School Dist.*, 768 F.3d 843 (9th Cir. 2014) ("[P]ersonal

7  opinion testimony is inadmissible as a matter of law under Rule 702, . . . and

8  speculative testimony is inherently unreliable." (citations omitted)); *Corp. Fin., Inc.*

9  *v. Principal Life Ins. Co.*, No. 05-20595-CIV, 2006 WL 3365602, at *3 (S.D. Fla.

10  Nov. 20, 2006) ("[T]he Court finds that Buster's testimony, to the extent it

11  represents a damages calculation is, at best, irrelevant and, at most

12  wholly speculative and misleading.").[8]

13  **E.  Conclusion**

14      For the reasons set forth herein, Defendants respectfully request that this

15  Court grant this motion in limine or, in the alternative, hold a *Daubert* hearing.

16

17

18

19

20

21

22

23

---

24  [8] "If a party fails to provide information . . . as required by Rule 26(a) or (e), the
party is not allowed to use that information or witness to supply evidence . . . at trial,

25  unless the failure was substantially justified or is harmless."  Fed. R. Civ. P.

26  37(c)(1).  To the extent that Mr. Martini attempts to establish actual (as opposed to
speculative) damages at trial, as a percipient witness or otherwise, he should not be

27  allowed to rely on or refer to documents or information that were not produced to

28  Defendants as required by Rule 26.

III.   **PJAM's Memorandum of Points and Authorities**

   **A.   Introduction**

   The parties have stipulated to the following facts:

   Jacques Webster is an entertainer who performs under the name "Travis Scott." XX Global, Inc. is the company through which Mr. Webster conducts his entertainment business.  The 2018 Super Bowl took place in Minnesota on Sunday, February 4, 2018.  On or about January 24, 2018, PJAM LLC d/b/a Twin Cities Live and XX Global, Inc. entered into the written contract ("the Contract") pursuant to which Mr. Webster agreed to appear and perform for thirty minutes at a venue called Myth Live in Maplewood, Minnesota on February 3, 2018 (the "Event"). Prior to the Event, PJAM LLC paid XX Global, Inc. $150,000 of the $200,000 that PJAM LLC owed pursuant to the agreement.  Jacques Webster did not appear and perform at Myth Live on February 3, 2018, as contemplated in the Contract. (See concurrently filed Final Pretrial Conference Order).

   Plaintiff seeks the lost profits it would have realized had Mr. Webster showed up and performed.[9]  "Minnesota law provides that damages for lost profits may be recovered so long as these damages are not speculative, remote, or conjectural." *Cashman v. Allied Products Corp.*, 761 F.2d 1250, 1252 (8th Cir. 1985), citing *Hornblower & Weeks-Hemphill Noyes v. Lazere*, 222 N.W.2d 799, 803 (1974). "Once the fact of loss has been shown, the difficulty of proving its amount will not preclude recovery so long as there is proof of a reasonable basis upon which to approximate the amount." *Id.*, citing *Polaris Industries v. Plastics, Inc.*, 299 N.W.2d 414, 418–19 (Minn.1980); *Leoni v. Bemis Co.*, 255 N.W.2d 824, 826 (Minn.1977).

   Assuming PJAM proves that Defendants breached the Contract, it is entitled to recover the lost profits it would have realized had Mr. Webster performed.  The

---

[9]   The Contract provides that Minnesota law applies.

1  only reasonable way to demonstrate such lost profits is to put on an expert in concert

2  and event promotion to opine on the revenues that would have been generated had

3  Mr. Webster performed.  Contrary to Defendants' misleading motion, Mr. Martini is

4  eminently qualified to opine on these issues, and his opinions are reasonable and

5  well-founded.  There is no basis to exclude his opinions.

6  **B.  Mr. Martini's Experience**

7  As set forth in his Supplemental Report, Mr. Martini describes his experience

8  as follows:

9  I graduated from the University of Venice in Italy in

10  1993 with a degree in Economics.  I then went on to study

11  Economic History at Princeton from 1996 to 2000.  For

12  approximately 20 years, I have been involved in the

13  entertainment and promotion business.  I have particularly

14  extensive experience in promoting and putting on shows,

15  concerts, club openings and related events.  I have put on

16  events at VIP destinations throughout the world.  These

17  locations include New York City, the Hamptons. Las

18  Vegas, Miami, Toronto, Montreal, Ibiza, Tulum,

19  Acapulco, Myconos, and many others.  I often work with

20  celebrity DJs such as Paul Oakenfold, Pete Tong, David

21  Morales, Erick Morillo, Swedish House Mafia and Deep

22  Dish.  Although none of these DJs are as high profile as

23  Travis Scott, their shows regularly generate extensive

24  revenues similar to what I anticipated for the Travis Scott

25  performance contemplated in this lawsuit.

