**EXHIBIT 1**

1      UNCERTIFIED ROUGH DRAFT; NOT TO BE CITED

2                      ALEX MARTINI

3      THE VIDEOGRAPHER:  This marks the beginning of

4    the videotaped deposition of Alex martini being

5    taken in the matter of PJAM LLC the XX Global ink et

6    al. being held in the United States District Court

7    Central District of California deposition is being

8    taken on March 5th, 2019 at approximately

9    10:19 a.m..

10          My name is Chris Jordan with TSG Reporting

11   the court reporter is Kim Reichert with TSG

12   Reporting.  Will counsel please state your names.

13      MR. KING:  Howard King and Matt Cave for the

14   defendants.

15      MR. TOMASULO:  Stephen Tomasulo for the

16   plaintiff and counter defendants.

17      THE WITNESS:  Emiliano de Sandro* Emiliano

18   Martini Lo Manto.  I am an expert witness.

19      THE VIDEOGRAPHER:  Will you court reporter

20   please swear in the witnesses.

21

22

23      THE WITNESS:  Yes, I do.

24   BY MR. KING:

25      Q    Good morning Mr. Martini.  You revealed to

Rough Transcript

Page 2

1    me before the deposition that this will be your

2    first deposition.  As such, I'm going to give you a

3    couple of the ground rules so you have some

4    understanding.

5            I'm going to ask questions, your counsel

6    may interpose objections.  You'll answer those

7    questions.  All of that will be taken down by the

8    court reporter as well as the videographer.  Because

9    the court reporter has to transcribe the

10   conversation, we try to not talk over each other

11   because it's impossible to transcribe two or three

12   people at once.

13           Do you understand that?

14   A      Yes, I do.

15   Q      Secondly, you've been administered an oath

16   obligating yourself to tell the truth under penalty

17   of perjury.  I want to make sure that you understand

18   that.

19   A      Yes.

20   Q      The third rule which I think you've got is

21   all your responses have to be audible because the

22   court reporter can't take down nods or shrugs.

23   A      Yes.

24   Q      Okay.  Although we're in a relatively

25   informal setting that oath that you've taken has the

Rough Transcript

Page 3

1    same force and effect as though you were in a court

2    of law before a judge or jury.

3              Do you understand that?

4    A     Yes.

5    Q     And it would be our intention to use your

6    testimony in this deposition at trial should we deem

7    it necessary because of that it's important that if

8    you don't understand my question, that you ask me to

9    clarify that.

10             Do you understand that?

11   A     Yes, I do.

12   Q     And do you understand that if you don't

13   ask me to clarify my question, I will assume and

14   argue later if necessary, that you fully understood

15   my question.

16             Do you understand that?

17   A     Yes, I do.

18   Q     Are you taking any drugs medication or

19   anything that would affect your ability to testify

20   today?

21   A     No.

22   Q     You refer to yourself in the introduction

23   as the expert witness.  What did you mean by that?

24   A     I think that is the objective of this

25   deposition.  I was asked to write as a report about

Rough Transcript

Page 4

1  my experience and in my life industry.  And I did so

2  in conserving * with my counsel and this is what we

3  produced.

4      Q    And I have to reports I'm going to show

5  you later that you produced.  Are you aware that two

6  reports have been given to us?

7      A    I don't know what you mean by two reports.

8  There's one report.  Maybe an appendix, but once you

9  show me what you have I will confirm it or not.

10     Q    There are two reports they're very similar

11 except on one you've added some exhibits, but that's

12 okay.  How many versions of those reports did you

13 prepare?

14     A    I'm not prepared to answer that.  Show me

15 the reports and I will be able to.

16     Q    No problem:  What is your role in PJAM?

17     A    PJAM stands for Patrick Johnston and Alex

18 Martini so the AM.  I'M part of the AM.  So I am one

19 of the principals.  I was the general manager of the

20 company.

21     Q    And that's the company who is the

22 plaintiff in this case?

23     A    Yeah.

24     Q    So just to be clear, you were the general

25 manager of the plaintiff PJAM?

Page 5

1      A     The managing partner, yes.

2      Q     You're the managing partner?

3      A     Yes.

4      Q     Were there any other managers -- let me

5   step whack I'm sorry?

6      A     No worries.

7      Q     LLCs typically have managers and members

8   not partners.  So let me ask were you a member of

9   PJAM?

10     A     Yes, I was.

11     Q     Do you guys call it PJAM or PJAM?

12     A     We don't really call it.  It's just -- it

13  was a legal entity that we are -- it was not really

14  like -- we publicize the events on the Twin City

15  Live, so we refer to that company as Twin City Live

16  as the brand name.  So PJAM was just --

17     MR. TOMASULO:  You're answering more than his

18  question.  Listen to his question only and answer.

19     THE WITNESS:  No worries.

20     MR. KING:  That's okay.

21     Q     I just want to get back.  PJAM is an LLC;

22     A     Sure.

23     Q     Right?

24     A     Yes.

25     Q     You are a member of PJAM?

Rough Transcript

Page 6

1          A     So --

2          Q     Are you Abe member of PJAM?

3          A     I they're companies different members.

4     There are other companies that are members of PJAM

5     check so I am a member of one of the company that is

6     a member of in PJAM.

7          Q     What company is that?

8          A     It's Jefferson Effect LLC.

9          Q     Jefferson Effect.

10         Q     How do you spell it?

11         A     E-f-f.

12         Q     Effect?

13         A     Yeah.

14         Q     Okay.

15         A     I am also.

16         Q     So what is your role in Jefferson Effect

17    LLC?

18         A     It's one of the entities that has

19    ownership of PJAM.  So the three entities.  One that

20    represents Patrick Johnston.

21         MR. TOMASULO:  Alex, he's asking you about a

22    specific question.

23         THE WITNESS:  Sorry.

24    BY MR. KING:

25         Q     Well, maybe your answer gives me the idea

Page 7

1    for a better question.

2        A    Sure.

3        Q    Who are the specific members of PJAM.   I

4    know one of them is Jefferson Effect LLC; correct?

5        A    Yes.

6        Q    Who are the other members of PJAM?

7        A    Art of Digital.

8        Q    Art of Digital?

9        A    Yes.

10       Q    Okay.

11       A    And there's a third company that's PJ -- I

12   don't remember the name.  They're all like

13   companies.  I can look for the record, but I don't

14   remember the company.  But it would be the company

15   representing Patrick Johnston.

16       Q    So the third company when you say

17   representing Patrick Johnston, do you mean owned by

18   Patrick Johnston?

19       A    I represent it -- I don't know the

20   ownership component of that company, but I know it's

21   his uncle and his father.  So I don't know what

22   level of owner ships there are, but I can look --

23   I'm going to try to be as forthcoming as possible.

24   I know sometimes there will be a situation where you

25   ask the question, but for the sake of brevity, I can

Rough Transcript

Page 8

1    explain to you how the corporate structure is.

2        Q     Please do I'm all for brevity.

3        A     I have a long relationship with Patrick

4    Johnston.  We call him PJ.  He approached me to

5    potential business to create a potential business

6    venture and I after, you know, talking about the

7    opportunity he indicated that he would be able to

8    bring in investors from investment from his family

9    and we created a partnership originally it was only

10   between two companies and then we brought in other,

11   other groups, other people involved.  So there's

12   three.

13           Right now there's three corporate entities

14   in PJAM.  Those are the people that are like members

15   of the LLC but there's a lot of other people

16   involved in this project, but from the legal point

17   of view those are the three companies that are

18   ownership.  And I think we can produce certainly

19   produce the cop * table of the company if requested.

20       Q     I appreciate.  That when did Mr. Johnston

21   approach you about a potential business venture?

22       A     It was I would say either December,

23   January 2017 it was the year before the event.  So I

24   would say around Christmastime 2016, January 2017.

25   So the event was 2018, yeah.

Page 9

1      Q     And did Mr. Johnston tell you what event

2      or events the potential business venture would be

3      involved with?

4      A     The whole idea was to create a company to

5      produce an event during Super Bowl.  So he at the

6      time was living in Minneapolis and he contact me and

7      said this is a great opportunity to produce events

8      in the past.  Why don't we do something for Super

9      Bowl?

10     Q     When did -- had you already -- is Art of

11     Digital your LLC?

12     A     I believe it's like an S corp and it is

13     not -- it is not mine.  Technically it belongs to my

14     wife.

15     Q     Why is that?

16     A     It's her company.

17     Q     So the three members of PJAM are Jefferson

18     Effect, Art of Digital and a third company owned or

19     controlled by Patrick Johnston; correct?

20     A     Yes.

21     Q     Is there a manager of PJAM?

22     A     I mean these are legal terms.  For all

23     intents and purposes I was running the operation.  I

24     believe it was like --

25     MR. TOMASULO:  Manager is a technical term.  Do

Rough Transcript

Page 10

1    you understand what a manager of an LLC is?

2         THE WITNESS:  No, I was like the CEO of the

3    company.

4    BY MR. KING:

5         Q    Okay.

6         A    I was making all executive decisions, all

7    the decisions ultimately were mine.  Nobody --

8    there's a lot of teamwork and input, but ultimately

9    I would make the final decisions on business.

10        Q    Did you put any money into PJAM directly

11   or indirectly?

12        A    I mean at the beginning I put money in.  I

13   was reimbursed after various stages.  So we have I'm

14   sure all the accounting is kept, but Stephen has

15   received all our accounting expenses and so forth.

16        Q    When was -- so you had helped me out by

17   saying you and Patrick originally had talked about

18   creating a business venture.  Did that -- sorry let

19   me step back.  You and Patrick had talks about

20   forming a business venture around the end of 2016 to

21   promote events for the Minneapolis Super Bowl;

22   correct?

23        A    Yes.

24        Q    Did you ultimately form such a venture?

25        A    Yes, we did its PJAM.

Rough Transcript

Page 11

1    Q    When was PJAM formed?

2    A    I have to double check.  Probably it was I

would say the rough draft of the operating agreement

started I believe around March of 2018.  March 2017,

the year before Super Bowl.  Again, it's easy to

verify.  I don't know the exact date when it was

signs about you I remember having a discussion with

Patrick's father about the potential success of the

venture in February 2017 and shortly after that with

PJ's uncle, Tom.

11    MR. TOMASULO:  He asked you when the venture

was formed.  Please try and stick to the question.

It's a much cleaner transcript that way.

14    THE WITNESS:  Okay.

15 BY MR. KING:

16    Q    So when was PJAM formed?

17    A    I just said I don't know the exact days,

but some time about a year before the actual event.

19    Q    And by that time had Mr. Jefferson Agar

come into the picture?

21    A    Not yet he was brought in business me

later.

23    Q    So --

24    A    Originally it was just PJ and me.

25    Q    What was the role of Patrick's father?

Rough Transcript

Page 12

1      A      The investor.

2      Q      In PJAM or in Patrick's company?

3      A      He was the investor -- Patrick's company

4   was a vehicle for them.  I don't know how they

5   shares ownership, but there were several wires from

6   that company into PJAM to fund the operations.

7      Q      What's Patrick's father's name?

8      A      The same Patrick Johnston.

9      Q      And his uncle was also an inconvenience

10  tore?

11     A      Yep.

12     Q      Were there any other investors?

13     A      Yes.

14     Q      Who?

15     A      Patrick's sister and there were two other

16  individuals that assisted financially.

17     Q      Who are they?

18     A      One was Manny Kess.

19     Q      How do you spell Kass, K-a-s-s?

20     A      I think it was K-e-s-s, but, yeah.

21     Q      Who is the other individual?

22     A      Anthony, last name is complicated.  It's a

23  lot of consonants.  Scnyderman.

24     Q      Okay.

25     A      I will provide the actual name.

Rough Transcript

Page 13

1      Q    We'll leave a blank in the transcript for

2   you to put that in?

3      A    Yeah,.

4           (INFORMATION REQUESTED: _____

5   _____.)

6      Q    Who is Manny Kess?

7      A    He was at the end -- towards the end of

8   the final months prior to the show, he was brought

9   in in order to create as a bigger team.  He also has

10  a lot of experience in producing events based in Las

11  Vegas so we approached him to be a as a part of our

12  group.

13     Q    And why did you need to approach him?

14  What was the need?

15     A    The idea was to build the biggest possible

16  team ahead of the event.  So he has a very large

17  roster of clients.  He operates out of Las Vegas so

18  the idea was to have reinforce our Las Vegas

19  potential clients so... .

20     Q    So what was the relationship between

21  potential Las Vegas clients and a show in

22  Minneapolis?

23     A    Well, it is not a show in Minneapolis it's

24  Super Bowl it just happens to be Minneapolis.

25  People fly from everywhere all over the United

Rough Transcript

Page 14

1   States, especially big spenders and Vegas is

2   particularly important because a lot of casino hosts

3   give tickets to clients to have a connection with

4   Las Vegas seemed very important.

5       Q    Was -- sorry, did you ever prepare any

6   sort of projections for any of these investors?

7       A    Yes, right from the beginning.

8       Q    When did you -- right at the beginning you

9   prepared those?

10      A    In February, February March 2017.

11      Q    Did you identify what talent would be at

12  the shows?

13      A    Yes.  We identified a roster of potential

14  clients.

15      Q    That's all in writing somewhere?

16      A    Yes.

17      Q    How much was invested by all the investors

18  into PJAM?

19      A    Originally we were hoping to contain the

20  budget at $1 million.  As we progressed in our

21  efforts we realized that to that was too

22  conservative.  So I don't know about the exact final

23  number.  I believe that when everything was said and

24  done we were in the neighborhood of 1.5.  That's how

25  much we actually spent.  Again, I would have to

Rough Transcript

Page 15

1    refer to numbers that we provided to our attorney

2    and with two accounting firms in Minneapolis that

3    have prepared -- prepared taxes.  Everything was

4    going through them so that --

5         MR. TOMASULO:  He asked how much you spent.

6    Please don't volunteer.

7         THE WITNESS:  I tend to be involved in

8    conversation.  I apologize.  So the actual number

9    it's there somewhere.  I believe it's around

10   1.5 million.  It would be easy to get an exact

11   figure.

12   BY MR. KING:

13        Q    And at the outset did you plan on having

14   multiple shows?

15        A    Yes.

16        Q    How many?

17        A    Very least we plans to have two shows

18   Friday and Saturday, but that was definitely the

19   Fridays and Saturday were planned.

20        Q    And when did you secure your talent for

21   the Friday show?

22        A    Secure like identified or signed a

23   contract?

24        Q    Signed a contract.

25        A    I believe it was December -- two talents

Page 16

1    two main acts.  So I believe one was in October the

2    first one and the second one was, I believe, was

3    late December.  Like it was around Christmastime so

4    it could be some days later, some days after, but

5    again, it would be easy to find an exact date.

6         Q    And I know the Friday night show was card

7    I b and future?

8         A    Future, yes.

9         Q    So who was signs first?

10        A    Future.

11        Q    And how much was he to be paid?

12        A    I think it was like 300,000.

13        Q    And Cardi B was signed?

14        A    Like maybe a couple months after.  It

15   was -- I can't remember if it was at the end of

16   December.  I believe it was around December 28,

17   but...

18        Q    How much was Cardi B to be paid?

19        A    So we paid her, I believe, 120-.

20        Q    And when did you first announce that these

21   people would be featured in a show the Friday night

22   before Super Bowl?

23        A    I don't remember the exact date.

24        Q    Did you at some point --

25        A    As soon as after -- the moment -- the day

Rough Transcript

Page 17

1   after we signed the contract officially then the

2   negotiations were quite intense.  So we knew already

3   in October -- even before October that those were

4   the artists.  It just took time to convince.

5        Q    But I think you said that you signed

6   Future in October and you think you signed Cardi B

7   in December?

8        A    Yes.

9        Q    So was it at that point in time when you

10  started your marketing and promotion for the show?

11       A    Well, the marketing promotion was start

12  with had much before.

13       Q    Okay.  Did you originally contemplate

14  having a different headliner for the Saturday show?

15       A    Absolutely.

16       Q    Who was it going to be?

17       A    We had a conversation with multiple

18  artists.  Kendrick Lamar took a lot of time

19  unfortunately to negotiate.  Drake, Chainsmokers.  I

20  mean we had an extensive negotiation week with most

21  of these performers.

22       Q    And they all fell through?

23       A    Some wanted too much money and you know,

24  we couldn't afford to pays their requests.

25       Q    Well, you had paid Future or you promised

Rough Transcript

1    to pay Future 300,000?

2         A    We paid Future.

3         Q    But with these other artists asking for

4    more?

