EX. A

```
 1                UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3          HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE

 4

 5   PJAM, LLC,                      )
                                     )
 6              PLAINTIFF,           )    CASE NO.
                                     )
 7          vs.                      )    CV 18-3192-JFW
                                     )
 8   XX GLOBAL, INC., AND            )
     JACQUES WEBSTER,                )
 9                                   )
                DEFENDANTS.          )
10   _____ )

11

12

13                     REPORTER'S TRANSCRIPT OF
14                      PRETRIAL CONFERENCE
                       FRIDAY, MARCH 29, 2019
15                          10:03 A.M.
                       LOS ANGELES, CALIFORNIA
16

17

18

19

20

21

22   _____
23
            MIRANDA ALGORRI, CSR 12743, RPR, CRR
24          FEDERAL OFFICIAL COURT REPORTER
            350 WEST 1ST STREET, SUITE 4455
25          LOS ANGELES, CALIFORNIA 90012
               MIRANDAALGORRI@GMAIL.COM
```

```
 1                    APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF:

 4       HILL FARRER & BURRILL, LLP
         BY:  STEPHEN J. TOMASULO
 5       300 South Grand Avenue
         37th Floor
 6       Los Angeles, California 90071

 7

 8   FOR THE DEFENDANTS:

 9       KING HOLMES PATERNO & SORIANO, LLP
         BY:  MATTHEW J. CAVE
10       1900 Avenue of the Stars
         25th Floor
11       Los Angeles, California 90067

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1              LOS ANGELES, CALIFORNIA; FRIDAY, MARCH 29, 2019

2                            10:03 A.M.

3                              ---

4

5              THE CLERK:  Calling item 2, CV 18-3192-JFW,

6   PJAM, LLC versus XX Global, Inc.

7              Counsel, please state your appearances.

8              MR. TOMASULO:  Stephen Tomasulo --

9              THE COURT:  You have to get closer to the

10  microphone and speak up.  As you will unfortunately find out in

11  this courtroom, as with many of our courtrooms in this

12  wonderful new building, we have a defective sound system.  So

13  make sure that you pull the microphone close to you because,

14  unless you're about two or three inches away from the

15  microphone, your voice will not pick up, and the court reporter

16  will be unable to hear you.  So why don't you start over.

17             MR. TOMASULO:  Stephen Tomasulo for plaintiff and

18  counterclaim defendant PJAM, LLC.

19             MR. CAVE:  Good morning, Your Honor.

20             Matthew Cave for the defendants and

21  counter-claimants XX Global, Inc., and Jacques Webster.

22             THE COURT:  Good morning to all.  You may remain

23  seated during the course of the proceedings as I'm going to be

24  jumping around back and forth from counsel to counsel.

25             This case is on the Court's calendar for a

4

1    pretrial conference.  I reviewed all of the pretrial documents

2    that have been filed, and I appreciate counsel's efforts in

3    preparing those documents.  I have very few issues to discuss

4    with counsel this morning.

5              But I just want to confirm that -- and I'm --

6    rather than use -- because it gets very confusing using

7    counter-claimants and counterclaim defendants, I'm going to

8    rely primarily on the actual names of the various parties.  We

9    have PJAM, which is an LLC, and we have XX Global, Inc., and we

10   also have Mr. Webster, and XX Global is the company that he

11   uses to conduct business.  And then we have counterclaim

12   defendants.  We have three of them.  But based upon the

13   pretrial documents, it appears that their claims against

14   those -- or those individuals are going to be dismissed at some

15   point in time; is that correct?

16             MR. CAVE:  That is correct, Your Honor.

17             THE COURT:  When are you going to file a

18   dismissal?

19             MR. CAVE:  We can do it today, Your Honor.

20             THE COURT:  Okay.  And the XX Global has

21   abandoned its second claim for breach of implied covenant

22   against the PJAM, LLC.

23             Is that also correct?

24             MR. CAVE:  That is accurate, Your Honor.

25             THE COURT:  All right.  So the case is going to

1   proceed on Plaintiff PJAM's claim No. 1 for breach of contract,

2   and it will proceed on XX Global's counterclaim for breach of

3   contract against the plaintiff PJAM.  Maybe I should do

4   plaintiff and defendant rather than names.

5          Those are the parties, and those are the claims;

6   right?

7          MR. TOMASULO:  Correct, Your Honor.

8          MR. CAVE:  Correct.

9          THE COURT:  Okay.  The case is a relatively

10  simple case, and the facts are -- the primary facts are

11  stipulated to.  Those not only appear in the various pretrial

12  documents, but they also appear in stipulated Instruction

13  No. 16.

14          And those facts are that Mr. Webster was also

15  known as Travis Scott as, an entertainer who performs under the

16  name Travis Scott.  XX Global is the company under which

17  Mr. Webster conducts his entertainment business.  The 2018

18  Super Bowl took place in Minnesota on Sunday, February 4, 2018.

19  January 24, 2018, the parties entered into a written contract

20  pursuant to which Mr. Webster agreed to appear and perform for

21  the grand total of 30 minutes at a venue called Myth, M-y-t-h,

22  Live in Maplewood, Minnesota on February 3rd, 2018.

23          Prior to the event, the plaintiff paid XX Global

24  $150,000 of the $200,000 fee that was reflected in the written

25  agreement.  And the final fact which brings us here or brings

1    the parties to this lawsuit is that Mr. Webster did not appear

2    and perform at Myth Live on February 3rd, 2018, as contemplated

3    by the agreement.

4              The agreement provided for a guaranteed fee on an

5    all-in basis, whatever that means, and it also provided that

6    the artist, Mr. Scott, would be entitled to the following

7    accommodations in addition to the fee: Private airfare from and

8    to the event, i.e., from Los Angeles to the event and from the

9    event to Las Vegas.

10             It seems to me that the factual issue that the