26  Attached as Exhibit 1 is an overview of my work

27  experience promoting events.  I note that I have promoted

28  events at many other venues beyond those that appear on

KING, HOLMES,
PATERNO &
SORIANO, LLP

3975.065/1413594.1

10

JOINT MOTION IN LIMINE #1 TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT

1   this summary.

2        Attached as Exhibit 2 is a listing of noteworthy

3   music festivals, events and large scale venues I have been

4   associated with and high profile promoters/owners with

5   whom I have worked.  (Cave Decl., Exh. 2).

6   Exhibit 1 goes on to detail domestic and international venues at which he has

7   produced or promoted shows.  Exhibit 2 lists domestic and international events and

8   festivals with which Mr. Martini has been associated with that have collectively

9   generated millions of ticket sales.  (Cave Decl., Exh. 2).

10       In addition to this background, Mr. Martini acquired specific information

11  relevant to the Super Bowl Event.  Mr. Martini served as the CEO of PJAM in

12  connection with putting on the Super Bowl Event.  (Martini Dep. Tr. at 10:2-9).

13  PJAM spent approximately $1.5 million to put on the event.  (Martini Dep. Tr. at

14  14:17 – 15:11).  This included tens of thousands of dollars advertising on many

15  social media platforms.  (Martini Dep. Tr. at 26:5-15).  This experience

16  supplemented his already extensive knowledge as to the revenues one might

17  realistically expect to receive at a Super Bowl Event where a major star was to

18  perform.   Clearly, there is no credible argument that Mr. Martini lacks experience

19  regarding the promotion and production of high end shows and events.

20  **C. Information Considered by Mr. Martini**

21  In his report, Mr. Martini explained

22       My opinions are in large part based upon my

23   experiences as to what can be expected at a high end Super

24   Bowl event at a venue like Myth Live which holds over

25   4,000 people.  I have regularly been involved with events

26   that have generated more than $1 million in revenues in a

27   particular night.  I have seen many instances where tables

28   sell for $5,000, $10,000 or $30,000.  In some instances, I

have seen tables sell for more than $100,000.

In addition to my experience and background as set forth below, I researched the revenues generated by another VIP event in Minnesota on the same night as Travis Scott was supposed to show up and perform at Myth Live.  That event was hosted by Tao and, without a high end performer, generated more than $300,000 just in ticket sales.

I also looked into what similar types of events – other than the ones I had hosted - had generated in revenues.  In this regard, I consulted with counterclaim defendant Jefferson Agar, who assisted me in the preparation of our 2018 Super Bowl event.  Mr. Agar works as the director of sales and VIP services at the Mirage in New York City.  The Mirage is similar in size to Myth Live.  Mr. Agar provided me with revenue data for a performance in 2018 by Drake, a high profile hip hop artist.  That event generated over $800,000 in revenues.  Although New York City is a different market than Minnesota, the fact that our event was to be held on the Saturday of the Super Bowl in Minnesota weekend makes this a reasonable comp.

I also researched how successful Travis Scott's performances have been.  In particular, I noted that he sold out Madison Square Garden and performed at the halftime of this year's Super Bowl.

I also considered the fact that we generated more than $100,000 in revenues at Myth Live the night before

1       Travis Scott was to perform, with a lower profile act than

2       Mr. Scott.  Typically, the Saturday before a Super Bowl

3       generates much larger revenues than the Friday night.

4       This is because people tend to arrive on Friday and are less

5       inclined to go out.  Given Travis Scott's high profile status

6       and the fact that he was to perform on Saturday, it is

7       reasonable to expect that revenues would be many times

8       higher than Friday.  Also, between Mr. Scott and his

9       booking agent, they were charging us $235,000 for his

10      performance.  Implicit in the concept of demanding that

11      type of fee is the fact that one can expect to generate much

12      more than that in revenue.  (Cave Decl., Exh. 2).

13     In addition to the information specified above, Mr. Martini confirmed his

14 opinions through other means.  For example, he noted Mr. Webster/Scott's record of

15 selling out venues and discussed his opinions with nightlife experts including Eddie

16 Dean, who owned a venue where Mr. Scott sold 8,000 tickets on back to back

17 nights.  (Martini Dep. Tr. at 34:16–36:9).  Moreover, the owner of Myth Live

18 (where the Event was to take place) confirmed Mr. Martini's belief and experience

19 that hip hop shows generate most of their revenue at the door on the day of the

20 event.  (Martini Dep. Tr. at 38:l– 39:18).  Mr. Martini's opinions are reasonably

21 based upon relevant information and experience.

22     **D.  Legal Argument**

23     The Court must determine whether an expert's opinion rests on a reliable

24 foundation and is relevant to the issue before the Court.  *Daubert v. Merrell Dow*

25 *Pharmaceuticals, Inc.* (1993) 509 U.S. 579, 597.  Rule 703 of the Federal Rules of

26 Evidence states, in pertinent part:

27       An expert may base an opinion on facts or data in the case

28       that the expert has been made aware of or personally

1    observed.  If experts in the particular field would

2    reasonably rely on those kinds of facts or data in forming

3    an opinion on the subject, they need not be admissible for

4    the opinion to be admitted.