5         A    $1 million or more.

6         Q    When did you start discussions with Travis

7    Scott or his representatives?

8         A    So Travis Scott was named floated around

9    quite a bit.  The first time that I have a record or

10   recollection of discussing Travis' name was also

11   around October, right around the time we booked

12   Future.  And Travis had a very successful show in

13   New York and the person that booked Travis at that

14   show is a personal friend and he and I discussed

15   booking Travis.

16        Q    Who is that?

17        A    E-d-d, Eddie **.

18        Q    When did you or PJAM first make contact

19   with Travis or his representatives about performing?

20        A    Well, the first representative -- the

21   first time we spoke to a lady that was an agent at

22   the time for Mr. Scott.  I believe it could be like

23   December, in December.  There was a third party that

24   was mediating that offer. someone that --

25        MR. TOMASULO:  Stick to the question please.

Rough Transcript

Page 19

1        THE WITNESS:  Right.

2   BY MR. KING:

3        Q    Well, I actually think you were getting

4   there because the question was when did you first

5   contact Travis or his representatives.  I was in

6   contact with her with the representative through a

7   third parties.  And ultimately she was asking for

8   too much money so we put things on hold base the

9   request was, I believe, $400,000.

10       Q    Who was the third party who was mediating

11  this?

12       A    It was Mr. David Geller.

13       Q    And who was the representative who

14  Mr. Geller was supposedly talking to?

15       A    It was Travis Scott's personal manager.  A

16  lady.

17       Q    A female?

18       A    Yes.

19       A    She was the manager at the time of Travis'

20  agency.

21       Q    But you never talked to her?

22       A    Yeah, I think I was copied on some of the

23  e-mail.

24       Q    So the discussions broke down because

25  somebody communicated to you Travis wanted too much

Rough Transcript

Page 20

1  money?

2      A    I saw the e-mail.  The e-mail was

3  something like $395,000.

4      Q    And when was that?  What was the date of

5  that?

6      A    I have to check, but.

7      Q    Can you estimate?

8      A    December.

9      Q    So by -- as of December 5 weeks or so

10  before this Super Bowl you had no artists for

11  Saturday night; right?

12      A    That is not correct.

13      Q    Okay?

14      A    We have artist we didn't have the top, the

15  big name artist.  And in my experience there was

16  never a time where we were not going to have an

17  artist there was always going to be a show on

18  Saturday night.

19      Q    Who did you have committed to perform on

20  that Saturday night show as of December of 2017?

21      A    Sure.

22      MR. TOMASULO:  Let him finish his question

23  please.

24      MR. KING:  I'll start over.

25      Q    As of December 2017 who did you have

Page 21

1    committed to perform on that Saturday night.

2        A    So we had two DJs that in the past have

3    performed with Mr. Scott as well and have quite a

4    significant following in the hip hop community.  One

5    is DJ Spade and the other one is DJ Reach.

6        Q    Anybody else committed to perform on that

7    Saturday night as of December of 17?

8        A    No.

9        Q    At some point did you sign up Gucci Manne?

10       A    This is a complicated question.

11       Q    Okay.

12       A    It requires a lot of context.

13       Q    So let's get there in a minute then?

14       A    Okay it's very complex.

15       MR. TOMASULO:  The question was whether you

16   signed Gucci Manne.

17       THE WITNESS:  Yeah.

18       MR. KING:  That was the question thank you.

19       MR. TOMASULO:  Give him a yes or no let's start

20   with that.

21       THE WITNESS:  Yes, we had signed a deal with

22   the company.

23       MR. TOMASULO:  Just, yes.  That was a yes-or-no

24   question.  He'll ask you further questions okay.

25       THE WITNESS:  Yeah.

Rough Transcript

Page 22

BY MR. KING:

1

2     Q     Did you ever sign a deal with Gucci Manne?

3     A     Yes.

4     Q     Or was it some company?

5     A     Gucci Manne was performing at another

6  venue with another group of promoters.  We

7  approached them and we signs a deal, a contract with

8  them so that Gucci Manne performance was effectively

9  merging with our performance.  So they would cancel

10 their dates and Gucci Manne would then perform at

11 our show.

12    Q     So you never had a contract with Gucci

13 Manne; correct?

14    A     We had a contract with these promoters.

15    Q     Did you ever have a contract with Gucci

16 Manne?

17    A     I would have to check.  I'm not sure.

18    Q     Did Gucci Manne perform on the night

19 before the Super Bowl?

20    A     Saturday night?

21    Q     Yes.

22    A     So Gucci Manne came to the show.  Came

23 late and refused to perform.

24    Q     Why?

25    A     He indicated that his pay was as

Rough Transcript

Page 23

1    supporting -- a supporting act not as main artist

2    and he said that if Travis was not playing he would

3    not play also.

4         Q    So your testimony is -- were you there

5    that night?

6         A    I was there for some part of the night.

7         Q    Were you there when Gucci Manne arrived?

8         A    I was just about to leave.

9         Q    So you were there when Gucci Manne

10   arrived?

11        A    Yes.

12        Q    So were you a witness to him refusing to

13   go on?

14        A    I was a witness of Gucci Manne promoters

15   saying that he would not perform unless Travis would

16   perform also.  And I believe we have that in writing

17   as well.

18        Q    Were you a witness to somebody telling

19   Gucci Manne why Travis Scott wasn't there?

20        A    No.  I wasn't a direct witness.

21        Q    Did Gucci Manne get paid anything?

22        A    Of course.

23        Q    Even though he didn't perform?

24        A    We paid the promoters in advance.

25        Q    So did DJ Spade perform that night?

Rough Transcript

Page 24

1     A    I believe so.

2     Q    Did DJ Reach perform that night?

3     A    He definitely performed.

4     Q    Anybody else perform that night?

5     A    Yes.

6     Q    Who?

7     A    A list of local talent and performers.  We

8  were trying to fill the night in the absence of

9  Mr. Scott.

10    Q    How many people were there that night when

11 you were?

12    A    There I can't remember.

13    Q    How many customers were there?

14    A    A lot less than we were hoping for.

15    Q    I got that, but how many?

16    A    To be honest I don't know the exact

17 number.

18    Q    Okay.  Do you know how many tickets had

19 been sold in advance of the show?

20    A    I don't know how many tickets were sold in

21 advance, no.

22    Q    Do you know how many tables were sold in

23 advance of the show?

24    A    A few.

25    Q    What does that mean under five?

Rough Transcript

Page 25

1    A    Yes.

2    Q    How much was a table?

3    A    I think our main one was $5,000.

4    Q    And did those people get refunds?

5    A    Some people got refunds.  Some people

6    canceled their credit card statement.  So we had

7    instances where people came.  I believe it was over

8    $10,000 billed and they just canceled the credit

9    card fee and got a refund.

10   Q    So $10,000 of table refunds?

11   A    That's just one client.  I would have to

12   ask my manager for the night for the actual number.

13   Q    So in preparing your report you didn't

14   actually do any calculation of how many tickets were

15   refunded or how many tables were refunded or

16   cancelled?

17   A    No.

18   Q    Is that correct?

19   A    I don't think it was requested of me --

20   for me.

21   Q    You don't know how many people actually

22   showed up?

23   A    It would be easy to find.  I could provide

24   it at a later time if needed.

25   Q    Okay.  Do you think marketing and

Rough Transcript

Page  26

1    promotion is important to the success of I show like

2    the show you hoped to put on that Saturday night?

3          A     I think marketing promotion is important

4    all the time.

5          Q     And what sort of black continuing and

6    promotion had PJAM anticipated doing for the

7    Saturday night show?

8          A     We had quite significant fates book and

9    social media marketing.  Tens of thousands of

10   dollars were spent.  There's a record of that, but

11   on ads purchased on Google, Google ads and Facebook

12   ads.  I believe Instagram ads as well.  We printed a

13   lot of fliers.  The whole city was blanketed with

14   it.  We had radio ads.  And we had a lot of

15   promoters promoting.

16         Q     But you didn't have any significant

17   presales, did you?

18         A     What does it mean significant?

19         Q     I don't know you tell me.  Did you have

20   any significant sales before the day of the show?

21         A     I don't know what significant means.

22         Q     How many sales of tables or tickets did

23   you have before the day of the show?

24         A     I just said I can provide the number.  I

25   don't know.

Page 27

1      Q    You don't know as you're sitting here

2  today; correct?

3      A    No, I said I have to verify that.

4      Q    Do you know when Travis Scott signed his

5  contract to appear?

6      A    It would be if I remember correctly a

7  couple weeks before the show.

8      Q    What was the date of the show?

9      A    The date of the show was February 2nd or

10  something like that.

11      Q    February 3rd?

12      A    February 3rd, yeah.

13      Q    Do you know the date of the contract that

14  Mr. Scott signed?

15      A    I just don't know.

16      Q    I'll show it to you in a minute.  I'll

17  represent it says as of January 24th.

18      A    That's the final draft.  The initial --

19  there's a contract that was circulating way before

20  that.

21      MR. TOMASULO:  That's not the question.

22      MR. KING:  There's only one contract; right.

23      THE WITNESS:  Sure, but you're referring to the

24  final draft,.

25  BY MR. KING:

Rough Transcript

Page 28

1      Q    Is there more than one signed contract for
2  this performance?

3      A    No, there's only one.  So you asked for
4  the date of when the contract was signed.

5      Q    I did?

6      A    And that's January 24 you said right?

7      Q    I'm saying that's the date on the
8  contract.  I believe it was signed several days
9  later, but I don't know.  That's why I'm asking you
10 if you don't know.  You may not know.

11     A    I just remember those days were quite
12 hectic.  It takes a lot of preparation to do
13 something of this magnitude.

14     MR. TOMASULO:  Alex please just focus on the
15 question okay.

16     THE WITNESS:  Sure.

17 BY MR. KING:

18     Q    Did you start promoting and marketing this
19 show before a contract was signed?

20     A    I'm not sure.

21     Q    Was the Friday night show a financial
22 success?

23     A    It was a first step.

24     Q    Did you lose money or make money on Friday
25 night?

Rough Transcript

Page 29

1      A     Well, technically I wouldn't look at it

2   like this, this way because it was always the

3   teaser, appetizer leading up to the bigger show.  So

4   sure, you know, we were expecting maybe a couple

5   hundred thousand dollars more on Friday, but the

6   majority of the bulk of the money we were expecting

7   to generate on Saturday night.

8      Q     So Friday night I know you paid the

9   artists at least $420,000; right?

10     A     Yeah.

11     Q     You didn't gross anywhere near $420,000

12  did you?

13     A     No.

14     Q     And you paid rent for the venue correct

15  that night?

16     A     Well, really the rent it was -- the

17  majority of the money that we were expecting, we

18  were expecting to generate on Saturday night.

19     Q     Okay.  Did you pay rent for the venue?

20     A     Yes.

21     Q     For two nights?

22     A     Yes.

23     Q     Is there a written agreement?

24     A     Of course.

25     Q     How much was the rent for the two nights?

Page 30

1    A    It was $240,000.

2    Q    Did you have to pay staff for Fridays

3    night?

4    A    Yes.

5    Q    How much?

6    A    I have all the numbers with my accountant,

7    but it was certainly like as you I mentioned the

8    entire show was in the neighborhood of $1.5 million.

9    Q    No, I'm only talking about Friday night

10   now.  Did you spend 1 million?

11   A    No, collectively this effort.

12   Q    I'm asking about Friday night?

13   A    I don't separate it.  The people were

14   there.  I don't know -- you can't separate this is

15   for Friday or this is for Saturday.  This was a show

16   that was put together and there's a number, one

17   number.  I wouldn't separate between Friday and

18   Saturday.

19   Q    Well, you lost money on Friday night, but

20   you hoped to make it back out of profit on Saturday.

21   Is that a correct statement?

22   A    I think -- I don't know if it's correct.

23   I think the statement is we were putting together an

24   event over the course of two days and there was I a

25   budget for these two days and we fell short from our

Rough Transcript

Page 31

1   targets and our goal and certainly like Friday was

2   less successful than we hoped for, but I don't think

3   you know I would feel comfortable in separating

4   Friday and Saturday.  I would say that Twin City

5   Live was one event and the bulk of the revenue were

6   supposedly coming from Saturday night.

7        Q    How many tickets had you sold for Friday

8   night in advance of the day of performance?

9        A    I don't have the number off the top of my

10  heads.

11       Q    And you don't know how many were sold in

12  advance for the Saturday night show; correct?

13       A    I mean -- there is quite an extensive team

14  of people and I as a businessman I hire people that

15  manage the front of the house.

16       Q    Right.

17       A    So I would have to ask my general manager.

18       Q    Well, Mr. Martini you're here today as the

19  expert witness to testify as to what the profits

20  would have been right?

21       A    Sure.

22       Q    Would you agree that all the questions I'm

23  asking are relevant to an opinion of what the

24  profits might have been?

25       MR. TOMASULO:  Object that calls for a legal

Rough Transcript

Page  32

1    conclusion, but you can answer.

2        THE WITNESS:  I just think they're legitimate

3    question -- I don't know if they're legitimate

4    question in the sense that it will establish how

5    much could have been made, but all of the answers --

6    I can provide very specific answers, there's a lot

7    of numbers and I have quite extensive staff working

8    on the ground.  So my general manager would be able

9    to tell exactly how many tickets were sold.  That

10   was not my role.

11       Q    Right.

12       A    My role was to coordinate a large team.

13       Q    It's your intention to give an opinion as

14   to how much you would have made had Travis Scott

15   showed up for the show; right?

16       A    Yes.

17       Q    Would it be relevant in doing sort of a

18   scientific analysis to know how many tickets had

19   been sold before the show was canceled?  Would that

20   be relevant to your opinion?

21       A    I don't think it would be relevant in the

22   sense that a lot of these hip hop shows are, you

23   know, shows where people go and pay cash at the

24   door.

25       Q    Upon what analysis do you base that

Page 33

1  conclusion?

2       A     On people going to Super Bowl event and

3  trying to decide where to go and you know, they will

4  decide based on what's on the menu.  A lot of times

5  you make a decision once you are with your friends.

6  This is not like just going to the opera ticket that

7  you book three months before.  A lot of people don't

8  even know they're going to Super Bowl until their

9  team is participating.  So a lot of travel

10  arrangements are made quite at the last minute.  So

11  I don't know -- I'm not sure like you know that I

12  could assess the success of the show based on the

13  presale, but I think I can assess the success of the

14  show based on the fact that if Travis normally sells

15  out his shows there's no indication for me to

16  believe he wouldn't sell out this show.

17       Q     Okay.  So you've made a number of

18  statements and I didn't write them all down.  You

19  said travel arrangements for Super Bowls are made at

20  the last minute is that true?

21       A     For participant, people that attend the

22  Super Bowl.  People that go to see the game.

23       Q     And what do you mean by last minute?

24       A     I mean that, you know, you can decide

25  whether or not you're going to go to the game.  In

Rough Transcript

Page 34

1    the few days before the game.

2         Q     And upon what specific data do you make

3    that conclusion that people make the decision to

4    attend the Super Bowl within a day or two of the

5    game?

6         A     It's common sense.

7         Q     Common sense?

8         A     If your team is going you might want to

9    make the decision, but if your team is not going to

10   the game maybe you don't necessarily want to go.

11        Q     And on what basis did you conclude that

12   because Travis Scott sells out other shows he would

13   have sold out this show?

14        A     What do you mean?  I don't understand the

15   question.

16        Q     I think you testified it was your opinion

17   that one reason you believe Travis Scott would have

18   sold out this show is that he sold his other shows.

19   Is that what you said?

20        A     Well, I think my point is that certainly

21   that was my hope given that he has a pattern of

22   selling out shows to a higher celebrity like Travis

23   would have been very profitable for our show.

24        Q     That was your hope?

25        A     Based on Travis' track record.

Page 35

1    Q    What track record did you study to reach

2    that conclusion?

3    A    I've seen other -- I looked at previous

4    shows and I can tell you that even the show in New

5    York where he sold 8,000 tickets and it was in New

6    York City.  I think it was two days back to back.

7    And I had an extensive talk to people that produced

8    that show.  So I certainly -- certainly coupled with

9    Mr. Scott's fame led me to believe that he would

10   bring a lot of people.

11   Q    Did you -- do you know what Pollstar is?

12   A    Pollstar?

13   Q    Yes.

14   A    No.

15   Q    Did you access any database -- strike

16   that.  Are you aware that there are databases that

17   will give you ticket sales for all performers at all

18   venues?

19   A    Yes.

20   Q    Did you consult any of those databases?

21   A    No.

22   Q    In reaching your conclusions?

23   A    No.

24   Q    Did you go on your instinct that he would

25   sell out?

Rough Transcript

1       A     No I talked to other people that are in

2   the night life industry.

3       Q     You talked to somebody in New York who

4   told you that Travis had sold 8,000 tickets for two

5   days of shows?