11   parties have framed in this case is -- you know, I actually

12   have several questions about the facts of the case for the

13   plaintiff.

14             It appears that what Mr. Scott is alleging or

15   contends was the reason that he did not show up for the

16   performance was that his representatives -- and I can't

17   remember the names.  It may be Mr. Stromberg,

18   S-t-r-o-m-b-e-r-g, for the court reporter and others -- after

19   the contract was signed kept asking for confirmation or a

20   confirmed itinerary because it was important.  And the

21   plaintiffs admit that it was -- that Mr. Scott had another

22   performance in the early morning hours on Sunday, February 4th

23   which he was going to perform in Las Vegas at 1:30 a.m., that

24   the private air transportation be such that he would arrive in

25   Las Vegas by 1:00 a.m. -- again, we're dealing with Pacific

1    Standard Time -- in order to make his 1:30 a.m. show.

2              There is going to be testimony that those -- that

3    travel itinerary was not provided, and because Mr. Scott did

4    not have that confirmed itinerary which was going to make sure

5    that he was able to make his 1:30 performance, he did not show

6    up.

7              I have looked at the exhibit -- the pretrial

8    exhibit stipulation, and I appreciate counsel's efforts in

9    resolving the objections which they indicate that they have

10   resolved the objections in the pretrial exhibit stipulation

11   that was filed on March 25th, document No. 53.  But it doesn't

12   tell me how those objections were resolved.  So I don't know

13   what -- if there are remaining objections, if the objections

14   were simply withdrawn, or what the status is.

15             In any event, today I'm going to issue a Civil

16   Trial Order which has various provisions in it, and one of

17   those is the preparation of a final pretrial exhibit

18   stipulation.  So I will have the benefit of those exhibits.

19             But what I'm going to ask counsel to do is

20   sometime next week by the middle of the week, if you will

21   actually provide me with my bench copies of the exhibits

22   because, when I'm reviewing these -- preparing the case for

23   trial -- in this case it's not that important because the

24   objections have apparently been resolved.  But I'd like to have

25   the actual physical exhibits so I can try to understand what

1    those exhibits are.

2             But in any event, referring to the pretrial

3    exhibit list, there's only one document that I see, and that's

4    at trial Exhibit No. 32 which relates to the private airfare

5    for Mr. Scott.  And that exhibit is described as a

6    February 3rd, 2018, M2 Jets trip information and confirmation

7    invoice prepared for Mr. Jefferson Agar who apparently is the

8    principal of the plaintiff in the amount of $41,805.22.

9             So what is the -- and then there's a whole series

10   of text messages, but I don't know -- I don't have those

11   exhibits; so I can't tell from those exhibits what was going

12   on.  At least the joint witness statement indicates that

13   Mr. Stromberg is going to testify that he kept trying to get

14   some confirmation in terms of this itinerary or when the jet

15   was going to be there and to make sure that Mr. Scott was able

16   to get to Vegas to meet his performance.

17            What is the evidence that the plaintiff is going

18   to put on that is going to attempt to convince the jury that

19   Mr. Scott's reason for not showing up because the -- due to the

20   air travel was not well-founded and that the jet was ready and

21   it was going to get Mr. Scott to Las Vegas sometime in the

22   early morning hours of Super Bowl Sunday so he could make his

23   performance?

24            MR. TOMASULO:  We have a couple witnesses listed

25   there, Your Honor -- Moshe Malamud and Brett Lockett who own

1    M2 Jets.  I think we are only going to have Mr. Lockett

2    testify.  But Mr. Lockett is going to testify that the jet was

3    paid for.  It was waiting at Van Nuys Airport to take Mr. Scott

4    to Minnesota and that they could have left whenever Mr. Scott

5    was done with his performance in Minnesota.

6            And I think that Mr. Agar and Mr. Martini will

7    testify that they were going to allow Mr. Scott to perform at

8    10:00 a.m. {sic}, early enough in the evening even though they

9    would have preferred to have him perform later.  But I think

10   that's sort of standard in the rap industry.  I'm not a rap

11   expert.  But you have your headline act in a club like this go

12   on late at night so people stay there and drink for longer, but

13   they were going to try to accommodate him by having him perform

14   early in the evening.

15           We would also note, Your Honor, that the contract

16   doesn't specify a time that Mr. Scott needed to be in Vegas.

17           THE COURT:  No.  But in your answer to the

18   counterclaim, you admit that you knew that he had to be in

19   Vegas in order to meet his 1:30 performance.  There's no issue

20   as to that.

21           MR. TOMASULO:  I think what we admitted was that

22   he told us that.

23           THE COURT:  Well, obviously he told you that.

24   Did he make it up?  Did he lie he was going to have to be there

25   at 1:15 instead of 1:30?

1              In any event, that's all well and good, but how

2     is that information, if it was communicated to Mr. Scott or his

3     representatives -- I don't know if there was a direct

4     communication between Mr. Scott and those gentlemen that you

5     just referred to or if they are dealing with a representative

6     of Mr. Scott.  Who is it that -- from -- that was receiving

7     this information that the jet was fueled, ready to go, and was

8     ready to take off from Van Nuys Airport?

9              MR. TOMASULO:  Well, it was Mr. Agar and

10    Mr. Lockett who were receiving texts back and forth with the

11    defendants, and I think that we actually did get a passenger

12    list from -- we did, in fact, get a passenger list from the

13    defendants.  So -- and that was provided to Mr. Lockett.  And I

14    think that the e-mails are, I think, subject to interpretation.

15             Our position is that Mr. Scott had a child two