5  Fed. R. Evid. 703.

6        A review of the case law following *Daubert* shows that "the rejection of

7  expert testimony is the exception rather than the rule."  See Adv. Comm. Notes

8  (2000) to Fed. Rule Evid. 702.  The trial court's role as gatekeeper under *Daubert*

9  "is not intended to serve as a replacement for the adversary system."  *Id*.  As the

10  Court in *Daubert* stated, "Vigorous cross-examination, presentation of contrary

11  evidence, and careful instruction on the burden of proof are the traditional and

12  appropriate means of attacking shaky but admissible evidence."  509 U.S. at 595.

13        In McClure v. Biesenbach, Not Reported in F.Supp.2d (2007) 2007 WL

14  3047209, the District Court for the Western District of Texas was presented with a

15  motion in limine that is directly analogous to the present motion.  There, the

16  Plaintiff sought damages against a City and its representative for effectively

17  cancelling an outdoor rock concert that Plaintiff had promoted.  The court denied

18  defendants' motion to preclude Plaintiff's expert from testifying about the lost

19  profits it would have realized from the show.

20        The court explained:

21        When evaluating experience-based testimony, no

22        definitive test exists.  For experience-based experts, the

23        *Daubert* factors "may or may not be pertinent in assessing

24        reliability, depending on the nature of the issue, the

25        expert's particular expertise, and the subject of his

26        testimony."  *Id.* at p. 3.

27        The court further explained:

28        Because the opinions of Mr. Clainos fall under

1  experienced-based testimony, his opinions cannot be

2  readily evaluated under the scientific *Daubert* factors.  In

3  analyzing the Defendants' arguments, the court must

4  therefore critically examine claims of reliability relating to

5  Mr. Clainos' testimony.  *Id.* at p. 4

6  The court noted the parties' opposing positions on the reliability of Plaintiffs'

7  expert's (Mr. Clainos) opinions:

8  Defendants argue that Mr. Clainos' opinions regarding lost

9  profits based on the cancellation of the Rock On concert,

10  as well as opinions regarding McClure's future lost profits,

11  are not based on sufficient facts or data and are therefore

12  speculative and unreliable. . .

13  Plaintiffs respond that Mr. Clainos' testimony is the

14  result of deduction rather than speculation and that Mr.

15  Clainos relies on objective facts and sound methodology

16  in forming his opinions.  After reviewing the record,

17  including the list of sources relied on by Mr. Clainos to

18  formulate his opinions, the court will allow Mr. Clainos'

19  testimony on the subject of lost profits at this time.  *Id.* at

20  p. 4.

21  Mr. Clainos' "opinions and conclusions are primarily based on his experience

22  in the music industry as well as research conducted regarding overall industry

23  standards."  *Id.* at p.5  The court noted:

24  In forming his opinions regarding the lost profits from the

25  cancellation of the Rock On concert, Mr. Clainos reviewed

26  various Pollstar records, sponsorship agreements, and

27  detailed records involving contracts and expenses paid by

28  Maxximum for the Rock On concert.  Furthermore, Mr.

Clainos relied on conversations with other individuals who work in the concert business in order to validate his opinions regarding projected expenses and projected concert attendances.  He also used his thirty years of experience in concert promoting to form his projections.

*Id.* at p. 4.

The court ruled that Mr. Clainos was qualified to testify as an expert on lost profits and denied the motion.

The present motion is effectively indistinguishable from the motion in McClure.  Mr. Martini's opinions are based on virtually identical (and more reliable) information than that relied upon by the expert in McClure.  Defendants can cross-examine Mr. Martini and point out to the jury any faults and deficiencies they perceive in his testimony.  But there is no basis to exclude Mr. Martini's testimony.

**E.  Conclusion**

For all of the reasons set forth above, the present motion must be denied.

1  DATED:  March 14, 2019          KING, HOLMES, PATERNO &
2                                  SORIANO, LLP

3

4                                  By:  */s/ Howard E. King*
5                                        HOWARD E. KING
6                                        MATTHEW J. CAVE
                                   Attorneys for Defendants and
7                                  Counterclaimants XX GLOBAL, INC. and
8                                  JACQUES WEBSTER

9  DATED:  March 14, 2019          HILL, FARRER & BURRIL LLP
10

11

12                                 By:  */s/ Stephen J. Tomasulo*
13                                       STEPHEN J. TOMASULO
                                   Attorneys for Plaintiff and Counterclaim
14                                 Defendant PJAM LLC, and Counterclaim
                                   Defendants JEFFERSON AGAR, ALEX
15                                 MARTINI and PATRICK JOHNSTON
16

17

18

19

20

21

22

23

24

25

26

27

28