6       A     Someone who is the owner -- the person

7   that owned the show.

8       Q     Who is that?

9       A     I mentioned before, Eddie Dean **.

10      Q     Did you talk with Eddie about how long he

11  marketed and promoted that show in New York?

12      A     No.

13      Q     Wouldn't that be relevant to trying to

14  determine whether you could have an equal chance of

15  success?

16      A     I think maybe a few years ago, yes, but I

17  think these days with social media and Twitter and

18  all these media ways to reach people that go out, I

19  think this is less relevant.

20      Q     But your fundamental basis for concluding

21  you would have made the type of profit you're going

22  to testify to is that there would have been a flood

23  of people buying tickets the day of show; right?

24      A     Yes.

25      Q     And you base that -- I want to make sure I

Rough Transcript

Page 37

1    have all the bases for that opinion?

2         A    Yes.

3         Q    Would you agree that's sort of a

4    fundamental basis of your opinion that you would

5    have made money?

6         A    Yes.

7         Q    What time -- did you ever announce that

8    the show was canceled?

9         A    Yes.

10        Q    What time on that Saturday did you

11   announce?

12        A    I think it was around lunchtime or maybe

13   3:00 p.m.

14        Q    And what form did that announcement take?

15        A    I think it was I believe like it was

16   social media.

17        Q    Do you know what social media

18   specifically?

19        A    It was also the results of tickets that

20   was purchased so everybody that purchased tickets

21   received an e-mail saying that Travis was not

22   performing and offering for a refund.

23        Q    And I'm sorry that was around 3:00 p.m. on

24   that Saturday?

25        A    I have to check the time, but the day of

Page 38

1    for sure.

2         Q    Right.  And did you get communications

3    back from people either cancelling or commenting?

4         A    I think most people opted for a refund.

5    Again, all the ticketing part was managed by Anthony

6    was one of the investors in PJAM, Anthony

7    Scnyderman.  So I would have to ask him for the

8    exact time that the e-mail went out so I can provide

9    that later.

10        Q    So as of when that e-mail went outlets

11   just say it was 3:00 o'clock in the afternoon or

12   2:00 o'clock in the afternoon the day of the show?

13        A    Yes.

14        Q    Wouldn't it be relevant in forming your

15   opinion about what you would have made to know how

16   many pick tickets had been sold by then the day of

17   the show?

18        A    As I mentioned before I think a lot of

19   people would just come to the venue to purchase

20   tickets at the door.

21        Q    That's what you hoped for?

22        A    Yes.

23        Q    But you have no basis?  You've done no

24   analysis to help you reach that conclusion; right?

25        A    The analysis is what me and my team

Rough Transcript

Page  39

1    believed.

2        Q    Right.

3        A    There's hundreds of years of night life

4    experience in the people that work on the show.

5        Q    Did you do any sort of a compilation of a

6    list of other shows that had generated 80 or

7    90 percent of their ticket sales on the day of the

8    show?

9        A    We talked to the owner of the club and he

10   told us that the majority of his hip hop shows, for

11   example, 50 cents or other alias tip hop artist

12   would be cash at the door.

13       Q    And who is that who is the owner?

14       A    The owner of the club Mike.

15       Q    What's his name?

16       A    Mike Ogren.

17       Q    Do you know how to spell that?

18       A    O-g-r-e-n, Ogren.

19       Q    You talked to somebody in New York -- you

20   talked?

21       A    I talked to a lot of people in general,

22   but you just asked me to pinpoint, for example,

23   somebody that could say or potentially say -- repeat

24   what I just said right.

25       Q    Right.

Page 40

1      A    And I know I can definitely attest that

2 he --

3      MR. TOMASULO:  I think you're answering the

4 question -- you didn't let him finish his question

5 please let him do that.

6      THE WITNESS:  Sorry.

7 BY MR. KING:

8      Q    I'll ask a different question.  The show

9 went on that night just without Travis Scott; right?

10      A    Yes.

11      Q    And without Gucci Manne?

12      A    Gucci Manne was on the bill, he just

13 elected not to perform.

14      Q    Did you pay the staff who worked Friday

15 night?

16      A    Yes.

17      Q    Who was responsible for paying the staff?

18      A    There were different, different groups.

19 PJAM was responsible.  Different -- different groups

20 that work in different capacities.  So, yes, the

21 staff you mean the waitresses.

22      Q    Yes?

23      A    Yes.

24      Q    Was there some drama over that weekend

25 about PJAM not having enough cash on hand to pay the

Rough Transcript

Page 41

1   obligations that it incurred with respect to both

2   shows?

3        A    Yeah, I would specify what you mean by

4   drama, but certainly it was a hectic weekend.

5        Q    Isn't it true that you were short on cash?

6   You didn't have enough cash to pay expenses

7   including the remaining $50,000 in cash that would

8   have been owed to Travis?

9        A    I -- there was a rumor circulated by the

10  person that brokered the contract between us and

11  Travis.  The person violently demanded to be paid

12  before the show and we said that we would pay after

13  the show as per our contract.

14       Q    Have you seen any text messages with

15  Mr. Agar talking about scrambling to get cash and

16  not having availability because his bank was in New

17  York and he was not Minneapolis?

18       A    In Johnston.

19       Q    Yes, Mr. Johnston have you seen

20  correspondence to that effect?

21       A    I think I have seen correspondence saying

22  I can't pull out $25,000 from an ATM and today is

23  Saturday.  So, yeah, I've seen that I think.  It's

24  pretty obvious I can't take $25,000 with an ATM even

25  if I have $25,000 in the bank account.

Rough Transcript

Page 42

1      Q      Do you know why PJAM needed $25,000 in

2   cash on that Saturday?

3      A      Well, I absolutely do know why.  Mr. Coon

4   Coon, the gentleman that refers to himself as Coon

5   was threatening everybody associated with PJAM

6   demanding violently for his brokers fee before

7   Travis comes to New York -- to Minneapolis.  So,

8   yes, you know he basically harassed multiple people

9   demanding that his $25,000 or whatever balance was

10  owed to him to be paid before Travis applied to to

11  Minneapolis.

12     Q      What did you understand Coon's role to be?

13     A      I understood he was a personal friend of

14  Travis Scott and he would be the one -- he wouldn't

15  be the one.  He's the one that was able to reduce

16  the fee, the regional fee from $395,000 that was

17  asked of us.  He was able to reduce it tow $200,000.

18  So that's why we chose to deal with this individual.

19  I didn't know him personally.  He was wrote up by

20  yet another person that was promoting -- he was

21  promoting the Philadelphia area.

22     Q      Was it your understanding that in addition

23  to paying Travis' fee you also owed a fee?

24     A      Yes.

25     Q      To Coon?

Rough Transcript

Page 43

1       A     Yes, we paid partial amount of that.

2       Q     But you didn't have cash to pay the

3    balance on that Saturday?

4       A     That's not correct.  He demanded all the

5    money up front before Travis came.  And we said to

6    him initially this is not what the contract says.

7    And he literally forced us to give him all the cash

8    that we had in the safe, took $10,000.  I don't know

9    if it's ten or 11,000.  I have to check.  In as a

10   very threatening and borderline violent way in front

11   of several witnesses.  And cameras in the

12   establishment.  After that he demanded to pick up

13   the rest from our hotel.  We told him that it being

14   five in the morning we didn't have that type of cash

15   on hand so he went to sleep and said he would pick

16   it up in the morning.  I was leaving at the time and

17   he was communicating with PJ, Patrick Johnston

18   demanding the cash.  And at that point that's when

19   PJ said it's Saturday in Minneapolis I I don't know

20   how much money was owed 15,000 or $25,000, whatever

21   balance he demanded, there was certainly a lot of

22   drama about this not missing, but completing payment

23   for this individual.  And it was certainly not

24   pleasant.

25       Q     PJAM didn't have $50,000 in cash on

Rough Transcript

Page 44

1    Saturday that would have been owing to Travis after

2    the show; correct?

3         A    I don't remember.

4         MR. TOMASULO:  Can you read back the question.

5              (Whereupon, the record was read as

6    follows:

7              "Question:

8

9         THE WITNESS:  I don't think we would have to

10   pay in cash.  I don't think our contract said cash.

11   BY MR. KING:

12        Q    If you assume you had to pay in cash

13   $50,000 is that that Saturday night?

14        A    We paid by wire each time to Mr. Scott.

15        Q    Listen to my question.

16        A    Sorry.

17        Q    If you assume that you had to pay the last

18   $50,000 in cash on Saturday night, is it true that

19   PJAM did not have 50,000 in cash?

20        A    We tried to do all our business using

21   wire.  And even the $10,000 that essentially was

22   extorted by us by Mr. Coon, that's something that we

23   didn't like.  So I don't know why anybody would

24   demand a cash payment.  We like to do everything

25   aboveboard and send wires.

Rough Transcript

Page 45

1      Q    Did you have $50,000 in cash on Saturday

2   February 2nd?

3      A    Is this relevant?

4      MR. TOMASULO:  It's within the scope of

5   discovery so at trial we would have a fight over an

6   objection, but you can answer.

7      THE WITNESS:  Before Travis Scott arrived in

8   the safe --

9      MR. TOMASULO:  No, there's just a simple

10  question.  It's a yes or no or I don't know

11  question.  Okay.

12     THE WITNESS:  Well, we didn't have it before he

13  arrived.  We might have had it after the show.

14     Q    Depending on how the show performed?

15     A    Sure.

16     Q    I'm going to show you a document I'm going

17  to mark as Exhibit No. 1.

18     MR. TOMASULO:  Can we take a quick break so I

19  can run to the restroom?

20     MR. KING:  Yeah, sure.  We'll go off the

21  record.

22     THE VIDEOGRAPHER:  Off the record.  The time is

23  1116.

24               (A recess was taken from ****** to

25  ******.)

Rough Transcript

Page 46

1          THE VIDEOGRAPHER:   Back on the record.   The
2     time is 1126.
3     BY MR. KING:
4          Q     I've handed you Exhibit 1, but I have a
5     question or two before I ask you about it.
6          A     Yep.
7          Q     What time -- was Future the headliner on
8     Friday night or was Cardi B?
9          A     I think when we booked Future he was a
10    headliner.   I think in terms of the variety
11    certainly by the time the event happened maybe Cardi
12    B was surfing a waive of note right which one can
13    argue made her the headliner, but I think our
14    understanding when we booked Future was that he was
15    the headliner.
16         Q     Who performed last on Friday night?
17         A     I think Future -- card I performed first
18    and Future after.
19         Q     Do you know what time Future performed?
20    What time he went on?
21         A     No, I don't remember.
22         Q     Were you there?
23         A     Of course I was there.   I was working.
24         Q     Yeah.   Do you know an estimate of what
25    time he went on?

Rough Transcript

Page 47

1      A    1:00 I'm not sure.

2      Q    There's no curfew at this club.  You could

3  go all night?

4      A    No, we were closing.  Closing at 2:00 a.m.

5      Q    2:00 a.m.

6      Q    But would 1:00 a.m. be, all other things

7  be considered, be a time slot for the headliner in

8  this type of event?

9      A    No, no.

10     Q    Well, isn't the idea to keep people there

11 as long as possible buying cocktails?  Is that one

12 of the goals?

13     A    I think the goal is to put on a good show

14 for your customers.

15     Q    Is your best recollection that Future went

16 on at 1:00 o'clock in the morning?

17     A    Yeah, between 12:30 and 1:00.

18     Q    Is it true you knew Travis could not go on

19 that late on Saturday night?

20     A    Of course.

21     Q    Why is that?

22     A    Because we agreed to have him perform

23 early so he could leave to go back to, I believe,

24 Las Vegas.

25     Q    Did you understand he had to be in Las

Rough Transcript

Page 48

1    Vegas by 1:00 a.m. on I guess it would be

2    September 14?

3          MR. TOMASULO:  Not September.

4          MR. KING:  I'm sorry February 4th.

5          THE WITNESS:  I understood yes keeping in mind

6    the time difference.

7          Q    Right.

8          A    So we understood with a private jet he

9    would be able to be in Vegas at the time he needed

10   to be.

11         Q    Right.  I just want to make sure we

12   understand that time was 1:00 a.m. Las Vegas time

13   3:00 a.m. --

14         A    I don't remember what time he asked us to

15   be in Vegas.

16         Q    Okay.

17         A    I remember we had negotiations on time and

18   we all agreed on putting Travis first.

19         Q    Okay.  And you agreed to provide

20   transportation that would assure him of being back

21   in Las Vegas by 1:00 a.m. Las Vegas time; right?

22         A    I remember agreeing on putting on Travis

23   early and, yes, we agreed to provide transportation.

24   We actually provided.  We paid for transportation a

25   private jet waiting for Travis to come to

Rough Transcript

Page 49

1   Minneapolis and waiting or the tarmac to go to

2   Vegas.

3        Q    Before I get to that I might have some

4   questions on that as you would imagine?

5        A    Sure.

6        Q    I just want to make sure that

7   fundamentally everybody on your side understood he

8   had to be back in Las Vegas by 1:00 a.m.; right?

9        A    I mean if that -- I'm not 100 percent sure

10  that I spoke to him to that extent.  My role was to

11  ensure the performance in Minneapolis.  And so we --

12  when this discussion came up we agreed that he would

13  be able to perform first and we talked about as

14  early as 10:00 p.m. in Minneapolis.

15       Q    I just want to make sure that you

16  understood whether you talked to Travis or not, that

17  you on behalf -- I think you said you were the guy

18  in charge right?

19       A    Yeah.

20       Q    You understood that Travis Scott could

21  only come to Minneapolis if he was assured he would

22  be back in Las Vegas by 1:00 a.m.; right?

23       A    Yeah, we had a discussion to that extent.

24       Q    You understood that.  I'm not asking about

25  a discussion.  You understood that the only way upon

Rough Transcript

Page 50

1   which Travis could perform at your show in

2   Minneapolis is if you assured him he would be back

3   in Las Vegas by 1:00 a.m. to perform in Las Vegas?

4      A    To be honest by that point it was not

5   exactly -- I wasn't thinking about Travis falling

6   the show.  I was very busy trying to produce my

7   show.

8      Q    Certainly by Saturday the day of show you

9   were aware there was a problem because Travis'

10  representatives were saying they weren't coming

11  unless they had assurances that they would be back

12  in Vegas by 1:00 a.m.?

13     A    That's incorrect.

14     Q    You didn't know about that?

15     A    That's incorrect.  The statement is

16  incorrect.

17     Q    Which statement?

18     A    That just made Travis representatives said

19  Travis is not coming because he couldn't make the

20  1:00 a.m..  That is not a correct statement.

21     Q    Let me ask it separately.  Did you become

22  aware that there was an issue on Saturday about

23  whether or not Travis was coming?

24     A    Yes.

25     Q    Did you understand that the issue had

Rough Transcript

Page 51

1    something to do with whether or not Travis had

2    assurances he would be back in Vegas by 1:00 a.m.?

3         A    No.

4         Q    Who did you think the dispute was with?

5         A    I didn't think.  I was told specifically.

6         Q    Right.

7         A    It wasn't speculation.  It was specific

8    statement.  And the statement was Mr. Coon demanded

9    cash payment before he would tell Travis to come.

10   And if we didn't pay him up front he's would tell

11   Travis not to come.  This is in front of ten people.

12        Q    So you became aware from Mr. Coon are

13   Coons, whatever his name is, that if he didn't get

14   cash he claimed he was going to tell Travis not to

15   come?

16        A    Not to come.

17        Q    By this point in time Saturday day of

18   show, were any of your people, the people who worked

19   for PJAM or promoted this event talking directly to

20   Travis' manager David Stromberg?

21        A    Yes.

22        Q    Did any of your people ever ask David

23   Stromberg if Travis was refusing to come unless Coon

24   got cash?

25        A    I don't know David Stromberg.  There is an

Rough Transcript

Page 52

1    e-mail chain I remember seeing among all the name

2    David Stromberg's name as well.  So I don't know if

3    any communication was direct to him or if it was

4    just part of an e-mail chain.

5        Q    Well, have you seen any communication to

6    Travis Scott or any of his representatives asking

7    whether or not payment to Coons of cash is a

8    requirement for Travis Scott to show up?

9        A    No, I don't remember saying him that.

10       Q    But it's your recollection that the only

11   issue on that Saturday?

12       A    No.

13       Q    Was whether or not Coons was going to get

14   money?

15       A    No, I didn't say that.

16       Q    Okay.

17       A    I didn't says that.  I said.

18       Q    What did you say?

19       A    I said the main issue was Coons demanding

20   money and as we were telling him that we were not

21   going to pay him before Travis performance, he

22   threatened us to pull the plug so to speak on the

23   show.  There were conversations as well initiated on

24   logistics and timing.