16    days before the event, the day that he advised them that he

17    needed to be in Vegas at 1:00 o'clock.  We think the travel

18    issue is pretextual.

19             THE COURT:  I understand what you think, but

20    what's the evidence going to show in terms of -- is there some

21    smoking gun e-mail to -- who is it that Agar and that other

22    gentleman are dealing with?  It looks like, based upon the

23    joint witness list, that they are dealing with Mr. Stromberg.

24    And defendant is going to be eliciting testimony that Stromberg

25    repeatedly told various individuals that he had to be there.

1   So what's your -- who is going to testify that there is no

2   doubt in anyone's mind that the jet was available, that they

3   are going to let him put on his performance early, and he was

4   going to be able to meet his Las Vegas performance at 1:30

5   Pacific Standard Time?

6               MR. TOMASULO:  Mr. Agar Martini and Lockett.

7               THE COURT:  Will testify as to having that

8   conversation with who?

9               MR. TOMASULO:  With Mr. Stromberg and with

10  Mr. Howard who is the booking agent for Mr. Scott.

11              THE COURT:  Okay.  So there is -- it's

12  unequivocal that they communicated to representatives of the --

13  of Mr. Scott that the transportation had been arranged, paid

14  for, and would -- and he would be able to perform earlier than

15  later so that he could meet his 1:30 performance in Vegas?

16              MR. TOMASULO:  I believe that is what they will

17  all testify to, yes.

18              THE COURT:  Are there any documents that reflect

19  that?

20              MR. TOMASULO:  There's text messages back and

21  forth about the travel which I believe are subject to

22  interpretation.

23              THE COURT:  What do you mean subject to

24  interpretation?

25              MR. TOMASULO:  Well, like you said, there is no

1     smoking gun document that says -- that defines that either way.

2     They could have interpreted the e-mails or the texts and

3     communications as not providing sufficient confirmation.  We

4     believe there was sufficient confirmation, and we believe there

5     was no issue, and we think that our witnesses will testify to

6     that and establish it to a jury.  But there's not a smoking gun

7     document if that's what you are asking.

8                    THE COURT:  What about this issue with respect to

9     the -- that the plaintiffs did not have sufficient funds on

10    hand to pay Mr. Webster the final $50,000 that was due in cash

11    immediately following the event?

12                    MR. TOMASULO:  Mr. Martini will testify that, had

13    Mr. Scott -- they did have -- I don't know the exact amount,

14    but they did have quite a bit of cash.  Mr. Martini will

15    testify that two -- one issue.  Mr. Martini will testify that,

16    if Mr. Scott showed up, there is no question that these

17    performances generate tremendous amounts of cash, that there

18    was not going to be an issue with them having 50,000.

19                    Mr. Tom Johnson, who is an investor, will also

20    testify that he could have gotten -- if there was an issue, he

21    could have gotten the remaining cash to him the next day in

22    Los Angeles if that's what they had wanted.

23                    THE COURT:  Well, I thought the cash was supposed

24    to be paid to him immediately after he performed.

25                    MR. TOMASULO:  I don't think it says immediately.

 1    It says after the services were rendered.

 2              THE COURT:  What's Mr. Scott's information with

 3    respect to this -- the private transportation?

 4              MR. CAVE:  Your Honor, the issue from our

 5    perspective is pretty simple.  There is no evidence that an

 6    itinerary with confirmed transportation from the Van Nuys

 7    Airport to the Minneapolis area and then, very importantly,

 8    from the Minneapolis area to Las Vegas was ever sent to

 9    Mr. Stromberg or anyone else on Mr. Scott's team up to just a

10    few hours before they were supposed to be taking off from the

11    Van Nuys Airport.

12              Your Honor has seen the text messages and e-mails

13    that were sort of frantically going back and forth in which

14    Mr. Stromberg was saying essentially, what's going on?  We need

15    to take off if we are going to do this show.  There was no

16    itinerary with an actual jet that included tail numbers and

17    confirmed times of arrival that would guarantee Mr. Scott would

18    be back in Vegas by 1:00 a.m.  The only itinerary that's in the

19    evidence is trial Exhibit 32.

20              And, Your Honor, if you look at that, if that jet

21    was in fact --

22              THE COURT:  I can't look at it because I don't

23    have it.

24              MR. CAVE:  I'm sorry, Your Honor.  I do have

25    additional copies if you'd like.

1      THE COURT:  No.  I'm not going to -- it's a jury

2  trial.  I'm interested -- because I looked through this, and

3  that's one of the disadvantages of not having the exhibits.  Go

4  ahead.  I interrupted you.

5      MR. CAVE:  That document shows an estimated time

6  of arrival in Las Vegas at 2:45 a.m.  It's an hour and 15

7  minutes after he was supposed to be at the Marquee Nightclub

8  performing, and that's landing at Las Vegas International

9  Airport.  He would then have to get to the club.  There is no

10  way he could have performed at that time.  He would have missed

11  the show.  And they knew in entering into the contract about

12  that show.  They admitted it in the answer as Your Honor

13  recognized.

14      And so, you know, that's really the only issue.

15  If Mr. Scott would have gotten a confirmed itinerary that would

16  have allowed him to get to Vegas for his second show, he would

17  have gone.  You know, this extraneous information about having

18  a child, yes, he did.  Were there other things going on in his

19  life?  Yes, as with everyone else.  But he actually went to

20  Las Vegas and performed that night, and he would have gone to

21  Minnesota beforehand and performed as well.

22      THE COURT:  How much did he get paid for the

23  Vegas event?

24      MR. CAVE:  I couldn't answer that, Your Honor.

25  I'm not sure.