25       Q    Okay.  So let's put -- and you paid Coons

Rough Transcript

Page 53

1    the cash?

2         A    Partially.  He demanded it and he took

3    some money and he said that unless we pay him the

4    rest he would call Travis and tell him not to come.

5         Q    I just want to make sure.  You're unaware

6    of any communication from Travis or his management

7    to PJAM saying he wouldn't come unless Coons got

8    cash?  Are you aware of any such communication?

9         A    There might be.  I don't know.

10        Q    But 100 -- as you sit here today

11   100 percent of your recollection that Coons demanded

12   cash or he would tell Travis --

13        A    In front of ten other people.

14        MR. TOMASULO:  Let him finish his question.

15   BY MR. KING:

16        Q    One hundred percent of your knowledge on

17   the demands that Coons was making came from what

18   Coons told you, not anything -- not from anything

19   that Travis' people told you; right?

20        A    Well, I have a strong recollection because

21   my physical -- when you're threatened physically you

22   tend to remember things.  So the fact that I have a

23   strong recollection on Coons words I think derives

24   from the fact that he had a threatening posture and

25   even made reference to my physical well-being had I

Page 54

1    not chosen the way to pays him.

2         Q    Coons was a thug; right?

3         A    I guess.

4         Q    Okay.  Did anybody from Travis Scott's

5    side threaten you?

6         A    No.

7         Q    Did anybody from Travis Scott say he

8    wouldn't show up unless Coons got cash?

9         A    No.

10        Q    So you said you were also aware of

11   logistic issues on that Saturday?

12        A    Yes.

13        Q    What were you aware of,?

14        A    There was an issue on timing of

15   performance and it was agreed that he would perform

16   early as early as 10:00 p.m. local time and I think

17   on our end we were trying to find as a way to

18   cooperate with Mr. Scott so that we would do

19   everything possible to help him to perform.  My --

20   that's my understanding like that unless Coon called

21   Travis telling him not to come, he was coming.  That

22   was my understanding.

23        Q    And on that basis do you conclude that

24   Coon told Travis not to come?

25        A    We were all at at lunch and the person

Page 55

1    demanding money for Coons a fella called Zach.  He

2    was very agitated and started screaming, walked away

3    and said if you guys don't give me the money now I'm

4    going to pull the plug quote unquote.  He walked

5    away made a phone call, came back to the table of

6    which ten people was there and he said I just spoke

7    to Travis camp and we told him not to come.

8         Q     That was Zach or Coon told you that?

9         A     Zach.

10        Q     What was Zach's last name?

11        A     I'm not sure. Z-a-c-h.

12        Q     I have something from him?

13        A     I'm sure like he's the person that

14   introduced us, Coons.

15        Q     What was his role in the show?

16        A     He was supposed to promote the event

17   because he's from Philadelphia.  He works in

18   Philadelphia and he made a recommendation because

19   his team was at the Super Bowl he would be able to

20   bring a lot of people.

21        Q     So you had some business arrangement with

22   Zach?

23        A     So Zach -- Zach came us to and said I can

24   get you guys Travis Scott through our friend Coons.

25   He knows Travis very well and that's how the whole

Rough Transcript

Page 56

1    thing started.  So supposedly this fellow Coons

2    threatened Zach as well so he was very agitated and

3    visibly didn't sleep the night before and said that

4    if we didn't give him the money for Coons, Coons

5    would beat him up and it would be quote unquote

6    ugly.

7         Q    What was your financial arrangement with

8    Zach?

9         A    I believe ed like a percentage of takes

10   that we would sell.  I have to check I'm not sure.

11        Q    So Zach was a profit participant in the

12   event or revenue participant in the event?

13        A    I would have to double check, but, yes.

14        Q    What would you double check?

15        A    I would have ask my partner like Jefferson

16   who is the one who knows Zach.  He was the one

17   that -- a lot of the front of the house aspects of

18   the show would be run by other people.  So they

19   would not report to me.

20        Q    So you were telling me about the logistic

21   issues and one of those you said you solved by

22   agreeing that Travis could perform at 10:00 p.m.?

23        A    I believe it was solved.  As I indicated,

24   but the fact that they produced the passenger list

25   for the jet and I would have the names.  Had Travis

Rough Transcript

Page 57

1   not agreed on playing we wouldn't have the names of

2   the passengers.

3        Q    Why do you say that?

4        A    Because he provided a list of people

5   right, so if you don't want to go somewhere you're

6   not going to give me the list of your fellow

7   passengers.  He provided a list of names that came

8   directly from him.  I assume when the decision --

9   when Mr. Zach came to us and said I told them not to

10  come, I assumed that I took him at face value.  I

11  took his words at face value.  If he stepped out of

12  the table and said I'm going to tell him not to come

13  and two minutes later he comes and says he's TPHO*TZ

14  coming --

15       Q    What time was that conversation?

16       A    We were at lunch.

17       Q    So that was it lunch on this Saturday?

18       A    Yeah.

19       Q    Do you know what time you had lunch?

20       A    No, I don't remember.

21       Q    1:00 o'clock, 2:00 o'clock, noon?

22       A    It was definitely like after 2:00 p.m.

23       Q    Lunch after 2:00 p.m.?

24       A    Like 2:30 I don't know.

25       Q    So let's say 2:30 p.m. on Saturday

Rough Transcript

Page 58

1   February 3rd Zach tells you I've just called Travis

2   and told him not to come?

3        A     Yes.

4        Q     Because you haven't given Coons cash?

5        A     Yes.

6        Q     And you accept there as a cancellation?

7        A     Not at all.  We were -- we were visibly

8   upset and we tried to -- can he scrambled.  We tried

9   to figure out how to fix it.  There were -- there

10  were -- my general manager at the table.  Jefferson

11  Agar was at the table.  There were local promoters

12  all at the table witnessing this, all trying to

13  figure out what are we going to do for this show.

14  We sent e-mail I think, I believe Jefferson sent

15  e-mail directly to in the e-mail chain to Mr. Scott.

16  I think there was attempts of reaching them.  At the

17  same time, yeah there was -- it was quite hectic

18  moment.  I mean I have somebody like coming up to me

19  saying give me money or I'll beat you up essentially

20  and he wasn't -- this is all easy to demonstrate.

21  And, yeah.

22        Q     but I'm now interested in the chronology.

23  So around 2:30 p.m. on the day of the show, seven

24  and a half hours before the show, Zach tells you

25  that he's called Travis and told him not to come;

Rough Transcript

Page 59

1  right?

2      A    Yeah, he called Travis' camp.

3      Q    He what?

4      A    Travis' camp.

5      Q    Travis' camp?

6      A    I don't know who called.

7      Q    He told you Travis isn't coming?

8      A    Yes.

9      Q    You don't accept that.  Everybody starts

10  trying to make direct contact with Travis' camp?

11      A    There was a lot of frantic activity trying

12  to figure out a solution for this.

13      Q    And in fact, Jefferson or somebody else

14  with PJAM gets in touch with Travis' camp; correct?

15      A    I don't know if he gets in touch, but.

16      Q    You've seen the e-mails haven't you?

17      A    The e-mail I've seen e-mails that I'm

18  copied to, yeah.

19      Q    So I assume if you were copies on e-mails

20  you saw them?

21      A    Yeah.

22      Q    Okay.  And did you ever see any e-mail

23  from Travis' camp saying they weren't coming because

24  you hadn't paid Coons?

25      A    I don't remember.  It's possible that they

Rough Transcript

Page 60

1    exist.

2         Q    Do you recall any e-mails saying please

3    send us confirmation that you have hired a jet?

4         A    I think so and we did send it.

5         Q    What did you send?

6         A    We sent confirmation with the tails number

7    of the jet.

8         Q    Who sent that?

9         A    I believe Jefferson sent it.

10        Q    Were you copied on that transmission?

11        A    It's possible.

12        Q    Now, are you 100 percent sure that

13   somebody told Travis' camp that there was a jet

14   hired gave him a tail number?

15        A    So I'm reasonably sure.  I'm not

16   100 percent sure of things unless I do it

17   personally, but my recollection is that not only we

18   communicated the time of departure, but we even

19   received a list of passengers confirming that they

20   would be coming on the plane.

21        Q    And it's your testimony that PJAM paid for

22   that jet?

23        A    Define PJAM.

24        Q    That someone paid for that jet?

25        A    Yes.

Rough Transcript

Page 61

1      Q    Who paid for the jet?

2      A    Manny Kess.

3      Q    Is he affiliated with the charter company?

4      A    No, he's not affiliated.

5      Q    So Manny Kess paid for the jet?

6      A    Yeah, it was part of our team as I

7  mentioned.

8      Q    When did he pay for the jet, before or

9  after the day of the event?

10     A    Before.

11     Q    Okay.

12     A    We wouldn't get a slot.

13     Q    Pardon me?

14     A    We wouldn't get a slot.

15     Q    That's my next question.  What's the

16  closest airport for a private jet to the nightclub

17  are?

18     A    I don't know.  All I know is we paid the

19  jet before definitely.

20     Q    Right, but you couldn't get a landing slot

21  anywhere closer than St Cloud regional airport,

22  right?

23     A    That's not my issue.  That's not my area

24  of expertise.  All I know it was a jet and the jet

25  was waiting for Mr. Scott.

Rough Transcript

Page 62

1        Q      You think there was a jet waiting for

2    Mr. Scott at Van Nuys airport in Los Angeles?

3        A      I was told so.

4        Q      Who told you that?

5        A      The management, the company that -- that

6    we booked the jet for -- from.

7        Q      Do you understand why Mr. Scott or his

8    team would want to see a tail number before they

9    drove to the airport?

10       A      Absolutely.

11       Q      Why is that?

12       A      They wanted to I guess have confirmation

13   that there's a jet waiting for them.

14       Q      I may have asked this.  Have you ever seen

15   any written communication of somebody from the PJAM

16   side sending someone from Travis' team confirmation

17   of that charter jet?

18       A      It's possible.

19       Q      All right.  We'll come back to that.  So

20   2:30 -- after 230 someone is reaching out to Travis'

21   camp to see if they're coming or not.  At what point

22   after 2:30 did Travis' camp say they're not coming?

23       A      I'm not sure like how we -- I think at the

24   end we took Mr. Zach Seidman or whatever his last

25   name is.  We understood he was indeed communicating

Rough Transcript

Page 63

1    with Travis camp and by took his words for you know

2    what they were and we understood that Mr. Scott

3    wasn't coming.

4        Q    No, one asked David Stromberg or anybody

5    else from team Travis whether he was coming?

6        A    I'm not sure, but that's ultimately --

7    most of the communication was mediated using Coons

8    as intermediary.  So like that Coons and Zike --

9    Zach were the two people that were communicating to

10   us anything regarding Travis.

11       Q    So Zach was part of your team though

12   right?

13       A    No, it was friends of Coons.

14       Q    But Zach was getting a percentage of the

15   revenue from the event?

16       A    I mean in theory even Coons in theory was

17   part of the team because he's the one that brokered

18   the appearance; right?  So I think, you know, in

19   this particular case personal relationship

20   superseded financial interest.  I don't know.

21       Q     but I'm not understanding.  You got cash

22   for Coons; right.  Not as much as you wanted, but

23   you got him cash?

24       A    He took cash.

25       Q    He took cash?

Rough Transcript

Page 64

1       A    Right.

2       Q    At that point did you tell Zach he's got

3   cash call Travis?

4       A    Yes.

5       Q    And get on the plane?

6       A    Yes.

7       Q    What did he say?

8       A    Coons would not do that unless he gets all

9   the money that he was expecting.  He wanted all of

10  it in advance.

11      Q    Exhibit 1 is in front of you.  This is a

12  contract that we have for the show.  Why don't you

13  take a moment and take a look at that and tell me if

14  you've ever seen it?

15      A    Yep.

16      Q    You've seen it?

17      A    I have, yes.  I recognize it.

18      Q    So under compensation on the first page do

19  you see that?

20      A    Yes.

21      Q    You see $200,000 fee?

22      A    Yep.

23      Q    And the final part of that section, do you

24  see 25 percent of the fee will be payable in cash

25  following completion of the services at the event?

Rough Transcript

Page 65

1      A    Yep.

2      Q    Does this refresh your recollection that

3   you had committed to have $50,000 in cash on hand?

4      A    I guess we were, yeah.

5      Q    You didn't have that did you?

6      A    We didn't have it in the safe before the

7   show.

8      Q    You might have had it after the show

9   depending on how much cash people paid; right?

10     A    There -- that's correct.

11     Q     but there's no assurances of that

12  correct?

13     A    I suppose.

14     Q    Okay.  So would you look at the signature

15  page?

16     A    Yep.

17     Q    And the dates under the signatures?

18     A    Yep.

19     Q    Does this refresh your recollection that

20  you didn't have a signed contract with Travis Scott

21  until January 28, 2018?

22     A    It says 26.

23     Q    Well, it says 26 under Jefferson Agar.

24  What's it say under Jacques Webster?

25     A    Twenty-eight.

Rough Transcript

Page 66

1    Q    So roughly five, six days before the show;

2    right?

3    A    Well, this was circulating before, but,

4    yes.

5    Q    When did you start promoting Mr. Scott's

6    appearance?

7    A    I believe we asked permission to post

8    after we signed.  I believe like -- I believe it was

9    even before we asked permission if we could actually

10   advertise a flier even if this particular contract

11   wasn't signed and I think we received permission

12   from Coons saying that we could.

13   Q    You received permission from Coons saying

14   that you could promote the show?

15   A    Yeah.

16   Q    When did you receive that?

17   A    I think it was a few days before actually,

18   this particular contract was signed and the reason

19   being that the sticking point was something about

20   sponsorship.  So that's why it took us a little

21   longer to negotiate.  So there was some reds lines

22   on the support sons section.  So the copy that you

23   see is like amended version of a copy that was

24   circulating before.

25   Q    I'm going to mark as Exhibit 2 a document

Page 67

1   that I have been furnished with. it's a trip

2   information and confirmation.

3              (Plf's/Dft's Exhibit ** was marked

4   for identification by the deposition officer and is

5   attached hereto.)

6   BY MR. KING:

7       Q    Have you ever seen this?

8       A    Yes.

9       Q    When did you first see this?

10      A    I don't know this exact version.  I was

11  part of the -- I was in a meeting when we were

12  talking to the owner of the jet, private jet

13  company.  And so we had to provides wire payment for

14  the owner.

15      MR. TOMASULO:  The question is when you first

16  saw it.

17      THE WITNESS:  So a few days -- a few days

18  before the show.  I don't know exactly was the date.

19  BY MR. KING:

20      Q    And did you review it when you saw it?

21      A    I reviewed the contracts.  There was a

22  contract for the jet.

23      Q    There was a contract with the jet?

24      A    Yes.

25      Q    Who was that contract with PJAM or the

Rough Transcript

Page 68

1  gentleman in Las Vegas?

2       A    Originally it was PJAM, but then they

3  redrafted because Manny Kess was the one paying.  So

4  they I think the contract was made to Mr. Kess.

5       Q    Okay?

6       A    And he signed Mr. Kess it was PJAM, but

7  the signature was Manny, but original contract was

8  to PJAM.

9       Q    What time does this confirmation say that

10 Mr. Scott will arrive in Las Vegas?

11      A    It was is it 330?

12      Q    I think ETA is the right --

13      A    I guess it says 3:30.

14      Q    I think ETE is the travel time.  I think

15 ETA is the arrival time.

16      A    2:45.

17      Q    So the jet you believe you had confirmed

18 wouldn't get Mr. Scott to Las Vegas until 2:45 a.m.

19 correct?

20      A    I'm not clear if this is local Vegas time

21 or eastern time.  Also as you notice the departure

22 is 1:15 a.m., but we discussed about actually having

23 him perform earlier so departing earlier as well.

24      Q    How far is the venue to St Cloud regional?

25      A    I don't know ^ I'm not sure.

Rough Transcript

Page 69

1       Q    You don't remember?

2       A    I'm not from Minneapolis.  So I don't

3  know.

4       Q    Okay.  Do you know what the weather was

5  like that weekend?

6       A    It was colds.

7       Q    How were the roads?

8       A    Cold.

9       Q    Would you agree that 2:45 at 2:45 arrival

10  of Mr. Scott in Las Vegas would be too late for him

11  to honor his commitments in Las Vegas?

12      A    No, I don't know that.

13      Q    Okay.  Do you think he could go on at

14  3:30 somewhere and everybody would be happy about

15  that?

16      A    It's not for me to say.

17      Q    Well, okay.

18      A    Certainly I've been in shows where the

19  headliner has arrived hours later, yes.