```
 1              THE COURT:  Approximately.

 2              MR. CAVE:  A few hundred thousand dollars.  That

 3   was typical at that time for performances he was giving.

 4              THE COURT:  It was a good night.  Good weekend.

 5              I guess the issue is what would Mr. Scott -- you

 6   say you wanted some kind of a confirmed itinerary.  What form

 7   does that -- so you're saying that, as far as Exhibit No. 32,

 8   does not give Scott the confirmed itinerary that he or his

 9   representative -- I assume it's his representatives that were

10   looking at this.

11              MR. CAVE:  And that is Mr. Stromberg, yes.

12              THE COURT:  Stromberg or Bromberg?

13              MR. CAVE:  Stromberg with an "S."

14              THE COURT:  What is the document that he was

15   looking for that would have prompted Mr. Scott to get on the

16   plane to -- I guess his position is or the plaintiff's --

17   defendant's position is that 32 didn't do it because it showed

18   the ETA in Vegas at 2:45 which was inconsistent with the

19   parties' understanding that he had to be there by at least

20   1:00 a.m. to make a 1:30 appearance.

21              MR. CAVE:  That is exactly right, Your Honor.  If

22   that document had a 1:00 a.m. arrival time or thereabout,

23   that's what he wanted.

24              THE COURT:  What's the issue -- there's a

25   footnote somewhere that -- is this the -- is the ETA of 2:45
```

```
 1    that's on this confirmation driven by the fact that they were

 2    going to take off from this St. Cloud Airport?

 3                     MR. CAVE:  That's an important issue, Your Honor.

 4                     THE COURT:  It's an issue because, when he

 5    performed, it was going to take him an hour to get to the

 6    St. Cloud Airport, if that's where the jet was going to take

 7    off from, to get to Las Vegas?

 8                     MR. CAVE:  That's exactly right.  That airport is

 9    69-and-a-half miles from the club.

10                     THE COURT:  Was there a closer airport that would

11    have eliminated that travel time?

12                     MR. CAVE:  Absolutely.  The Minneapolis

13    International Airport.  There is also one in downtown from

14    St. Paul that was 15 minutes away.

15                     THE COURT:  So this confirmation, as reflected in

16    Exhibit No. 32, was a confirmation to land at St. Cloud?

17                     MR. CAVE:  That's right, Your Honor.

18                     THE COURT:  And take off from St. Cloud.  So in

19    addition to the ETA of 2:45, which is outside the parameters of

20    what the parties understood, there was an additional period of

21    time that may have even pushed that time beyond that if there

22    was a problem getting from the venue to the St. Cloud Airport.

23                     MR. CAVE:  At the coldest Super Bowl in history

24    driving in Minnesota in February, yes.  So assuming the roads

25    were okay --
```

```
 1                    THE COURT:  That's why I don't go to the

 2    Super Bowl.

 3                    MR. CAVE:  But, yes, Your Honor.

 4                    THE COURT:  Okay.  Did Stromberg communicate to

 5    plaintiff that, hey, this confirmation isn't consistent with

 6    what our deal is because it has an ETA of 2:45?

 7                    MR. CAVE:  Yes.

 8                    THE COURT:  In what form?

 9                    MR. CAVE:  There are text messages saying this

10    won't work.  We need information ASAP if we're going to take

11    off.  And I believe they had conversations over the phone as

12    well that he will testify to.

13                    THE COURT:  What's your response to all that?

14                    MR. TOMASULO:  One response with regard to the

15    ground travel is that my clients had arranged a helicopter to

16    address that issue.  So I think that's sort of a red herring,

17    the ground travel.  Like I said, I believe that Mr. Agar and

18    Mr. Lockett will -- I don't think that they're contending there

19    was a problem getting from Los Angeles to Minnesota.  I believe

20    their position is there was a problem with the itinerary

21    provided -- that didn't provide him sufficient confirmation

22    that they could get from Minnesota to Las Vegas on time.