20      Q    You earlier acknowledged that the

21  condition of him showing up in Minneapolis was that

22  he would be in Vegas by 1:00 a.m..  Do you remember

23  that testimony under oath an hour ago?

24      A    Yeah, and I said this 1:15 a.m. departure

25  doesn't reflect the fact that in our negotiations to

Rough Transcript

Page 70

1    have Mr. Scott perform we agreed to have his

2    performance slated at the very early of the night.

3         Q    When did those negotiations take place?

4         A    We were talking to Mr. Zike, with Zach and

5    Coons.

6         Q    On the day of the show?

7         A    Yeah, the show or the day before.  The

8    only time I remember discussing this was, yeah, I

9    believe like there was a discussion both the day

10   before and the day of the show.

11        Q    Okay.

12        Q    You're not an accountant?

13        A    No.

14        Q    Are you trained as an accountant?

15        A    No.

16        Q    You have a degree in economics; right?

17        A    Economic history, yes.

18        Q    Economic history.  Have you ever testified

19   as an expert before?

20        A    No.

21        Q    I'm going to hand you Exhibit 3.  It's a

22   notice of your taking of deposition.

23             (Plf's/Dft's Exhibit ** was marked

24   for identification by the deposition officer and is

25   attached hereto.)

Page 71

1    BY MR. KING:

2         Q    Have you ever seen this before?

3         A    Yes.

4         Q    Starting on page 5 it asks for you to

5    produce certainly documents.  Have you seen that

6    before?

7         A    Yeah.

8         Q    What efforts did you make to get any of

9    the documents set forth in requests No. 1 through 8?

10        A    I at first I'm not sure I understand.

11   Like I produced what I had.

12        Q    Okay.  So you don't have any

13   communications with any of your partners?

14        A    No, I do have communications.

15        MR. TOMASULO:  Let him finish the question.

16        THE WITNESS:  I'm sorry.

17   BY MR. KING:

18        Q    I can go through these one by one, but

19   your counsel has produced four documents today which

20   I'm going to ask you about, so I asked what you

21   efforts you've made to find any of the documents

22   enumerated in requests one through eight other than

23   these her to documents that have been produced?

24        A    Uh-huh.

25        Q    Any efforts?

Rough Transcript

Page 72

1          A     Most of my communication were made by
2     phone or in person with people that I talked to.
3          Q     You have a lot of communications by text
4     message, don't you?
5          A     Some.
6          Q     How many text messages did you produce?
7          A     I -- I believe that was communication
8     regarding the preparation of the expert witness
9     report; right?
10          Q     No, how many text messages -- let me step
11     back?
12          A     Yeah.
13          Q     It's a very simple question?
14          A     Sure.
15          Q     What efforts did you make to locate
16     documents within your custody or control that are
17     responsive to requests one through eight?
18          A     I made all the efforts I could, all the
19     attempts I could keeping in mind the bulk of e-mail
20     communications for Twin City Live is beyond my
21     reach.  So I communicated that to the attorney and I
22     explained that.  I don't know if he explained to you
23     or not.
24          Q     Well, you don't have to tell me what you
25     communicated to your lawyer, but I'm interested --

Rough Transcript

Page 73

1   twin cities live is just a business name for PJAM;

2   right?

3        A     Yeah, it is the brand name.

4        Q     You're the manager of PJAM?

5        A     Sure.

6        Q     So why do you tell me the communications

7   with twin cities live are out of your custody or

8   control?

9        A     Because Twin City Live hosting, hosting

10  like the service that provides hosting all the

11  e-mails.

12       Q     Right?

13       A     Has been discontinued so all the Twin City

14  Live e-mail that communication -- that was, you

15  know, where I could just find most of the e-mails is

16  currently unavailable to me.  Now, I did make

17  attempts on record to reach to Google which is the

18  company where the Web site is hosted and we have

19  multiple attempts to reach Google customer service

20  to grant us access to the e-mails.  Not only by me,

21  but by other people involved as well.  So.

22       Q     Well, regardless of who hosts it all the

23  e-mails have a recipient and a sender; right?

24       A     Right, but we can't access the e-mail.

25  It's a web based e-mail service.  So the e-mails

Page 74

1    they're not downloaded on the device.  They're in

2    the cloud.  We have no access to Twin City.

3        Q    What he auto mail address did you use

4    during the period of time?

5        A    My Twin City Live e-mail address.

6        Q    Which is what?

7        A    Alex at Twin City Live dot com.  And

8    everybody associated with this show had an e-mail

9    address that was as a Twin City Live domain.

10   Occasionally there would be -- I would be copies I

11   have another e-mail address so people would just cc

12   other addresses as well.  And that's how I was able

13   to produce some of the communication just because I

14   was cc'd on other e-mails on other e-mail addresses.

15       Q    Let's go through them one by one.  When

16   was the e-mail server closed?

17       A    I believe it was like maybe April

18   following the show or May.  I don't know.

19       Q    Request one is any documents regarding the

20   form in which your expert report was created.  So --

21       A    That wouldn't be Twin City Live, that

22   would be my current e-mail.

23       MR. TOMASULO:  The question is what effort he

24   made to find -- I missed the question.

25       MR. KING:  That was a bad question.

Rough Transcript

Page 75

1    Q    What's your e-mail address that you

2    currently use?

3    A    I have several, but you could call it my

4    primary address is Alex at Art of Digital dot com.

5    Q    What efforts did you make to recover any

6    communications that relate to your expert reports?

7    A    So for my expert report was drafted --

8    there was no communication between me and PJ, for

9    example.  We discussed things with the attorney and

10   you know, it was informed by conversation I had with

11   people in night life that I know for 20 years and

12   there's no particular communication that I use in

13   order to create that report.

14   Q    So I just want to make sure there's not

15   one written communication you had with anybody?

16   A    Other.

17   Q    Relating to the formation and creation of

18   your expert report?

19   A    Other than between me and my attorney,

20   yes.

21   Q    Who wrote the report you or your attorney?

22   A    Mostly drafted by my attorney.

23   Q    And do you have possession of the various

24   drafts -- how many drafts were you given?

25   A    Well, it was written on my -- based on my

Rough Transcript

Page 76

1   direction.  So there was a lot of communication

2   before the draft and then, yes there was multiple

3   drafts.

4        Q    So your attorney prepared the first draft

5   based upon conversations?

6        A    Interviews, yeah.  First it was

7   interviews, series of interviews.

8        Q    When were those interviews?

9        A    Before the time --, you know, before it

10  was prepared.  I don't know maybe like in the weeks

11  leading to the preparation of the report.

12       Q    How many different drafts were prepared?

13       A    I believe like at least two.

14       Q    And what changed between the drafts?

15       A    There was some minor corrections that I

16  told them to amend.

17       Q    What did you tell them to amends?

18       A    They were mostly based on form.  It was

19  nothing substantial.

20       Q    Was there anything you asked them to put

21  in the report that didn't get in the report?

22       A    I don't remember.  I would have to check,

23  but I don't think so.

24       Q    Request for production No. 2 are any

25  communications between you and the other PJAM people

Page 77

1   concerning your expert work.  You told me there's no

2   written communications?

3        A    No, no --, yes there was no commit even

4   communication.  Certainly PJ would not have any

5   feedback on this report because that's not his

6   business and neither do the investors.  One is an

7   attorney and one is a businessman so they would not

8   have feedback on this.

9        Q    You didn't solicit their feedback?

10       A    I wouldn't need their feedback.

11       Q    I'm asking you if you discussed with any

12   of them your expert report?

13       A    I discussed things with Jeff son Agar and

14   it was in person communication.

15       Q    What did you discuss with Jefferson Agar

16   about your report?

17       A    I told them that we were preparing a

18   report, going to court and you know, we did

19   preparation of things.  We used some information,

20   for example, of similar events that he put together

21   that are comparable in size for the event we were

22   producing.

23       Q    And he gave --

24       A    He disclosed some information of events he

25   was associated with that would be relevance in this

Rough Transcript

Page 78

1    case and that I also put him in touch with the

2    attorney as well.  And I believe they spoke

3    privately.

4        Q    I just want to make sure there's no

5    writings that were ever exchanged that detailed the

6    data he provided you for the inclusion in the

7    report?

8        A    The data that Mr. Agar provided, I think

9    he pro he didn't provide it to me he provided it to

10   counsel in writing or they spoke. but we discussed

11   things and then I put them in touch and they spoke

12   directly.

13       Q    Have you ever seen any ^ check written

14   data he prepared?

15       A    I didn't ask.

16       Q    Why not?

17       A    He told me he spoke to him and he got

18   everything that he needed and I had no reason to

19   ask.

20       Q    So certain parts of your report are based

21   upon data given by Mr. Agar to the lawyers that

22   you've never seen?

23       A    No, I never said in writing.  I discussed

24   it.

25       Q    So No. 4 says any communications between

Rough Transcript

Page 79

1  you and a whole list of people and then I'm going to

2  jump otherwise relating to this litigation.  Do you

3  see this in No. 4?

4       A    All communication between you and --

5  concerning or otherwise relating to this litigation,

6  I think I produced that.  I gave all the e-mails or

7  communication text messages that I had I provided it

8  to the attorney.

9       Q    How many text messages do you think

10  provided?

11       A    I don't know.

12       Q    Can you make a reasonable estimate?

13       A    It was screen shots like a few.  There

14  weren't even my screen shots.  I think they belonged

15  to Jefferson.

16       Q    What about e-mails?  Did you provide any

17  e-mails?

18       A    I did provide some e-mails.

19       Q    How many?

20       A    I don't know.  Maybe like ten.  I probably

21  could access -- I could have more e-mails if I could

22  access the e-mail account that is that is right now

23  did he activated.

24       Q    Certainly e-mails from April on would have

25  been in an accessible account?

Page 80

1     A     There was very little discussion after,

2   you know after April.

3     MR. TOMASULO:  I can represent to you he did

4   provide certain e-mails and texts that I did not

5   believe were responsive to these requests.

6     MR. KING:  That's fine.

7     Q     How much time did you spend in creating

8   your report?

9     A     There's several interviews, phone

10  interviews with the attorney and time reviewing

11  passed on to me and that was mostly the base.  And

12  some time trying to find some industry data.

13    Q     What other industry data did you try to

14  get?

15    A     Just -- I have my experience was -- I had

16  a very good sense of how many drinks per customer in

17  general people consume at these type of shows and I

18  was trying to find third-party reports that

19  corroborates my intuition or my experience.

20    Q     Did you find those third-party reports?

21    A     Yeah, I provided it to the attorney.

22    Q     Did you provide it to us?

23    A     I'm not sure.

24    MR. TOMASULO:  That's one of the two things I

25  gave you.

Rough Transcript

Page 81

1        MR. KING:  This is your original.  I'm going to

2   mark as Exhibit 4 basically what was produced by

3   your lawyered to.

4                (Plf's/Dft's Exhibit ** was marked

5   for identification by the deposition officer and is

6   attached hereto.)

7        MR. KING:  So why don't you take a look at

8   Exhibit 4.  I think it's four different documents.

9        Q    And my question is very simple.  Is

10  Exhibit 4 the totality of any industry data you

11  surveyed in reaching your opinion?

12       A    Say again.

13       Q    Does Exhibit 4 represent all of the city

14  data you accessed to support your opinions?

15       A    Well, most of my opinions are supporting

16  by years and years of experience in the night life

17  industry.

18       Q    Right.

19       A    I think there's -- there's information

20  available on the Internet that would support as a

21  similar conclusion, namely the night life industry

22  association of America that indicate 2.5 drinks is

23  the average alcoholic beverage that a customer would

24  drink at a show, a nightclub.

25       Q    I just want to make sure that what you

Rough Transcript

Page 82

1    produced in Exhibit 4 is the totality of all of the

2    industries data you surveyed in order to support

3    your conclusions?

4        A    I surveyed -- I wasn't trying to survey, I

5    was trying to identify documents that would

6    corroborate my experience.

7        Q    Does Exhibit 4 constitute the totality of

8    the documents that you located to corroborate your

9    experience and your opinions?

10       A    They're the ones that were available

11   immediately available online.  I'm sure there's -- I

12   could locate more if I spent more time looking for

13   it.

14       Q    Why would you do that?

15       A    I don't know may be prepare for trial.

16       Q    Maybe it would not support your opinion?

17       A    Well,.

18       Q    Right?

19       A    I spoke to Mr. Jefferson Agar and he think

20   that two and a half drinks per person is a

21   conservative number.

22       Q    But your written industry data consists of

23   two articles that you furnished us; right?

24       A    There was just -- there's not like -- I

25   didn't base my report on this article.  My report

Rough Transcript

Page 83

1   was based on 15 years of night life experience.

2        Q    So none of your report is base did upon

3   what's in Exhibit 4; is that correct?

4        A    I would say it corroborates my report.

5        Q    Corroborates your instinct over 15 years

6   of experience?

7        A    Yes, 15 plus.

8        Q    What do you mean by empirical data ^

9   check?

10       A    It means over the course of the years if I

11  produce 200, 300 shows and I can say that the

12  minimum amount of drinks that average customer

13  drinks is about at least two:  So over the years

14  that informs -- that occurrence informs my

15  experience.  It's not an instinct.  It's a pattern

16  recognition.  So that's how I feel strongly about

17  it.  People will go to an event like this and use --

18  and consume at least two drinks.

19       Q    Who is a Emiliano Lo Manto?

20       A    That's my name on my I.D.

21       Q    Your name is not Alex Martini?

22       A    My name is Alesandro, but people call me

23  Alex.

24       Q    But your last name is Lo Manto?

25       A    My official last name on my I.D., yes.

Rough Transcript

Page 84

1      Q     Why do you use a different name?

2      A     I like it.

3      Q     I'm going to hand you Exhibit 5 which is

4   the first expert witness disclosure we reached -- we

5   received in this case.

6            (Plf's/Dft's Exhibit ** was marked

7   for identification by the deposition officer and is

8   attached hereto.)

9   BY MR. KING:

10     Q     I would ask you to take a look at the

11   Exhibit A and tell me if that is your first expert

12   report?

13     A     Yep.

14     Q     So on that one page 1 under opinions?

15     A     Yep.

16     Q     Are you with me?

17     A     Yeah.

18     Q     Your first opinion is PJAM would have sold

19   at least 2,000 general admission tickets as an

20   average price of at least $300.  I think you already

21   told me you don't know how many were sold as of

22   Saturday afternoon when the show got canceled;

23   correct?

24     A     Uh-huh.

25     Q     I'm correct?

Rough Transcript

Page 85

1       A      Yes, you're correct.

2       Q      And is it your testimony under oath that

3    the tickets were going to sell for $300 each?

4       A      There was the intended price.  We actually

5    started to put tickets online at a higher amount.

6    Part of the reason why the initial negotiation with

7    Mr. Scott failed was that when we indicated the cost

8    of the tickets being $499, the manager said that the

9    tickets were too high and so we progressively

10   reduced the tickets so the $300 it was the amount of

11   close competitors.  We used that in this particular

12   report.  We used that competitor as a benchmark of

13   some events at higher ticket price.  Some of the

14   other ticket price were lower.  Certainly by

15   Saturday afternoon, I believe, that we probably

16   could have like sold tickets in cash at the door may

17   be more for if people wanted to come to see Travis

18   maybe they would have paid more.

19      Q      Maybe they would have?

20      A      Hopefully.

21      Q      Maybe they wouldn't even have shown up.

22   You don't know?

23      A      Certainly I hope a star like Travis would

24   bring people to the show.

25      Q      But you had no assurances that would

Page 86

1    happen?

2        A    We don't have no assurance of anything in

3    life.

4        Q    You could make some estimates as of the

5    afternoon of the show; correct?

6        A    Some.

7        Q    And, in fact, you didn't sell any tickets

8    at $300 did you?  Weren't the tickets on sale for

9    $150?

10       A    I would have to check that.

11       Q    I'll show you some advertisements in a

12   minute, but you don't recall what the tickets were

13   actually on sale for?

14       A    I recall what we put the tickets at the

15   beginning originally and I believe it was actually

16   $500.

17       Q    Did you sell any tickets at $500?

18       A    I would have to again check.

19       Q    Okay.  Well, you're making a rather

20   bold --

21       A    Actually, I think we did.

22       Q    Okay.  In fact weren't the tickets

23   advertised at $150 with a no host bar or $295 with

24   all the boos you could drink?

25       A    There is no standard practice at Super

Rough Transcript

Page 87

1    Bowl.

2         Q     Would you know what the tickets were

3    advertised at?

4         A     Standard practice at Super Bowl to have on

5    bar tickets.

6         Q     It is or is not?

7         A     It is.

8         Q     So was the $300 for an open bar ticket?

9         A     Yes.

10        Q     So then why in the next sentence do you

11   say PJAM would have sold another $100,000 of drinks

12   if it would have been standard practice to have an

13   open bar?