23                    THE COURT:  Right.  That was the important part.

24                    MR. TOMASULO:  Right.  And I believe it was --

25    Mr. Lockett will testify that there was no issue with the plane
```

1    leaving whenever Mr. Scott was done performing.  I believe
2    that -- I believe Mr. Agar will testify that in conversations
3    that that was communicated.
4              THE COURT:  Okay.  Well, I guess that's a factual
5    issue that probably would have precluded me from granting
6    summary judgment.
7              Where did you get the -- I'm addressing Scott's
8    counsel now, Mr. Scott's counsel.
9              Where did you get -- where did the information
10   come from that they -- the plaintiffs didn't have the $50,000
11   in cash to pay the balance of the contract after he performed?
12   I take it it was his understanding he was going to have a bag
13   of cash as soon as he left the stage?
14             MR. CAVE:  That's typical, Your Honor, yes.  If
15   not a bag of cash, it would be given to him at the show,
16   immediately after.
17             THE COURT:  Not Bitcoins.  It would actually
18   be --
19             MR. CAVE:  Right now I don't think Bitcoins would
20   be acceptable, no.
21             THE COURT:  What's the evidence that you have as
22   to why the plaintiffs allegedly did not have the $50,000 to pay
23   him?
24             MR. CAVE:  It came from Mr. Seidman who was
25   another promoter working on the party.  Zach Seidman is the

1   witness's name.  He was there with the gentlemen who formed

2   PJAM.

3               Speaking with them and -- this is getting

4   somewhat into the facts.  But the night before there was

5   another concert at the same venue with two other big hip-hop

6   stars, and that show actually lost a lot of money.  It did not

7   go as planned.  And Mr. Martini admitted that during his

8   deposition.  They actually lost a few hundred thousand dollars

9   that they were planning to recoup, according to them, on

10  Saturday night.  So there was a lot of concern generally about

11  how this event was being run and how much money was being lost.

12              And, in particular, with these issues about not

13  arranging transportation for the main performer, where was this

14  money going to come from?  They were banking on just lots of

15  people showing up at the door even though there had been really

16  minimal ticket sales up until even the day before.

17              So it was a general concern conveyed through

18  Mr. Seidman that things were not going well and they would not,

19  in fact, have the $50,000 in cash.

20              THE COURT:  So it's based upon speculation.

21              MR. CAVE:  That's right, Your Honor.

22              THE COURT:  Okay.  All right.  That's an issue

23  that I have.

24              Then there was something in this -- somewhere

25  that I read in these papers that there was an issue about -- I

1    guess that would go to the breach of the implied covenant.

2    There was disclosure of confidential information.  Apparently

3    Mr. Agar got ahold of TMZ and indicated that Mr. Scott was

4    going to be double booking over the weekend.  That's not in the

5    case anymore, is it?

6             MR. CAVE:  That's not an issue in the case

7    anymore.  The only thing that relates to that that is important

8    for the case is in that article it was disclosed that Mr. Agar

9    was, in fact, aware that Mr. Scott had to be in Vegas by

10   1:00 a.m.  So to the extent plaintiffs took the position that

11   they didn't know that, that article makes pretty clear that

12   they did.

13            THE COURT:  It also has a judicial admission.

14            MR. CAVE:  That's even stronger.

15            THE COURT:  All right.  The big question I have

16   in this case, now that I understand the parties, is the

17   question of damages.  Mr. Scott wants his $50,000 bag of cash

18   which is the balance due under his contract I take it.

19            Is that right?

20            MR. CAVE:  That's right, Your Honor.

21            THE COURT:  And the plaintiff has his damage

22   analysis which has, based upon Mr. Martini's offer of proof,

23   has three components to it.  It totals $850,000.  That's the

24   ticket sales at 600,000; drinks at 100,000; and tables at

25   150,000 for a grand total of $850,000.

1          Is that what the plaintiff is going to seek in

2     this case?

3          MR. TOMASULO:  That's one component, Your Honor.

4     There's also -- I guess it would be an alternative measure that

5     they expended, I think, $1.5 million promoting this event.  And

6     certainly some of that is -- some of the cost would have been

7     attributable to -- a large portion would have been attributable

8     to Saturday night that that money was functionally wasted when

9     Mr. Scott didn't show up.

10          THE COURT:  Well, I don't see that's an issue in

11     the pretrial documents.

12          All right.  Let me give you the good news or the

13     bad news.  I just finished a final status conference with a

14     criminal case, and that criminal case is set to start on

15     Tuesday, April 2nd.  This case is set for April 9.  Based upon

16     the -- the Government thinks that it can conclude its case by

17     Friday, but they are calling some 60 or 70 witnesses.  Although

18     we move pretty quickly in here, I have my doubts as to whether

19     or not the case will be over by Friday although I'm certainly

20     going to push.

21          In terms of your scheduling, at this point in

22     time, I cannot guarantee you an April 9 trial date.  I will do

23     my best.  But given the criminal case -- that just includes the

24     Government's case, doesn't include the defense case although,

25     based upon my final status conference, I'm not sure the defense

1    is going to have -- there is going to be much of a defense.  We

2    will never know -- I never know until the Government rests its

3    case.

4              The hearing we have set for next Friday,

5    April 5th, on the disputed jury instructions and the two

6    motions in limine I will probably be unable to -- I certainly

7    won't be able to conduct a hearing at whatever time it's set

8    for, 10:00 a.m.  I may be able to do it later in the afternoon.

9    Unfortunately on Monday I can't do it.  It may have to wait

10   until the day of trial.  But I am prepared to discuss those

11   motions with you this morning.

12             One of the issues I have with the jury

13   instructions, although they are all agreed to, it seemed to me

14   that what was missing -- and I just looked at this briefly.

15   There really are no elements of breach of contract.  You go

16   right to defining for the jury what a breach is.

17             But it seems to me that -- obviously we are

18   dealing with lay people -- that it would be helpful to have a

19   jury instruction which indicates the first claim for relief and

20   the counterclaim alleged, breach of contract, in order to

21   prevail on that, the following are the elements of a breach of

22   contract:  Contract was entered into, there is no issue because

23   the parties have stipulated there is a contract.  And just go

24   through the elements for them rather than just the way you have

25   done it, No. 26, is just simply define what a breach is which I