14        A     Because the open bar ticket sometimes it's

15   at of a amount of time.  There's not on bar all

16   night.  It could be on bar up to a certain point.

17        Q     Do you even know what your arrangement was

18   for that Saturday show?

19        A     What does it mean arrangement?

20        Q     Did you have a cut off for open bar

21   tickets for the show?

22        A     We would decide when and if there was an

23   open bar.  It was entirely up to us.

24        Q     When would you decide?

25        A     What do you mean?

Rough Transcript

Page 88

1      Q     Well, had you decided by Saturday

2   afternoon of the show?

3      A     We certainly like the negotiation with

4   Mr. Scott took the majority of the time.

5      Q     Had you decided by Saturday afternoon who

6   was going to have to pay for drinks?

7      A     We had decided -- we were in heavy

8   negotiation with Mr. Scott and the majority of the

9   time was taken for that.

10     Q     You were in negotiation with Mr. Scott

11  over the drinks?

12     A     The camp, no, no negotiating about

13  participation.  That's what I was focusing on.

14     Q     Did you know by Saturday afternoon how

15  much people were going to pay for drinks or whether

16  they were getting free drinks ^ check?

17     A     My understanding was at this point on

18  Saturday we were opting out of the open bar.  We

19  were just doing a cash bar.

20     Q     Well, was that advertised somewhere?  Did

21  you tell people in your promotion and marketing

22  efforts how much it cost?

23     A     We would have different advertisement

24  depending on different networks or different

25  circles.

Rough Transcript

Page 89

1    Q    I don't know what that means.  What do you

2  mean by different networks?

3    A    Promoters, the deciding to set a ticket

4  price.  So different -- there would be multiple

5  ticket price.  Different promoters could offer

6  different links with different ticket prices.

7    Q    You don't know what those various

8  alternatives were?

9    A    Alternative in what sense?

10   Q    You said different promoters could offer

11  different ticket prices.  Do you know what those

12  variations were?

13   A    I can tell you the average ticket price

14  would be $300.

15   Q    But you don't know what the actual average

16  ticket price was, do you?

17   A    I can find out.

18   Q    Well, today is your time.  You don't know

19  as you sit here what the average ticket price was,

20  do you?

21   A    Ways.  You're talking about the average

22  ticket price was actually sold prior to the event?

23   MR. KING:  Or offered.  How about offered.  You

24  don't know what the average.

25   THE WITNESS:  It changed.  You mean like the

Rough Transcript

Page 90

1    day of?

2       Q    Anytime.  You only signed up a week before

3    at best.  During the week before how many times did

4    the ticket prices change?

5       A    Several times.

6       Q    But you don't know what those changes

7    were?

8       A    I told you it started at as a high other

9    price and you're correct by the end of Saturday

10   afternoon the price I believe was $150.

11      Q    Okay.

12      A    So the average price I guess would be in

13   excess of $300 if you average from the moment the

14   first price was released to the moment the last

15   amount was offered.

16      Q    Well, you've actually done the math to

17   conclude under oath that the average ticket price

18   was three hub dollars?

19      A    No, I haven't done the math.  I have to

20   check what was the first day.  I have to do the

21   math.

22      Q    You don't know how many tickets were sold

23   at $500 do you?

24      A    I don't.

25      Q    You don't know how many tickets were sold

Rough Transcript

Page 91

1  at $300 do you?

2       A     I don't.

3       Q     You don't know how many tickets were sold

4  at $150 do you?

5       A     I told you at the beginning.

6       Q     How you would reach a conclusion that you

7  would have sold $600,000 work of tickets if you

8  don't know how much you sold as of Saturday

9  afternoon?

10      A     I'm operating under the assumption we

11 would sell out the venue.

12      Q     Did you sell out the venue the night

13 before?

14      A     Almost.

15      Q     What was the ticket price the night

16 before?

17      A     I believe it was -- I believe it was like

18 over $200.

19      Q     What's the size of the venue?

20      A     The size of the venue the legal capacity

21 is, I believe, 3500 people, but it got reduced

22 because we brought furniture and made with the venue

23 less empty so to speak.

24      Q     What was the capacity as you configured

25 it?

Rough Transcript

Page 92

1      A     How many people?

2      Q     Yes, how many tickets could you sell?

3      A     We could sell potentially 25 hundred

4  tickets.

5      Q     So if you sold out the night before that

6  would be $200 --

7      A     No I think it was full.  I said it was

8  full.  I didn't say we sold out.

9      Q     2500 seats.  What did you gross Friday

10  night?  I think you told me it was $100,000?

11      A     It was 110,000.

12      Q     Total tickets and boos?

13      A     We unfortunately there was when the storm

14  was own Friday.  There's no storm.  There was no.

15      MR. TOMASULO:  Just answer the question.

16  BY MR. KING:

17      Q     Friday night you had 2500 seats?

18      A     We didn't sell 2500 seats.

19      Q     You said it was full?

20      A     It was full.

21      Q     Are that would indicate to me close to

22  2500?

23      A     N.

24      Q     What do you think full means?

25      A     I have to double check on the actual

Rough Transcript

Page 93

1    numbers.  I think there was probably in and out it

2    was -- I would have to guesstimate that so I don't

3    want to.

4         Q    I don't want any guesses.  I really want

5    your expert testimony?

6         A    Yes.

7         Q    So there's 2500 seats.  You didn't sell

8    out, but it was full.  And you claim under oath that

9    it was $200 a ticket, but somehow you grossed

10   including boos $110,000 that night?

11        A    So there's a difference between tickets

12   comped and tickets that are paid.  So you can comp

13   tickets and you can have 1,000 people coming that

14   could be comped because the promoaters want people

15   in the venue.  So I know they did a lot of comping

16   tickets on Friday.

17        Q    I'm familiar you only comped tickets

18   because you haven't sold enough to fill the venue.

19        A    That's your opinion.

20        Q    Why would you comp tickets for a one off

21   show in Minneapolis.

22        A    We would like to have people coming and if

23   you believe that you can build a brand and have

24   multiple events after.  That was part of it.  That's

25   certainly like we gave a lot of tickets to some

Rough Transcript

Page 94

1    people that were partners.

2        Q    How many tickets did you comp Friday

3    night?

4        A    I don't know.

5        Q    How many tickets did you comp Saturday

6    night?

7        A    I don't know about Saturday, but I think

8    on the actual comp rate list or Friday there were

9    like I think a list like a list of six or 700.

10       Q    So you comped 700 tickets Friday night?

11       A    I don't know how many of those people

12   came, but their wrists bands not ticket, but access

13   wrist bands.  I remember the number because I had to

14   like sign off on the number of bracelets that we

15   could create.

16       Q    How many comps were there created for

17   Saturday night?

18       A    So Saturday night we didn't make the comps

19   because we still had bracelets from the night before

20   so there was not the same process that we had to go

21   through.  It was not necessary for Saturday.

22       Q    How many comps did you anticipate giving

23   on Saturday night?

24       A    At that point I didn't have any -- I

25   didn't know.  I didn't know how many people were

Page 95

1    going to show up without Travis.

2        Q    I'm talking before Travis before you think

3    he canceled how many comps had you can't had for for

4    Saturday night?

5        A    I think what was leftover from the night

6    before.  Like probably a couple hundreds.

7        MR. TOMASULO:  When you get a chance can we

8    take five minutes?

9        MR. KING:  This is fine.

10       THE VIDEOGRAPHER:  Off the record.  The time is

11   1231.

12                (A recess was taken from ****** to

13   ******.)

14       THE VIDEOGRAPHER:  Back on the record the time

15   is 1246.

16   BY MR. KING:

17       Q    You said that you were trying to build a

18   brand by putting on these shows over Super Bowl

19   weekend.  Did I get that right?

20       A    Yes.

21       Q    Whose brand were you trying to build?

22       A    Our brand.

23       Q    Under the name of?

24       A    Twin City Live.

25       Q    What was the brand to be known for?

Page 96

1      A      Events, events at sporting events like the

2    idea was to create a brand that would produce

3    events, Super Bowl would be a good example.

4      Q      Produce events in the twin cities?

5      A      Twin City Live it was just the name for

6    the show.

7      Q      That's what I was asking.  I know that was

8    the name you used for the shows in Minneapolis.  Was

9    that the brand you were trying to build?

10     A      Yeah, Twin City.

11     Q      Did you do other shows in the twin cities

12   or beyond the twin cities?

13     A      No, as the name of shows.

14     Q      How many other shows did you guys put on?

15     A      No, that was the idea to build a brand.  I

16   didn't say we had a brand.

17     Q      Have you built a brand?

18     A      Personally?

19     Q      Twin cities live?

20     A      Yeah, it was -- there were branding

21   efforts on the way.  It was our first show.

22     Q      How many shows have you done since Super

23   Bowl 18?

24     A      That I produced.

25     Q      Twin cities live?

Page 97

1      A     None.

2      Q     And you attribute that to not putting on

3   the Travis Scott show?

4      A     Certainly the press there we got after was

5   not conducive for us booking heads liners in the

6   Future.

7      Q     Under that name?

8      A     Under my name.  I was named personally.

9      Q     Did it adversely affect your ability to

10  book shows?

11     A     Absolutely.

12     Q     Tell me how.

13     A     I was called a want to be promoter.

14     Q     I called you that?

15     A     I take offense at that.

16     Q     I'm asking what adverse of impact did that

17  have are you no longer able to produce shows?

18     A     I'm involved in a show in two weeks.

19     Q     What adverse effect did you suffer as a

20  result of me calling you a want a be promoter?

21     A     Challenging.  Probably dealing with a

22  booking agency or headliners.

23     Q     Have you lost any deals?

24     A     I didn't seek any deals.

25     Q     Did you have any adverse economic effect

Rough Transcript

Page 98

1    of being called a wanna be promoter?

2         A    I have to think about it.

3         Q    Back to your report.  You say PJAM would

4    have sold at least 30 tables at an average price of

5    $5,000 per table.  You don't know if you sold any

6    tables at any price?

7         A    A few tables.

8         Q    At what price?

9         A    I would have to double check on that.

10        Q    Well, you don't know as you sit here today

11   what price?

12        A    There was above 5,000.

13        Q    Okay.  Of those you don't know how many

14   you refunded?

15        A    I think we refunded all of them.

16        Q    Under facts and data considered, you say I

17   have extensive national and international experience

18   with concert event and party promotion.

19             I was intimately involved with the

20   planning management of marketing of the Super Bowl

21   weekends, which we have talked about.  This included

22   analysis of the economics of high end Super Bowl

23   weekend events.

24             What analysis did you perform of the

25   economics of high end Super Bowl events?

Rough Transcript

Page 99

1        A    I base -- that's a consequence -- that

2    sentence is -- refers to other Super Bowl events or

3    discussion I had with people that produce Super Bowl

4    events.  And that's what the sentence means.

5        Q    Okay.

6        Q    Do you have any written analysis of the

7    economics of high end Super Bowl week end events?

8        A    I didn't write what I was reading at the

9    time or I didn't write a memo on conversation that I

10   had with people that worked at the high end events

11   during Super Bowl.

12       Q    So there's no documentary evidence of your

13   analysis other than what you've written in this

14   report?

15       A    I usually don't write memos for

16   conversations.

17       Q    How many people did you talk to in forming

18   your analysis?

19       A    Several.

20       Q    How many?

21       A    Before this show or regarding this report?

22       Q    Regarding this report.

23       A    That I can immediately remember like at

24   least five.

25       Q    Who are those five people?

Rough Transcript

Page 100

1      A    I can send you, I can give you a listing

2   of names.

3      Q    You don't remember?

4      A    Some of the spellings may be off.

5      MR. TOMASULO:  Tell him one.

6      THE WITNESS:  Yura Shabatayev, Yura Shabatayev.

7      Q    Uh-huh.

8      A    Eric lump Brock, ^ Ronnie Madra, Yosi Ben

9   advice it a ^ Jefferson obviously Jefferson Agar,

10  Rubin Arnetta ^.  These are people that I had like

11  conversation on the report and then those are people

12  that I work with in night life over the course of

13  the ten or 15 years.

14     Q    People you work with?

15     A    I work with them or for them in some

16  cases.

17     Q    Doing what?

18     A    Promoting events.

19     Q    Is that the primary experience that you

20  have that influences your expert opinion is your

21  experience in promoting events?

22     A    Yes.

23     Q    And do you have any particular training

24  for that?  Is that on-the-job training?

25     A    Experience.

Rough Transcript

Page 101

1    Q    What does that mean, promoting as it
2    relates to what you've done?  What does that mean to
3    promote an event?
4    A    It means, depending on which event.  I
5    have different capacity -- I work in different
6    capacity depending if it's nightclub or festival.
7    Q    So tell me in a nightclub what your
8    promotional experience is.
9    A    Anything could range from doing bookings
10   for talent to bring people to the club or even like
11   do the hiring of staff, waitresses, door men,
12   deciding who gets in or doesn't.
13   Q    Have any of the events you've promoted
14   lost money?
15   A    Yes.
16   Q    Why?
17   A    Sometimes not everything goes according to
18   the plan.
19   Q    Sometimes have you been wrong about your
20   estimates of tickets to be sold?
21   A    I was mostly working New York in a
22   favorable market condition so I considered my night
23   life experience overall to be a success.
24   Q    I'm picking at a scab.  I'm asking you
25   about the ones that weren't successful?  What

Page 102

1   happened?  What are you just wrong on your

2   estimates?

3        A    You asked me if I was associated with

4   events that were not successful.  It might not be

5   something I was directing producing, but I would be

6   associated with.

7        Q    I'm sorry what's the difference between a

8   show that you've directly produced and something

9   you're associated with?

10       A    So another club owner puts together a show

11  like, for example, Eddie Dean ^, a past show with

12  Travis Scott, that that's his show, that's his

13  venue.  He will ask promoters to bring people.  In

14  that case it was a success.  But if he miss

15  calculate something it could have been a failure I

16  still promote the show, but I work for him.

17       Q    Okay.  On the next page you say your

18  opinions are in large part based upon my experiences

19  at what can be expected at a high end Super Bowl

20  event.  What are your direct experiences with high

21  end Super Bowl event at least prior to 2018?

22       A    Well, we produced a show the year before

23  bust a rhymes in Houston ^ and I also worked for a

24  group, one-up group in the past.  And they're well

25  known for v-i-p high end events around the world.

Page 103

1   So I worked with them in multiple locations from

2   Central Bay to Ibiza to like other New York.

3       Q    What involvement did you have in the 2017

4   bust a rhyme Super Bowl?

5       A    I was associated -- well, it was primarily

6   Jefferson Agar event.  And I would pass along

7   reservations for tables and giving them my Rolodex

8   of clients for tables.

9       Q    So your sole involvement with that?

10      A    Was promoting.

11      Q    Okay?

12      A    So it's active enrollment it wasn't

13  passive.  It was actually on the basis on that

14  success so to speak that I saw the potential for for

15  profitable event at Super Bowl.

16      Q    And at One Oak Group, those weren't Super

17  Bowl events; right?

18      A    Some were.

19      Q    Was your involvement the same thing

20  providing customers, potential customers?

21      A    Yeah, and expertise and, yeah.

22      Q    You weren't a principal?

23      A    No, I was not.

24      Q    In either of these?

25      A    No.

Rough Transcript

Page 104

1    Q    Okay.  Then you go on to say at a venue

2    like myth live which holds over 4,000 people?

3    A    Yes, 3,750 is legal capacity and then

4    there's a second room upstairs which we did not

5    utilize, but potentially could have been utilized if

6    I had made that choice.

7    Q    Was it configured for 2500 people or 4,000

8    people?

9    A    The legal capacity of the venue is, I

10   believe, 3700 -- 3750 for the main venue.  And then

11   there's another room upstairs which we didn't use.

12   I think what I also said was that because of the

13   furnitures that we put in place, the capacity would

14   be reduced.  Noise legally we could have sold more

15   tick nets theory, but in practice I think 2500

16   people would have fit comfortably.

17   Q    Okay.  How many tickets were you planning

18   to sell if everything sold out, 2500?

19   A    Less because some ticket were maybe like

20   part of the tables.  So I think 2,000 was our

21   target.

22   Q    The next paragraph you say I researched

23   the revenues generated by another v-i-p event in

24   Minnesota?

25   A    Yep.

Page 105

1    Q    What research did you do?

2    A    I called my friends who produced the

3    event.

4    Q    What event?

5    A    Tao.

6    Q    Who was head lining that event?

7    A    I'm not sure.

8    Q    I asked him how did he do in ticket sales.

9    Q    You don't know who --

10   A    There were multiple headliners.  It was --

11   there's a lot of DJs.  I believe cascade ^, I

12   believe who else was playing?  There were like

13   multiple.