```
 1    don't think gives the texture that is -- it's on page 30.
 2              It would be very helpful to the jury even though
 3    I recognize that the whole issue is whether or not there is a
 4    breach.  But all you do is simply define breach.  You don't
 5    have breach as an element of the claim for relief.
 6              So I think that what I'm going to suggest to you
 7    is to get together -- and I don't know.  I'm sure the Minnesota
 8    Practice Jury Instruction Guide has a form instruction like
 9    they do in the CALJICs that lay out what the elements are as a
10    breach of contract.  Am I missing something in these
11    instructions?  Is there a breach of contract instruction?
12              MR. CAVE:  There is not, Your Honor.  For
13    defendants we have no problem adding that.  That makes sense.
14              THE COURT:  All right.  You can add that at your
15    convenience.
16              Let me -- did counsel have any issues they want
17    to -- first of all, I can tell you I think I totaled up the
18    amount of time that you think you're going to have for this
19    case, and the amount of time that you think you are going to
20    have for this case is not -- you are not going to have it here.
21    This case is going to be tried in certainly no more than two
22    days.  I will set some time limits.
23              I think that the joint witness list that you
24    filed had time estimates.  It's a very simple case with very
25    simple issues.  I don't think it's going to take the amount of
```

1    time that you think it's going to take to try this case.  But

2    the next time we meet, I will give you some better time

3    estimates because you have a total of -- I think it was close

4    to 15 or 17 hours to try this case which seems to me to be

5    excessive.  I realize you probably made the estimates because

6    they're estimates.  But I think a lot of these -- if all these

7    witnesses are going to testify, certainly I think many of them

8    are going to be a lot shorter than you think.

9              Do you have any other issues that you want to

10   raise?

11             MR. TOMASULO:  If I may, Your Honor.  My clients

12   are -- at least two of my witnesses have to fly out from

13   New York, and I'm wondering is there a date in the near future

14   that you can provide that will give us more certainty?  I would

15   hate to have them not know as of, say, Friday or something

16   whether they are actually going to have to fly out or not.

17             THE COURT:  Well, let me -- we are down whatever

18   we are down now, nine judges.  So it's -- the U.S. Attorney's

19   Office doesn't appear to realize that, so they keep indicting

20   criminal cases.  At some point in time we are going to have to

21   stop trying civil cases.

22             Let me look over the weekend.  Perhaps I can --

23   rather than have you trail, which is my normal practice,

24   because of the out-of-state witnesses, we can continue the

25   trial, depending upon what I have on the 16th of April which is

1    the following Tuesday.

2                 MR. TOMASULO:  That would be preferable if that

3    could give my witnesses some certainty.

4                 MR. CAVE:  I would need to confirm with my

5    client.  We are absolutely flexible, the attorneys of course.

6    I can confirm quickly for Your Honor.

7                 THE COURT:  Okay.  All these witnesses -- at

8    least the joint witness statement -- indicate they are going to

9    be testifying live; correct?

10                MR. TOMASULO:  Mine will, yes, Your Honor.

11                MR. CAVE:  There is a little bit of deposition

12   testimony we are planning to use for Mr. Martini, the proffered

13   expert.  But he also --

14                THE COURT:  That's cross-examination.

15                MR. CAVE:  He also will be testifying live.

16   Correct, Your Honor.

17                THE COURT:  I have a provision in the Civil Trial

18   Order if you're going to put any testimony by deposition, not

19   impeachment testimony but just direct testimony because the

20   witness is not available, but we are not going to have that.

21   They will all be live.

22                MR. CAVE:  All be live.

23                THE COURT:  All right.  Well, let me give you my

24   views on the motion in limine.  And these are -- I worked up

25   the motions in limine because I knew that this criminal trial

1   was probably going to preclude me from hearing the motions next

2   Friday although it all remains in a state of flux.

3            Motion in Limine No. 2, the defendants seek an

4   order precluding any reference to Mr. Scott cancelling or

5   postponing any other performances.  The defendants argue that

6   this evidence is irrelevant, unfairly prejudicial, and may

7   mislead or confuse the jury.

8            Apparently the defendant wants to examine

9   Mr. Scott on missed or postponed performances in February of

10  2016 in Toronto, August of 2016 in Ireland, October of 2016 in

11  New Zealand.  I don't know if that was a missed or postponed.

12  And then we have an October 2018 Florida postponement,

13  Cleveland and Milwaukee, a 2019 performance in Tulsa, February

14  of 2019 in Buffalo.

15           That apparently, according to the plaintiffs in

16  this case -- I can tell you I don't find that the birth of

17  this -- of the child to be very relevant in this case, nor do I

18  find the fact that he was accused of cheating -- Mr. Scott was

19  accused of cheating which I guess your argument is going to be

20  that's why he canceled or postponed the Buffalo trip.  And then

21  the March 19 double booked at Madison Square Gardens and

22  Indio Festival.

23           The plaintiff argues that these events

24  demonstrate a pattern of putting personal ventures ahead of

25  contractual obligations and last-minute cancelations are

relevant to Mr. Scott's credibility for the reason for not traveling to Minnesota which he claims was the lack of private air travel that would bring him to Las Vegas in sufficient time to meet his 1:30 commitment.

I tentatively conclude that under Rule 403 that this testimony is not going to be admitted.  It seems to me that the defendant may have had contractual rights or other justifications to cancel or postpone those performances that would be perfectly acceptable under the terms of whatever relevant contracts existed for those performances.

So I conclude that the reasons why he canceled or postponed, whichever it is, those performances would involve an undue consumption of time, require an examination of the terms and conditions of each of those contracts, as well as a determination as to whether or not Mr. Scott actually breached all of those -- each of those agreements, all of which would result in, in my view, an undue consumption of time and a potential juror confusion.

I haven't ruled yet, but I can give you my thoughts on these to maybe help you in your trial preparation.