14   Q    That's a comp that you used to support

15   your opinions; right?

16   A    Well, there was a group from New York.

17   I'm from New York.  There was one that was mutual to

18   me and the I went to see how many tickets were in

19   ticket sales and I thought there were comparable in

20   size, actually, were bigger.  We were a bigger

21   venue.

22   Q    Okay.  You don't know who was performing.

23   Do you know how long she promoted and marketed the

24   show?

25   A    I just asked them what was their revenue.

Rough Transcript

Page 106

1    Q    So you don't know how many of that revenue

2  was tickets, tables, alcohol?

3    A    I think the 300,000 they gave me was just

4  tickets and it didn't include table service.

5    Q    How much were their tickets?

6    A    Their tickets were starting at $300.

7    Q    And then they told you is a they sold

8  tickets above 3 hundred dollars?

9    A    I think they were selling tickets for

10  $300.  It's easy to double check that.

11    Q    Do you know if they actually sold tickets

12  at $300?

13    A    I'm sure they did.

14    Q    Who did you talk to them?

15    A    I spoke to a friend of mine who works

16  there.

17    Q    Does he have a name?

18    A    I gave you the name.  Rubin Arnetta ^.

19    Q    And then you also relied in forming your

20  conclusions on what you learned about Drake's

21  alleged performance in a New York show; right?

22    A    So that was Mr. Agar, yeah.

23    Q    He gave you the information?

24    A    Yes.

25    Q    The other plaintiff, one of the plaintiffs

Rough Transcript

Page 107

1    in this case -- one of the owners of PJAM?

2        A    Yes.

3        Q    Have you done any analysis other than what

4    you've talked about in Houston and at Tao, any

5    analysis of what other Super Bowl shows have done as

6    far as their financial performance?

7        A    I mean we were intimately involved with

8    the bounce group.  They produced several, several

9    events, Super Bowl they're very well known and they

10   were working with us closely and their stuff was our

11   stuff.  We flew in their stuff.

12       Q    Are you talking about for the Travis Scott

13   show?

14       A    We flew them in to Minneapolis, yes.  So

15   as we were gearing up and preparing the event we

16   worked with them closely.

17       Q    What is their role?

18       A    They just branded one of the nights, the

19   Friday night so we co branded a night with them.

20       Q    What did you co brand it as?

21       A    They added bounce to our fliers.

22       Q    My question is did you undertake any

23   analysis of how other Super Bowl shows performed in

24   reaching your conclusions?

25       A    My conclusion is based on the conversation

Rough Transcript

Page 108

1   I had with them and our experimentation that we

2   would have sold out you know that was certainly how

3   we anticipated things.

4        Q    Can you identify any other Super Bowl

5   party that you analyzed to help support your

6   conclusions?

7        A    No, I can't.  I would like to rephrase

8   that.  I know of several Super Bowl parties that had

9   similar scope and scale and revenues, I just I can

10  produce a record of it, but I can talk about Maxine

11  parties or other parties that have generated a

12  similar amount in revenues or pneumatic ^ check.  So

13  I didn't speak to any principal of those events.

14       Q    Did you rely upon the financial

15  performance of any of those events in reaching the

16  conclusions that are in your expert report?

17       A    So as I said I didn't speak to them.

18       Q    Okay.  So you then didn't rely upon the

19  financial performance of those events?

20       A    Sorry -- I didn't rely on data provided by

21  them, but other than the fact that we would know how

22  many people go to a mixing party and we would go if

23  it's sold out or not and extrapolate how many paid

24  tickets.

25       Q    Did you do that analysis those

Page 109

1  extrapolations in preparation of this expert report?

2      A     No, I didn't.

3      A     There was more for the forecast for the

4  show.

5      Q     And as of February of 2018 it was your

6  opinion that Travis Scott had a higher profile than

7  Cardi B?

8      A     I certainly comparable if not more.

9      Q     Okay.

10     A     Certainly asked for more money he asked

11 for 400,000.  And she only wanted by hundred 60,000.

12     Q     I hired m and m for 25,000 once.  I didn't

13 ask you the question.  I asked you whether Cardi B

14 was as popular as Travis Scott by the time of Super

15 Bowl 18?

16     A     This is very subjective.  I don't know.  I

17 think in terms of records probably Travis was more

18 popular.?

19     Q     Then you state typically the Saturday

20 before Super Bowl generates much larger revenues

21 than the Friday night.

22          Other than on your instinct and common

23 sense what do you base that opinion on?

24     A     I spoke to before the show when I spoke to

25 people -- even before deciding if we wanted to

Rough Transcript

Page 110

1    take -- we were going to take -- start this venture

2    we spoke to a lot of people and when we were offered

3    like two options, separate the Friday and the

4    Saturday or do like a one single event maybe only

5    Friday, only Saturday, the conversation I had with

6    people that had done a lot of shows at Super Bowl

7    was always the same like the conclusion was the

8    Saturday night is the night.  If you had to choose

9    just focus on the Saturday and at the ends we

10   decided to do both, but I had countless conversation

11   about the merit and salary verses Friday.

12       Q    Did you know were you going to lose money

13   on Friday night?

14       A    We were not striving to lose money, but we

15   were hoping at the very least, you know, if the

16   weather been better we anticipated to do better so,

17   yeah, so I didn't know.  I was hoping for a better

18   result, yes.

19       Q    Okay.  Would you say the bulk of your

20   involvement in the entertainment and promotion

21   business has been arranging for customers to show up

22   to events?

23       A    No.

24       Q    How would you characterize the bulk of

25   your involvement in the entertainment and promotion

Rough Transcript

Page 111

1    business?

2         A     Nightclubs experience.

3         Q     Doing what with nightclubs?

4         A     Depending on the nightclub, in some night

5    clubs I would be there to do a promotion.  I would

6    make sole decision on what promoters the club would

7    hire.  Other nightclubs I would be hired on specific

8    nights.  I work with all the best nightclubs in the

9    world.  I on some of the most famous nightclubs in

10   the world.  Maybe you were at some of my clubs when

11   you came to New York.

12        Q     It's possible?

13        A     It's possible.

14        Q     All right.  I'm going to now hand you a

15   document I'm marking as Exhibit 6.

16               (Plf's/Dft's Exhibit ** was marked

17   for identification by the deposition officer and is

18   attached hereto.)

19        MR. KING:  It's also entitled expert report of

20   Alex Martini.

21        Q     This was your second expert report;

22   correct?

23        A     I would have to compare the draft.

24        Q     You --

25        A     I was asked for additional information

Rough Transcript

Page 112

1    that could corroborate my experience in nightclubs.

2        Q    What additional information did you add to

3    this report that wasn't in the first report?

4        A    To the best of my recollection, I added

5    some specific instances of venues that I had been

6    associated with where I had an active role or a job.

7        Q    So I think what you did basically is ad

8    Exhibit 1 and 2, 1 being an overview of your work

9    experience promoting events, I'm just reading from

10   the fifth page of your report, and Exhibit 2 being a

11   listing of note worthy events with which you've been

12   associated and high profile promoters with whom I

13   have worked.

14       A    Yep.

15       Q    Let's look at Exhibit 1.  Can you tell me

16   what Exhibit 1 --

17       A    It's a spreadsheet of a calendar view of

18   my experience.

19       Q    Were you the principal of any of these

20   events?

21       A    What do you mean by principal.

22       Q    Where your opinion was at risk?

23       A    In some events.

24       Q    Which events?

25       A    Like in the Hampton's there would be

Rough Transcript

Page 113

1    events where I would be responsible for paying for a

2    DJ ^ so if the nights would be unsuccessful my money

3    would be at risk.  I also -- other events I would be

4    paid on a percentage of -- percentage based on the

5    revenue of the bar.  In which case you could make an

6    argument that my time my money -- it's money, my

7    efforts were essentially a effort of my time; right.

8         Q    Right.

9         A    I can go through a list and tell you which

10   one if you want.

11        Q    Which one what?

12        A    Which one I was booking DJs and which one

13   I would be paid as a percentage of the bar.

14        Q    No, that's okay.  Let's go to Exhibit 2.

15   What is Exhibit 2 supposed to represent?

16        A    Some of the facilities that I was

17   associated with.

18        Q    When you say associated with, again, what

19   do you mean?

20        A    Again,, for example, this is a venture

21   very similar to the show in Philadelphia where I

22   raised investors money for investors to produce a

23   show also in Miami.  It obviously belongs to

24   somebody else and I was promoting a specific night.

25   The BPM, I was I was one of the initial not funder,

Page 114

1    but I worked very closely with a team of co-founders

2    and we built it from zero to very large festival

3    with hundreds of thousands of tickets sold.  It was

4    probably like the one that I'm most proud of with

5    being associated with and most financially

6    successful.  We made a lot of money.  I think I

7    based my model that I provided to investors based on

8    the financial success of this particular festival.

9        Q    The BPM?

10       A    Yes.

11       Q    I'm done with that so is Zach, Zach

12   Seidman?

13       A    Yeah.

14       Q    I'm sure you've seen these e-mails because

15   we gave them to your lawyer, but let me hand this to

16   you and verify that you've seen this before.  So

17   Exhibit 7 is.

18            (Plf's/Dft's Exhibit ** was marked

19   for identification by the deposition officer and is

20   attached hereto.)

21       THE WITNESS:  I didn't read this ahead of time.

22       Q    Okay.  This is an e-mail from Zach Seidman

23   to David Stromberg?  Do you know who David Stromberg

24   is?

25       A    It's Travis manager.

Page 115

1    Q    You've never seen this e-mail?

2    A    Did you send it to me?

3    MR. KING:  It's nine I'm going to ask you some

4    questions to see if you have any information.  A

5    date prior to the event did you learn that someone

6    named Kevin Fanklestein had chartered a jet for

7    Travis to come to Minneapolis.

8    THE WITNESS:  Say it again.

9    Q    Did you ever learn that someone named

10   Kevin Fanklestein had chartered a private jet for

11   Travis to come to Minneapolis?

12   A    For Travis, this is incorrect.  For

13   Travis?

14   Q    Do you know Kevin Fanklestein?

15   A    I don't know, but I think what you're

16   trying to say here --

17   MR. TOMASULO:  Alex is do you know who Kevin

18   Fanklestein is?

19   MR. KING:  That one he doesn't know.

20   Q    Do you have any dispute between Zach and

21   Jefferson over reimbursement for a private jet that

22   had been chartered by one of Zach's clients --

23   customers?

24   A    I recall there was an issue with one

25   client.  I don't know if it was Zach's client.  I

Rough Transcript

Page 116

1    was under the impression it was Jefferson's client.

2    I remember that this client that was suppose today

3    come didn't come.  I didn't know it was Zach's

4    client.

5        Q    As part of your promotion and marketing

6    did someone on behalf of PJAM plant a story with

7    TMZ?

8        A    Yes, that came up unfortunately.  I guess

9    it came out in the press.  I had nothing to do with

10   it.

11       Q    I'm going to hand you Exhibit 8, although

12   we're not done with Exhibit 7.

13               (Plf's/Dft's Exhibit ** was marked

14   for identification by the deposition officer and is

15   attached hereto.)

16   BY MR. KING:

17       Q    Is this the story that came out a couple

18   days before the event from TMZ?

19       A    Yes, I saw that on the TMZ Web site.

20       Q    Is Jefferson responsible for planting this

21   on TMZ?

22       A    I have to ask him.

23       Q    Have you ever asked him?

24       A    I didn't ask him who approached who.

25       Q    Did Jefferson talk to TMZ, communicate

Rough Transcript

Page 117

1    with TMZ?

2         A    He communicated with TMZ.  I don't know if

3    he planted a story.

4         Q    You know, he communicated with TMZ?

5         A    Yes.

6         Q    And you know, he did it a couple days

7    before the event?

8         A    I don't know if he did but you're saying

9    he actively pursued TMZ.  I don't know if he did it.

10   I don't know.  He may have been approached by TMZ.

11        Q    How did TMZ know Jefferson Agar?

12        A    I don't know.

13        Q    Zach tells David Stromberg that Jefferson

14   Agar opened.  He told him he contacted TMZ and

15   leaked information, details of the event in order to

16   sell more tickets.  Do you know if that's true or

17   not?

18        A    This is the first time I hear that ^

19   check.

20        Q    In the next sentence he says this is

21   because ticket sales were very low about 200 and the

22   company was in very bad shape because of it is that

23   true?

24        A    This is completely not true.  So he's

25   arguing here that we contacted TMZ to boost ticket

Rough Transcript

Page 118

1    sales?

2        Q    I'm asking it different.  I'm asking was

3    it a true statement his statement that ticket sales

4    were very low?

5        A    Ticket sales were low yes, yes that's a

6    true statement.

7        Q    Were they about 200 as of two days before

8    the show?

9        A    Yes.

10       A    I do agree on the don't agree that the

11   company was in bad shape.

12       Q    You agree that 200 tickets were sold?

13       A    Yeah.

14       Q    That was a disappointing No. 2 days before

15   the show wasn't it?

16       A    Yes.

17       Q    The next paragraph he says the day prior

18   to the event the partners of TCL borrowed money from

19   Anthony Scnyderman.  Is that not true?

20       A    That's incorrect.

21       Q    And paragraph 5 Mr. Seidman says in his

22   seconds -- first sentence he says he met with PJ

23   Mr. Johnston I assume stated without the booking fee

24   and Travis' back end money he would not be able to

25   come.  Do you know anything about that?  Is that the

Rough Transcript

Page 119

1   conversation you were talking about earlier?

2       A    I wasn't present for the conversation, but

3   I think it refers to the fact that we are going in

4   the morning.

5       MR. TOMASULO:  Don't speculate.

6   BY MR. KING:

7       Q    Let go to paragraph 6.  He says throughout

8   the day of the event team TCL which is twin cities

9   live?

10      A    Yep.

11      Q    Were asked multiple times for flight

12  itinerary and tail numbers and they were unable to

13  provide?

14      A    There's completely inaccurate.  In fact,

15  actually, I was showing the entire time sitting at

16  lunch -- so I guess my lawyer doesn't want me to

17  answer.

18      Q    You can respond.

19      A    We were showing the itinerary to Mr. Zach.

20  Mr. Sides man was not concerned at all with the

21  plane.  His only concern was give me the money for

22  Coons or I will be beat up.  That's his only

23  concern.

24      Q    So you don't recall -- you may not have

25  been present.  So you don't recall any inquiries by

Rough Transcript

Page 120

1  Zach for a flight itinerary and tail number?

2      A    I recall that we provided details to Zach

3  and Coons.

4      Q    Okay.  Why don't you read paragraph 7 to

5  yourself.

6      A    What does it mean?

7      Q    I don't know.  You have not seen it

8  before?

9      A    No.

10     Q    It does state that you were assaulted by

11  somebody.

12     A    First of all I was assaulted.  I was

13  assaulted on camera at the airport in front of the

14  police.  I was assaulted like there was a detective

15  in Minneapolis looking for -- there's two large

16  black men that took my suitcases and through the

17  suitcase inside the s IV I was thrown on the ground

18  I lost my tooth and the police recorded the whole

19  event.  I didn't stage anything.  The people run

20  away.  They're still at large.  So, you know,.

21     Q    Did understand they were people affiliated

22  with Gucci Manne?

23     A    Of course there were people affiliated

24  with Gucci Manne.

25     Q    What did they want from you?

Rough Transcript

Page 121

1        A      They claimed that they went to be paid

2    $10,000.

3        Q      For what?

4        A      For promotion.  They were part of the --

5    not the people that assaulted me.  I didn't

6    recognize, but there was a group that booked Gucci

7    Manne to perform and we paid, I believe like

8    30,000 -- whatever money was paid to these guys and

9    on top of that they said they also wanted to have

10   $10,000 to promote the night.  And I refused because

11   Gucci Manne didn't perform which it seems like

12   pretty much common sense.  They intimated I couldn't

13   leave town.  I called the police the first time.

14   The police escorted me to the car.  I opened the car

15   tell my wives this town is crazy and as I get out of

16   my car at curb check in and their SUV pulled up two

17   people jumped out and I guess tried to kidnap me.

18   There was no -- there was no at all -- there was no

19   doubt at all that they were trying to prevent me

20   from leaving town.  Just an hour before this group

21   were telling me you can't leave.  So, yeah, I

22   certainly wasn't expecting that.

23       Q      I'm going to hand you a document.  I'm

24   going to mark this Exhibit 8.

25                    (Plf's/Dft's Exhibit ** was marked

Rough Transcript

Page 122

1    for identification by the deposition officer and is

2    attached hereto.).