With respect to joint Motion in Limine No. 1, this is the defendant's motion to exclude the testimony of Mr. Martini to the extent he proposes to testify as an expert. I had issued various orders requiring an offer of proof with respect to his testimony.  That offer of proof was filed, and a

joint statement was also filed regarding his testimony, and

that was filed on March -- yesterday, March 28, 2019, and

appears as docket No. 58.

Obviously the -- counsel are -- have been doing

this long enough that we all understand Rule 702 and the

*Daubert* test.  And although it appears that Mr. Martini has a

lot of experience in promoting and putting on shows, concerts,

club openings, and related events, it's my view tentatively

that he does not appear to have reliably applied that

experience to the opinions in this case.  He offers three

opinions.

By way of example, with respect to opinion No. 1,

that PJAM would have sold at least 2,000 general admission

tickets at an average of at least $300 for a total of 600,000,

his opinion appears to be based purely on speculation and hope

and not a sufficient, intellectually rigorous analysis.

Indeed, in forming his opinion, he failed to consider how many

tickets had actually been sold in advance of the event before

Mr. Scott canceled or at the similar event the night before.

Moreover, during the course of his deposition, he

indicated that he could not even testify as to the average

amount that a ticket was selling for on the day before the

event or if PJAM had even sold one ticket at $300.

With respect to opinion No. 2, that PJAM would

have sold at least $50 worth of drinks to each of the 2,000

1   general admission entrance for a total of 100,000 -- and,

2   again, his opinion appears to be based on speculation without

3   any real analysis -- he doesn't offer any facts supporting his

4   opinion as to how many drinks were actually sold at the event

5   or the average number of drinks per person, how many drinks

6   were sold at the same venue the night before or the average

7   sold, what types of drinks were offered for sale, how much each

8   different type of drink would cost.

9              Moreover, based upon his deposition testimony, it

10  appears that tickets were advertised at $150 with a no host bar

11  or 295 with an open bar.  If a ticket costs 300 with an open

12  bar, it is unclear how Mr. Martini could reliably testify that

13  PJAM could expect to obtain $300 per ticket plus $50 in drinks

14  per person.

15             With respect to opinion No. 3, that PJAM would

16  have sold at least 30 tables at an average price of $5,000 per

17  table for a total of 150-, it, again, appears to be based on

18  Martini's speculation.  At his deposition he could not testify

19  as to how many tables PJAM had sold the day before the event

20  and would have to double check whether he sold any tables at

21  $5,000.

22             I rarely exclude expert testimony because it's

23  always been my view that a vigorous cross-examination is the

24  most appropriate way of attacking shaky or expert testimony.

25  However, Mr. Martini's opinions appear to be just the type of

testimony that *Daubert* standard was meant to exclude.  He, as

the principal of PJAM, has an incentive to inflate the revenue

that PJAM would have received.  Cloaked as an expert, the jury

would overly rely on such testimony.

And as the Supreme Court stated in the *GE Joiner*

case at 522 U.S. at 146, "Nothing in either *Daubert* or the

Federal Rules of Evidence requires the district court to admit

opinion evidence that is connected to existing data, only by

the ipse dixit of the expert.  A Court may conclude that there

are simply too great an analytical gap between the data and the

opinion offered."  That was a quote from the *GE* case.

In this case it appears that Mr. Martini relied

on minimal data and that his opinions are connected with that

minimal data only by the ipse dixit of Mr. Martini.

Accordingly, it's my tentative conclusion that the opinions are

not going to be admissible.

So I guess my question for counsel is why this

case hasn't settled.

MR. TOMASULO:  We went to a mediation, and it

just -- we were far apart.

THE COURT:  How far apart are you now?

MR. TOMASULO:  There hasn't been progress since

the mediation.

THE COURT:  Well, how far apart were you at the

mediation?

1        MR. TOMASULO:  A million dollars, something like

2   that.

3        THE COURT:  Okay.  All right.  Well, I suggest

4   that -- I don't really have anything else to go over with

5   counsel.  In fact, I have another criminal case coming in in

6   five minutes.

7        It seems to me that, if you're a million dollars

8   apart, you're a million dollars apart.  I can't imagine that --

9   I have severe doubts whether or not the plaintiff is going to

10  be able to prevail in this case, but that's going to be up to

11  the jury.

12       As far as the damage analysis is concerned, I

13  have given my tentative views.  I was suspicious of

14  Mr. Martini's testimony, and that's why I asked for the offer

15  of proof in the joint statement.  I think my suspicions were

16  confirmed.

17       It's very easy to sit down and figure out, okay,

18  we hope we would have made $850,000, so let me see if I can put

19  that number out there and then work backwards and try to

20  support it.  But he didn't even do that.

21       MR. CAVE:  Your Honor, if I may, we would be

22  happy to waive oral argument on the motions in limine.  I think

23  Your Honor's assessment is consistent with everything I would

24  say during oral argument.  I think a lot of the separation as

25  to numbers was based on testimony that was going to come from

1    Mr. Martini.  So to the extent that a ruling would come down on

2    that issue, I think, from our perspective, that would help to

3    the extent we might have further conversations about how this

4    might get resolved.

5               THE COURT:  Well, I know it's going to help you

6    because you're going to say you're not going to recover any

7    damages.  But are you willing to -- I mean, you know, I

8    understand that Mr. Travis is a well-paid, highly-paid

9    performer.  But he actually didn't perform.

10              So I don't know what a stumbling block would be

11   to give back his whatever it was, $200,000, that was --

12   actually, he only got 150- -- give back $150,000 and try to

13   settle the case that way because there is -- there is exposure

14   for each side with respect to attorney's fees because that

15   indemnity provision, if my memory serves me -- and don't hold

16   me to this -- but I think that would provide both ways.  It

17   provided for the lender, which was the artist as defined in the

18   agreement, and PJAM that, if there were any breach of the

19   agreement, that it looked to me like either side would be --

20   the prevailing party on either side of the dispute would be

21   entitled to recover attorney's fees under that clause.

22              I don't know if anybody has given that any

23   consideration or not.

24              MR. CAVE:  I'd have to look back at the

25   indemnification provision to be honest, Your Honor.  I haven't