3         Q    Again, you may have seen before it was

4    previously sent to your lawyer.

5         Q    So forget the Zach Seidman.  The second

6    e-mail is from David Stromberg to Brett Lockett at

7    m-2 jets?

8         A    Okay.

9         Q    Was m-2 jets --

10        A    The company we used.  And the copies to

11   among others Jefferson Agar; right?

12        A    Right.

13        Q    Whose one of the principals of PJAM.

14        A    Yep.

15        Q    And Mr. Stromberg says we need to depart

16   s-t-c at 1130c-s-t.  We need to be in Vegas by

17   1:00 a.m. sharp?

18        A    Okay.

19        Q    Okay.  That's sent at 2:24 p.m.?

20        A    Okay.

21        Q    Which is the day of the show?

22        A    2:24 p.m. L.A. time.

23        Q    Yes.

24        A    So 424, 4:24 in Minneapolis.

25        A    I guess.

Rough Transcript

Page 123

1    Q    Well, that would be mathematically

2    correct.

3    A    I don't know where David Stromberg is

4    based ^.  Definitely the day of the show, yes.

5    Q    So day of the show David Stromberg is

6    sending the charter company and Jefferson Agar?

7    A    Yep.

8    Q    An e-mail saying we need to depart s D.C.

9    at 1130c-s-t ^?

10   A    Okay.

11   Q    Even if you were going to put Travis Scott

12   on stage at 10:00 p.m.?

13   A    There's no way he could depart s-t-c by

14   1130 that night of the show; right.

15   A    I don't know that.

16   Q    Let's make an assumption because I know

17   this?

18   A    Yeah.

19   Q    If it's an hour and a half in good weather

20   to get from Myth to St Cloud airport?

21   A    Okay.

22   Q    Would you agree that putting him on a

23   10:00 would make it impossible to leave s-t-c at

24   11:30?

25   A    I don't know how long it takes so I don't

Rough Transcript

Page 124

1   know.  I don't know what's the distance.  I told you

2   before and I don't know.  Is it one and a half?  Is

3   it?  I don't know.

4   BY MR. KING:

5       Q    It is, but you don't have to take my word

6   for it.  So if you go back to the last page of this,

7   you'll see a trip confirmation, information and

8   confirmation from m-2 jets.  Do you see that?

9       A    The last page?

10      Q    Yep?

11      A    Yes, the last page.  So reading backwards

12  you can see that that's been sent to David Stromberg

13  by Zach Seidman; right.

14      A    (No audible response.)

15      Q    If you look at the last e-mail it says on

16  February 1st, 2018?

17      A    Yeah.

18      Q    Zach Seidman David please see attached per

19  Travis' jet.  Exclamation point.  Let me know if you

20  need any changes.  Do you see that?

21      A    Yep.

22      Q    So attached is an itinerary; right?

23      A    Yes.

24      Q    Would you agree that that itinerary does

25  not have a tail number on it?

Page 125

1          MR. TOMASULO:  Is he copied on any of these

2    e-mails?

3          MR. KING:  No, well, I don't know we'll find

4    out.

5          MR. TOMASULO:  I don't think this has anything

6    to do with his expert report.

7          MR. KING:  This is a percipient question?

8          THE WITNESS:  I don't see any.

9    BY MR. KING:

10         Q    Did you know that at least an itinerary

11   sent to team Travis did not have a tail number on

12   it?

13         A    I was not part of it so I don't know.

14         Q    That's what I meant.  Nobody brought that

15   to your attention?

16         A    I was communicated that tail number was

17   provided.

18         Q    Who told you that?

19         A    Jefferson and I believe I was speaking to

20   Brett as well.  I'm not as you can see my e-mail --

21   I'm not copied on this e-mail.

22         Q    Okay.  And then if you go to the second

23   page of this e-mail chain, halfway through the page,

24   you can see on February 2nd at 5:50 p.m., David

25   Stromberg asking -- stating and I need the tail

Rough Transcript

Page 126

1    number.  Do you see that?

2         A    Yep.

3         Q    Did anybody ever communicate to you that

4    David Stromberg the day before the show was asking

5    for a tail number?

6         A    Yes.

7         Q    Who told you that?

8         A    No, we were talking and there were

9    discussion there were all discussion like with

10   groups of people.  Anthony was present, Manny Kess

11   was present.  Zach, Jefferson, my general manager,

12   we were team and I remember like Jefferson was

13   telling me that tail number was communicated or I

14   don't know like I'm not sure by who.  I don't know

15   if it was by Brett.  I assume that -- all I knew was

16   the contract was signed and the jet was paid.

17        Q    Okay?

18        A    So at that point I assumed that it was

19   taken care of.

20        Q    Okay?

21        A    I didn't think of anything else.

22        Q    You assumed they had communicated that to

23   Travis Scott?

24        A    Yes.

25        Q    So again, now back to the first page.  The

Rough Transcript

Page 127

1  e-mail I asked you about a minute ago at 2:24 p.m.,

2  day of show, we're talking 96 minutes before they

3  have wheels up out of Van Nuys, you have David

4  Stromberg saying send itinerary with these times and

5  tail number.  Do you have any, any opinion of why

6  Mr. Stromberg is asking for the tail No. 96 minutes

7  before the flight is set to depart if the tail

8  number had already been furnished to him?

9        A    I don't know.

10       MR. KING:  I'm going to hand you exhibit No. 9.

11       MR. TOMASULO:  How much longer are you going to

12  go.  That dissolve is I closed he's here as an

13  expert.  I don't think asking him questions about

14  e-mails he wasn't copied on is appropriate expert

15  testimony.

16       MR. KING:  Well, but his whole entire opinion

17  about profit is really based upon whether there was

18  going to be a show or not.  I think almost

19  everything is fair game at that point.

20       MR. TOMASULO:  I disagree, but how much longer

21  are you going to go?

22       MR. KING:  Ten minutes on this.  There's not

23  much.  In fact, watch how fast this goes.  I've

24  handed you Exhibit 9.  This is a text exchange.

25                 (Plf's/Dft's Exhibit ** was marked

Rough Transcript

Page 128

1   for identification by the deposition officer and is

2   attached hereto.)

3        MR. KING:  And I'm not sure quite sure who it's

4   between.  So I'm going to ask you if you recognize

5   the phone numbers.  I can see some identified as

6   David Stromberg, but the other one is (310)486-0606.

7   Do you know who that is?

8        THE WITNESS:  310, L.A. somewhere.  I don't

9   know.

10       Q    Let me ask you do you recall there ever

11  being a discussion of finding an alternative airport

12  to St. Cloud oak I county Blain airport?

13       A    Yes, ^ is.

14       Q    What do you recall?

15       A    That was during lunch when we were all

16  trying to figure out a way to make team Travis

17  comfortable with timing and logistics.

18       Q    So the first text on the second page says

19  it's going to take Travis a couple of hours to get

20  to the airport?

21       A    Where.

22       Q    I'm at the top of the second page.  It's

23  the 310 number communicating?

24       A    Yeah.

25       Q    Communicating with (702)743-0412?

Rough Transcript

Page 129

1      A    Yep.

2      Q    Do you know who that is?  Is that the

3  charter plane guy?

4      A    I don't know.

5      A    It looks like a Vegas number.

6      Q    So to summarize the top text at close to

7  1:00 p.m. on the day of the show, somebody from the

8  310 number who I think will find out is David

9  Stromberg says if we don't have a trip sheet in the

10 next 30 minutes showing certain times we're not

11 going to be able to make the trip.

12     A    Uh-huh.

13     Q    So earlier you testified that there was a

14 lot of discussions about Zach telling Travis not to

15 show up because he didn't get his cash?

16     A    Yes.

17     Q    Do you recall being told that Mark

18 Stromberg was somebody else on Travis' behalf had

19 sent a text saying we're not showing up unless you

20 confirm our travel?

21     A    No, the name this never came up during

22 lunch.  ^ check.  I didn't know he had such an

23 active role in discussing this until I'm finding it

24 out now.

25     Q    Who?

Rough Transcript

Page 130

1      A    Mr. Stromberg.  I didn't realize

2   Mr. Stromberg was involved in deciding -- I'm just

3   reading this.

4      Q    Okay?

5      A    So I remember lunch being a little more

6   focused on the payment part.

7      Q    But does this refresh your recollection

8   that somebody had told you that Stromberg or someone

9   on Travis' behalf said if they didn't get confirmed

10  travel they weren't going to show up?

11     A    I think they did things that were in

12  parallel.  I know that because Jefferson was asking

13  me about options for helicopters.

14     Q    So you understood there was a problem and

15  that Jefferson was suggesting that helicopters might

16  solve it?

17     A    I understood that Travis wasn't happy

18  about the distance between one of the airport and so

19  there was when Jefferson said if you give him a

20  helicopter.  So that seemed to be a solution at the

21  time to dramatically decrease the time in the car.

22     Q    Did you get him a helicopter?

23     A    We had a quote and ready to get a

24  helicopter and we provide a helicopter option and

25  now, I believe, all of this was very quick and fast

Rough Transcript

Page 131

1   and there was a little screaming at this point.  So

2   not everybody was on the same page, but I remember

3   like there was an issue with the number of people on

4   the jet versus the number of people that could fit

5   in the helicopter.  So there was discussion about

6   getting two helicopters and we said we would provide

7   a helicopter for Travis and a car for the rest.

8   Only four people could fit in the helicopter.  So to

9   that extent.  And I think that showed willingness to

10   cooperate in bringing Mr. Scott do you know and we

11   were willing to pay $8,000 extra.

12        Q     Did you book a helicopter?

13        A     We were ready to book it.  We found one.

14        Q     So I'm looking at a news report that must

15   be wrong, but I'll read to you what it says.  It's

16   the star tribune.  It's an article dated February 7,

17   2018; right after.  It's a story on the show, but it

18   says ironically Gucci did show up and perform at

19   Myth nightclub on Saturday.  That's false?

20        A     He showed up he did not perform.

21        Q     I had earlier asked you what the pricing

22   was on the tickets and I told you I had seen

23   something that said $150 --

24        A     You're aware that.

25        MR. TOMASULO:  There's no question.

Rough Transcript

Page 132

1          THE WITNESS:  Yeah.

2     BY MR. KING:

3          Q    And I think you acknowledged ultimately

4     that the tickets were on sale for $150 without an

5     open bar, is that --

6          A    What I was trying to say is you might see

7     a display ad for 150.  Different markets show

8     different prices.

9          Q    Okay?

10         A    So it's possible that you see a local ad

11    for 150 while we were still selling tickets in New

12    York for 300.

13         Q    Okay.  Who was actually in charge of

14    getting this job.  Was that Agar?

15         A    Jefferson Agar recommended to use this

16    particular company, so he acted as point man in

17    charge.  We signed a contract as PJAM.  So I guess

18    ultimately it's my fault if communication -- didn't

19    pan out to be effective.  I take responsibility.

20         Q    And it was with somebody called m-2 jets?

21         A    M-2 jets is the company that provided the

22    jet.

23         Q    Is somebody named Moses?

24         A    There are two principals.

25         Q    Do you know their names?

Rough Transcript

Page 133

1      A    * Mow Shea and Brett.

2      Q    And they have some preexisting

3   relationship with one of the people in PJAM?

4      A    They do.  One of them.  *Mow Shea knows

5   Jefferson.  I think Jefferson used this company

6   before.

7      Q    So was the way it worked that you rented

8   the facility and you brought in the alcohol?

9      A    Yes, we brought in -- we order -- we paid

10  for the entire stock.  So everything that was

11  consumed was ours.

12     Q    And what about the alcohol that was not

13  consumed?  What happens to that?

14     A    It's still there.

15     Q    But is it owned by you?

16     A    Well, I'm making the case it's owned by

17  me, yeah.

18     Q    Did you pays for it?

19     A    Yes, we did.  We pay up front.  We order

20  from the distribute for.  PJ's dad sent a wire two

21  days before.

22     Q    How much alcohol was leftover?

23     A    Approximately $100,000.

24     Q    Is there a dispute over is that your

25  alcohol?

Rough Transcript

Page 134

1    A    Yes, there is.

2    Q    What's the nature of the dispute?

3    A    On the remaining.

4    Q    Is there a contract dispute where somebody

5  is claiming they own it?

6    A    There is a dispute between PJAM and me.

7    Q    PJAM and you?

8    A    Myth.

9    Q    Myth is claiming they own it?

10   A    No, they claimed they don't want to return

11 it.

12   Q    Did they communicate a reason for that?

13   A    Their thugs as you define it.  There are a

14 lot of people in this business are less scrupulous

15 than they should be.

16   Q    Do they claim they're owed money by PJAM?

17   A    We claim we are owed money by Myth.

18   Q    For the alcohol or something else?

19   A    Alcohol and some of the revenues that run

20 through their p-o-s which they have so far refused

21 to turn out.

22   Q    What's the magnitude of those revenues?

23   A    I have to double check on the exact

24 numbers.  Above $100,000 for sure that's missing.

25   Q    Do you have a lawsuit pending against

Rough Transcript

Page 135

1   them?

2        A    We do.

3        Q    Where is that pending in Minneapolis?

4        A    New York.

5        Q    In New York.  How much did you spend on

6   advertising and promotion?

7        A    Tens of thousands.  I think I can get the

8   number.  I have to ask my marketing team.

9        A    We have two separate marketing agencies,

10  I'm sorry.

11       Q    I let's go off the record and let me talk

12  to Zach -- for five minutes -- let me talk to Matt

13  for five minutes and then we may be done.

14       THE VIDEOGRAPHER:  Off the record.  The time is

15  142.

16            (A recess was taken from ****** to

17  ******.)

18       THE VIDEOGRAPHER:  Back on the record.  The

19  time is 148.

20  BY MR. KING:

21       Q    It was pointed out to me off the record

22  that I marked two Exhibit 8.  So I've taken the TMZ

23  article that says Travis Scott working a double

24  shift Super Bowl 52 weekend and I've marked that 8-a

25  instead of eight.

Rough Transcript

Page 136

1                    (Plf's/Dft's Exhibit ** was marked

2       for identification by the deposition officer and is

3       attached hereto.)

4       BY MR. KING:

5            Q    I just have a couple of questions

6       Mr. Martini.  There were some names in the

7       advertising I saw that I thought you could tell me

8       who they are.  They were listed as people affiliated

9       with the show.  Aim hospitality group?

10           A    Yes.

11           Q    Who is that?

12           A    Anthony Scnyderman.

13           Q    To were listed because they're co

14      promoters?

15           A    Yes, and they invested money in the show.

16           Q    They invested through PJAM?

17           A    Into PJAM.

18           Q    Okay.  So they are somebody who would

19      benefit if you prevail in this case?

20           A    I don't know if they would benefit.  They

21      probably wouldn't benefit.

22           Q    Okay.

23           A    Financially you mean?

24           Q    Yes.

25           A    They wouldn't receive any compensation.

Rough Transcript

Page 137

1  Q  No, reimbursement of their investment?

2  A  We haven't discussed.  I mean this is not

3 something that is discussed yet.

4  Q  Okay?

5  A  And e-c l events is PJAM; right?  I'm

6 sorry Twin City Live is PJAM.  Who is e-c l events.

7  A  E-c l?

8  Q  Yes.

9  A  E-c l I don't know I'm not familiar with

10 them.

11  MR. TOMASULO:  If you don't know.

12  THE WITNESS:  There are a lot of promoters?

13 BY MR. KING:

14  Q  How about note; right?

15  A  I think it's another promoter Nathan lieu

16 Okay., I believe.

17  Q  Hip hop m-n?

18  A  It must be another promoter.

19  Q  Okay I have no further questions at this

20 time.  I would suggest that we stipulate that the

21 original transcript go to the witnesses counsel.  I

22 think is two weeks enough to review it given our

23 trial date?

24  MR. TOMASULO:  Yeah, that ought to be fine.

25  MR. KING:  Okay so the witness will have two

Rough Transcript

Page 138

1   weeks from the point its sent to counsel to review

2   it make any changes and sign it under penalty of

3   perjury.  If in which case counsel will notify us

4   that it's been signed what the changes were and make

5   it available for use at trial should we so request.

6   If it's not returned to us if that notice is not

7   given to us within two weeks then any party can use

8   an unsigned certified copy of the transcript as

9   though it were an original signed under penalty of

10  perjury.

11      MR. TOMASULO:  So stipulated.

12      MR. KING:  Thank you.

13      THE VIDEOGRAPHER:  This concludes today's

14  deposition and we're off the record the time is 151.

15      MR. TOMASULO:  I'm going to order a certified

16  copy.  UNCERTIFIED ROUGH DRAFT; NOT TO BE CITED

17

18

19

20

21

22

23

24

25