```
 1    looked in a while.  I certainly agree that is extra exposure
 2    that needs to be considered, and it is something that we ought
 3    to talk about to see if there is a way to resolve this before
 4    trial.
 5                THE COURT:  Well, I urge you to see if you can
 6    resolve the case although I -- I'm going to show my lack of
 7    understanding of rap music.
 8                THE CLERK:  Coolness.
 9                THE COURT:  My clerk tells me I'm very uncool.
10                Is Mr. Scott -- did he perform at the -- was he
11    in the Super Bowl Halftime Show?
12                MR. CAVE:  This year, yes.
13                THE COURT:  So we're talking about -- he was in
14    2019.  So he didn't go from -- it wasn't anticipated he go from
15    Minnesota to Vegas and Vegas back to the Super Bowl again.
16                MR. CAVE:  Different years.
17                THE COURT:  Whole different year.  All right.
18                But he's the one that actually performed with
19    Adam Levine --
20                MR. CAVE:  That is correct, Your Honor.
21                THE COURT:  -- at the Super Bowl.  So actually
22    that would be -- I'm sure my staff would love to have
23    Mr. Travis come to court and testify.
24                In any event, quite frankly, I think this is a
25    case that should be resolved.
```

```
 1            So let me see if I can accommodate the trial
 2   taking place on April 16th.  Right now you can take the next
 3   Friday hearing on motions in limine and disputed jury
 4   instructions off because, if we continue the trial and we want
 5   to have further argument on those motions, we will do it
 6   sometime before the trial.
 7            If the defendant is good with April 16th, I would
 8   appreciate if -- I'm sorry.  If the plaintiff is good, I would
 9   appreciate if you could check with your witnesses and clients
10   and let Shannon know not later than the end of the day whether
11   or not the 16th is -- or Monday if it's --
12            MR. CAVE:  Certainly by Monday, Your Honor.
13            THE COURT:  By Monday let her know if the 16th is
14   available.  And if it's not available, then what I propose to
15   do is just trail the case and you have everybody here and ready
16   to go.  When the criminal case is concluded, I will call down
17   and get a jury panel, and we will try the case.
18            MR. CAVE:  Thank you, Your Honor.
19            THE COURT:  All right.  Counsel have anything
20   they want to add?
21            MR. TOMASULO:  No.  But just you think you will
22   let us know about the 16th on Monday?
23            THE COURT:  Well, after counsel lets us know if
24   the 16th is available.  I assume you are going to have to check
25   with your people.  Although you are committing for them, I
```

```
 1    think it would be best to make sure that both counsel and all
 2    parties and witnesses are onboard for the 16th.
 3              I'm going to ask you also to confirm that with
 4    Shannon because then, to the extent we need to move things
 5    around on the 16th, I know that I'm moving them for a reason
 6    and that is we are actually going to try the case on the 16th.
 7    I'm not going to do it just for drill because I have a whole --
 8    I have criminal cases back-to-back.  So both counsel will let
 9    Shannon known by noon on Monday if the 16th is okay.  I will
10    then look at my calendar and have Shannon communicate to you
11    whether or not we can do the 16th.  If we can't, then we will
12    be trailing.
13              MR. TOMASULO:  She gave us her cell phone number.
14    Is text the best way to do that?
15              THE COURT:  E-mail.  Unless it's an emergency,
16    e-mail will do it.
17              THE CLERK:  If it's off hours, text.
18              THE COURT:  They are going to do it during
19    business hours sometime on Monday.  I don't want you to give
20    your phone number out.
21              THE CLERK:  If it's during business hours,
22    e-mail.  Anything outside of regular business hours and it's an
23    emergency, text me.
24              MR. CAVE:  One minor question.
25              THE COURT:  Yes.
```

1          MR. CAVE:  This will be, I think, a low-tech

2    trial, but there are some documents that we might want to put

3    up for the jury.  In terms of coordinating technology, what

4    would Your Honor prefer?

5          THE COURT:  Well, we have the technology here.

6    You can make arrangements with Shannon to come in sometime when

7    we are dark -- it's going to be hard because we will be in

8    trial next week -- but to come in and play with the technology

9    to make sure you're not fumbling in front of the jury.

10         MR. CAVE:  If necessary, we will do that.  Thank

11   you, Your Honor.

12         MR. TOMASULO:  Thank you, Your Honor.

13         THE COURT:  Thank you.

14         MR. CAVE:  Thank you very much.

15         (Proceedings concluded at 11:00 a.m.)

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7    THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8    PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9    FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15                             DATED THIS  10TH  DAY OF APRIL, 2019.

16

17

18                             /S/ MIRANDA ALGORRI

19                             MIRANDA ALGORRI, CSR NO. 12743, CRR
                               FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**